```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2               JACKSONVILLE DIVISION

 3  UNITED STATES OF AMERICA,       Jacksonville, Florida

 4          Plaintiff,       Case No. 3:19-cr-109-J-34JRK

 5  -vs-                             October 9, 2019

 6  RONALD LEON BRONNER,            11:09 a.m.

 7          Defendant.              Courtroom 5D
    _____

 8

 9      TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS
           BEFORE THE HONORABLE JAMES R. KLINDT
10              UNITED STATES DISTRICT JUDGE

11

12                  A P P E A R A N C E S

13  GOVERNMENT COUNSEL:

14      Ashley Washington, Esquire
        United States Attorney's Office
15      300 North Hogan Street, Suite 700
        Jacksonville, FL  32202
16

17  DEFENSE COUNSEL:

18      James Glober, Esquire
        Law Office of James Glober, PA
19      422 Jacksonville Drive
        Jacksonville Beach, FL  32250
20

21  OFFICIAL COURT REPORTER:

22      Shelli Kozachenko, RPR, CRR, CRC
        221 North Hogan Street, #185
23      Jacksonville, FL  32202
        Telephone:  (904) 301-6842
24
                    (Proceedings reported by stenography;
25                    transcript produced by computer.)
```

1                  T A B L E   O F   C O N T E N T S

2

3  GOVERNMENT WITNESS:                                    Page No.

4    TASK FORCE OFFICER MATTHEW YARBOROUGH

5        DIRECT EXAMINATION BY MS. WASHINGTON......         9

6        CROSS-EXAMINATION BY MR. GLOBER...........        65

7        REDIRECT EXAMINATION BY MS. WASHINGTON....       113

8        RECROSS-EXAMINATION BY MR. GLOBER.........       114

9

10

11

12      G O V E R N M E N T   E X H I B I T S   R E C E I V E D

13                                                       Page No.

14  GOVERNMENT'S EXHIBIT 2 .........................        17

15  GOVERNMENT'S EXHIBIT 3 .........................        18

16  GOVERNMENT'S EXHIBIT 1 .........................        19

17  GOVERNMENT'S EXHIBIT 4 .........................        24

18  GOVERNMENT'S EXHIBIT 5 .........................        25

19  GOVERNMENT'S EXHIBIT 6 .........................        27

20  GOVERNMENT'S EXHIBIT 7 .........................        28

21  GOVERNMENT'S EXHIBIT 8..........................        50

22

23

24

25

1              P R O C E E D I N G S

2    October 9, 2019                           11:09 a.m.

3                     - - -

4         COURT SECURITY OFFICER:  All rise.  United States

5    District Court in and for the Middle District of Florida is now

6    in session, the Honorable James R. Klindt presiding.

7         Please be seated.

8         THE COURT:  This is the case of the United States of

9    America against Ronald Leon Bronner, Case No.

10   3:19-cr-109-J-34JRK.

11        Ashley Washington represents the United States.

12   James Glober represents Mr. Bronner.  Mr. Bronner's present in

13   the courtroom.

14        We're set for a hearing on Mr. Bronner's motion to

15   suppress evidence, document No. 19, filed on September 30th,

16   2019.

17        The motion was timely filed, as Judge Howard had

18   extended the deadline for filing motions to September 30th,

19   2019, in granting one of the motions to continue the trial.

20        I entered an order on October 1st, 2019, document No.

21   21, setting this for a hearing.  So I set it rather quickly

22   because I didn't want to let too much time pass.

23        I believe this is on the January trial term, but

24   given the various time parameters, I thought it would be best

25   to set this as soon as possible.

1          What I'm going to do, in just a moment -- and this is

2     just by way of overview.  In a moment I'm going to ask

3     Mr. Glober if there's anything that he, at this point, wants to

4     add in terms of his basis for seeking to suppress the evidence

5     in this matter other than what's set out in his motion.

6          And then I'll turn to Ms. Washington and ask her

7     first -- first of all, what the government's position is with

8     respect to Mr. Bronner's standing to challenge the search of

9     the 204 Lane Avenue property, the 4361 Melissa Court West

10    property, and then the recorded video surveillance.

11         And then I'm also going to ask her to provide at

12    least some detail about what evidence the government intends to

13    use that was seized from the two properties that I just

14    mentioned and then also ask her to basically give me the

15    government's position with respect to the issues that have been

16    raised in the motion to suppress and to outline how she intends

17    to proceed with respect to the presentation of evidence.

18         So that's how we'll proceed.  We'll get as much done

19    as we can.  I'm hoping we can get it all done today.  We've

20    gotten a bit of a late start, but we'll plow through and do as

21    much done as we can.

22         So, Mr. Glober, why don't I start with you.  And if

23    you want to add anything at this point -- obviously, after we

24    develop the evidence, we'll set the case over for oral argument

25    at some point, and I may ask for supplemental memoranda, so

1   don't feel compelled to elaborate.

2        But if you'd like to elaborate with respect to

3   anything that you think would be helpful in terms of my

4   understanding the issues, I'd be glad to hear from you now.

5        MR. GLOBER:  Your Honor, I'm not aware of any

6   specific issues.  I would ask for latitude regarding

7   questioning regarding the confidential source.  Although I set

8   out a couple of reasons why I thought that he was not reliable,

9   there may be others.

10        THE COURT:  All right.  Well, we'll -- we'll see

11   where that takes us.  I understand what you're saying.

12        All right.  Well, Ms. Washington, why don't I turn to

13   you now.  And it may be best if you come to the podium because

14   you have a little longer presentation than Mr. Glober.

15        As an initial matter, are you challenging

16   Mr. Bronner's standing with regard to the two properties that

17   were searched or the pole camera?

18        MS. WASHINGTON:  No, Your Honor.

19        THE COURT:  All right.  So the government's conceding

20   that Mr. Bronner has standing to challenge the searches and to

21   challenge the pole camera as he has.

22        All right.  And in terms of the evidence that you

23   intend to use, can you just give me a brief outline of what the

24   evidence is?

25        MS. WASHINGTON:  Sure, Your Honor.

1        At the 204 Lane Avenue, there was drugs.

2   Specifically, the ones that are in the cigar box are the ones

3   that form the basis of the charges, for the two drug charges,

4   the heroin and the cocaine base.

5        And then there's also drug-related paraphernalia and

6   drug sort of cutting equipment that's in both that house and

7   the Melissa Court address.

8        So we would be looking to introduce, of course, the

9   drugs that were found in the cigar box, as well as the pieces

10  or items in the homes that are related to cooking cocaine into

11  cocaine base.

12       Now, there's other information, such as in the 204

13  Lane Avenue, the cigar box is found near shoes that belong to

14  Mr. Bronner, so something like that to further tie those to him

15  would be used.

16       There is a firearm in the Lane Avenue home that was

17  found that we'd be looking to introduce if we were to add an

18  additional gun charge for Mr. Bronner, as well as the firearms

19  that were found in the Melissa Court.

20       THE COURT:  All right.  Well, at least at this point

21  I'm going to operate under the presumption that you would seek

22  to enter the firearms into evidence.

23       I know there was a motion in limine filed.  I

24  think -- just in reviewing that and conferring with Judge

25  Howard's chambers, I think that at this point that is best left

1   for her to decide in terms of what has been requested, the

2   relief requested in that.

3        But we'll assume for the purposes of this hearing

4   that you are going to introduce those, or at least attempt to

5   introduce those items.

6        So does that pretty much sum it up?

7        MS. WASHINGTON:  Yes, Your Honor.

8        THE COURT:  All right.  And then could you just tell

9   me how you intend to proceed?

10        MS. WASHINGTON:  Sure, Your Honor.  I will just be

11   calling one witness, Task Force Officer Matthew Yarborough, and

12   just the exhibits I've provided the Court, which is eight

13   exhibits total.

14        THE COURT:  All right.  Let me just mention this to

15   you.  In terms of the exhibits, I see that you have not listed

16   the -- the application and affidavit for the two residents that

17   were searched.

18        And it has been at least my experience that the

19   government introduces certified copies of the applications and

20   affidavits and the certified copies of the search warrants at

21   the hearing, because obviously the probable cause is at issue,

22   given the issues that were raised.

23        Did you intend to -- to submit those as government

24   exhibits?

25        MS. WASHINGTON:  No, Your Honor.  I don't have those

1    with me today.  I wasn't aware that that was something that

2    we'd typically done.

3            I certainly can obtain them and include them with any

4    sort of briefing.

5            THE COURT:  All right.  Well -- well, we can talk

6    more about that.  I know they're attached to Mr. Glober's

7    motion.

8            But generally speaking, you try to have the

9    suppression hearing as a discrete proceeding that includes all

10   of the evidence so that when Judge Howard reviews this, she'll

11   have the exhibits and she won't have to hunt through the docket

12   to find different things.

13           And then if eventually the Eleventh Circuit has to

14   look at the issue, they'll have a discrete set of exhibits and

15   items.

16           So maybe what we'll do is set a time, I don't know,

17   in the next week or so to reconvene the hearing so that those

18   can be submitted as exhibits in the case.

19           All right.  Well, if there's nothing else, then, you

20   may call your first witness.

21           MS. WASHINGTON:  Thank you, Your Honor.  I'd call

22   Task Force Officer Matthew Yarborough.

23           THE COURT:  All right.  Sir, if you'd approach the

24   witness stand, please.

25           If you'd raise your right hand.

1    Do you solemnly swear the testimony you're about to

2    give will be the truth, the whole truth, and nothing but the

3    truth, so help you God?

4    THE WITNESS:  Yes, sir.

5    THE COURT:  All right.  Thank you.

6    And once you're seated, please, sir, if you would

7    state your first and last name and then spell both your first

8    and last name.

9    THE WITNESS:  My name is Matthew Yarborough,

10   Y-a-r-b-o-r-o-u-g-h.  And Matthew --

11   THE COURT:  All right.  Could you spell your first

12   name, please?

13   THE WITNESS:  M-a-t-t-h-e-w.

14   THE COURT:  All right.  Thank you.

15   You may proceed.

16   MS. WASHINGTON:  Thank you, Your Honor.

17   TASK FORCE OFFICER MATTHEW YARBOROUGH, GOVERNMENT'S WITNESS,

18   SWORN

19   DIRECT EXAMINATION

20   BY MS. WASHINGTON:

21   Q.   Officer Yarborough, where are you currently employed?

22   A.   I'm employed by the Florida Department of Law Enforcement.

23   Q.   What is your position?

24   A.   I am a special agent.

25   Q.   What are your duties in that position?

1    A.    I'm assigned to the organized crime squad, and more

2    specifically, I'm in the Drug Enforcement Administration task

3    force here in Jacksonville.

4    Q.    And how long have you been in that position?

5    A.    At the task force?  I've been there since 2016.

6    Q.    What type of cases do you typically work?

7    A.    Primarily narcotics cases.

8    Q.    What, if anything, did you do prior to joining FDLE?

9    A.    I worked at the Baker County Sheriff's Office for

10   approximately seven-and-a-half to eight years.

11   Q.    What were your duties there?

12   A.    I was a deputy on patrol for four years, and then I was

13   assigned to narcotics investigations for the remainder of my

14   time there.

15   Q.    Turning back to your current position, were you involved

16   in the investigation of Ronald Leon Bronner?

17   A.    Yes, ma'am, I was.

18   Q.    How did you become involved in that investigation?

19   A.    On February 23rd, 2018, I was contacted by Florida Highway

20   Patrol Trooper Joshua Earrey.  Mr. Earrey advised that he had a

21   source of information who had narcotics information relative to

22   a person selling cocaine and heroin in Jacksonville, Florida.

23   Q.    And at some point did you have an opportunity to meet with

24   that source of information?

25   A.    That's correct.  On February 26th, 2018, I met with

1    Trooper Earrey and the source of information at the DEA office

2    in Jacksonville.

3    Q.    Prior to going to that meeting, what, if anything, did you

4    know about that source of information?

5    A.    I knew that he had been providing information to Trooper

6    Earrey regarding other narcotics investigations.  This was my

7    first time meeting him.  I had limited knowledge.

8    Q.    And who was that source of information?

9    A.    That person was Kasper Renard Clayton, who's later

10    referred to as CS-18-157670.

11            THE COURT:  Is that the CS in the affidavit?

12            THE WITNESS:  Yes, sir, it is.

13            THE COURT:  Because there is a CS and a source of

14    information in the affidavit, but this person who you initially

15    said was a source of information later is referred to as the CS

16    in the affidavit?

17            THE WITNESS:  That's correct.  That person was not

18    signed up as a confidential source until he was introduced to

19    me by Trooper Earrey.

20            THE COURT:  That person meaning?

21            THE WITNESS:  The CS, Kasper Clayton.

22            THE COURT:  All right.  Thank you.

23            THE WITNESS:  Yes, sir.

24    BY MS. WASHINGTON:

25    Q.    And what happened during that meeting?

1    A.    Kasper Clayton went over some information that he had

2    related to a subject named Jabo.  That was J-a-b-o, the way it

3    was explained to me.

4          We reviewed the information that he had as far as

5    addresses and telephone numbers.  And I showed an unlabeled

6    photograph of Ronald Leon Bronner to him, and he confirmed that

7    that was Jabo that he was referring to.

8    Q.    And after receiving that information, did you do anything

9    to investigate the criminal history of Mr. Clayton?

10   A.    I did.

11   Q.    And what did you learn?

12   A.    Mr. Clayton had multiple previous narcotics charges.  I

13   don't recall all of them, but I know that there was a vast

14   history of narcotics violations.

15   Q.    And did you have any information at that time that

16   Mr. Clayton was selling drugs?

17   A.    To my knowledge, no.

18          THE COURT:  Let me ask you this.  You said he had a

19   criminal history involving narcotics.

20          How about convictions?  Did you -- did you go through

21   his criminal history and determine how many prior felony drug

22   convictions or any other felony convictions he had?

23          THE WITNESS:  I believe there were convictions.  I

24   don't know the exact number.

25          THE COURT:  But at the time did you -- did you

1    determine that?

2             THE WITNESS:  Yes, sir.  That was verified.

3             THE COURT:  That there were felony convictions?

4             THE WITNESS:  Yes, sir, I believe so.

5    BY MS. WASHINGTON:

6    Q.    And just to be clear, once you met with him and were aware

7    of his criminal history, you didn't have any information, at

8    least at that time, when you had met, that he was currently

9    selling drugs?

10   A.    No, ma'am, I did not.

11   Q.    Following that meeting, what, if anything, did you do to

12   investigate that information Mr. Clayton had given you?

13   A.    We began reviewing addresses that were frequented by

14   Mr. Bronner.  A lot of that was based off of the information

15   provided by the confidential source.

16            We were able to verify that he did indeed frequent

17   4361 Melissa Court, and we believed that to be his residential

18   address.  We were able to confirm that he was also visiting and

19   residing at -- partially at 204 Lane Avenue South at that time.

20            THE COURT:  But how did you do it?  See, that's one

21   of the things in your affidavit, is there's a lot of

22   information, but the basis of the knowledge isn't listed.

23            So when you say you figured out 4361 was where he was

24   staying, when you figured out this other stuff that you just

25   said, how did you do that?  What was your -- what was your

1    basis of knowledge or your source of information to determine
2    those things?
3              THE WITNESS:  We began doing surveillance at those
4    locations and identified Mr. Bronner and a vehicle that was
5    described by the CS at those locations as well.
6              THE COURT:  All right.  And how -- how, again, did
7    you determine that this person that was described as Jabo was
8    actually Mr. Bronner?
9              THE WITNESS:  Based on his -- different -- I believe
10   his driver's license address, his probation address, everything
11   came back to 4361 Melissa Court.
12             THE COURT:  All right.
13             Go ahead.
14   BY MS. WASHINGTON:
15   Q.   Now, you just mentioned physical surveillance.
16             Where were you guys doing physical surveillance?
17   A.   At 4361 Melissa Court and also 204 Lane Avenue South.
18   Q.   And when we talk about physical surveillance, what
19   specifically were you doing?
20   A.   It involves following subjects in traffic in their
21   vehicles, parking down the street, keeping an eye on their
22   house, seeing what we can see from public areas.
23   Q.   And for -- let's start with the 204 Lane Avenue one.
24             What exactly were you doing to look at that specific
25   address?

1    A.    We would park in the area and also conduct numerous

2    drive-bys to observe who was coming and going from that

3    address, and also identifying those people and trying to

4    determine if they were traveling between those two points of

5    interest, which would be the residence on Melissa Court and

6    also the house on 204 Lane Avenue.

7    Q.    And did you see Mr. Bronner at 204 Lane Avenue?

8    A.    Yes.

9    Q.    And the Melissa Court address?

10   A.    Yes.

11   Q.    And you talked about the Lane Avenue and what you did

12   there.

13          What could you do at the Melissa Court address in

14   terms of physical surveillance?

15   A.    We were very limited there.  It's a small, I would say,

16   residential area.  There's a cul-de-sac just past his house.

17   Anytime that you drive past that location, you're required to

18   turn around and drive back past that location.

19          Twice I attempted surveillance on that for -- I would

20   say I attempted to do several hours and was approached by

21   neighbors looking into my windows and walking around my truck,

22   wondering, I assume, what I was doing in that area.

23   Q.    And in looking at the Melissa and the Lane Avenue, did you

24   have the same challenges in looking -- doing physical

25   surveillance at the Lane Avenue address?

1    A.    No, I did not.  Lane Avenue is a very busy four-lane

2    highway in front of the house.  Especially in the morning and

3    evening hours with traffic, it was very easy to blend in in

4    that area.

5              And there was also a business across the street that

6    I was able to park in their driveway the majority of the time

7    to get a good view of the house.

8              THE COURT:  Is that the 204 Lane Avenue or the 137

9    Lane Avenue?

10             THE WITNESS:  137 is just past that location, but it

11   was also accessible from repeated drive-bys.

12             THE COURT:  All right.  We probably ought to refer to

13   the Lane Avenue by the number since there are two places on

14   Lane Avenue that are mentioned in the affidavit.

15             Go ahead.

16   BY MS. WASHINGTON:

17   Q.   For the physical surveillance at the 204 Lane Avenue, was

18   that the only one you were doing physical surveillance at, or

19   was it at the 137 Lane Avenue as well?

20   A.   They were -- they were both in close proximity and

21   accessible from Lane Avenue.  We were doing surveillance on

22   both.

23             MS. WASHINGTON:  Your Honor, may I approach?

24             THE COURT:  Yes.

25   BY MS. WASHINGTON:

1   Q.    I've just handed you Government's Exhibits 2 through 8.

2   Direct you to Exhibit 2.

3          Do you know what this is?

4   A.    Yes, ma'am.  This is a map of the area of 4361 Melissa

5   Court West.

6   Q.    And can you describe to us what we're looking at?

7   A.    It's a Google Maps aerial photo.

8   Q.    And you talked before about this cul-de-sac and this, I

9   think, subdivision.

10         Can you kind of give us an idea of what we're looking

11  at here in terms of where that address is in the neighborhood?

12  A.    Yes, ma'am.  This is close to Wilson Boulevard, to give a

13  good reference, and then the intersection of Ricker Road and

14  Old Middleburg.

15         Melissa Court is attached -- Melissa Court North is

16  attached to Ricker Road, which leads to Melissa Court West,

17  where Mr. Bronner's residence is located.

18         MS. WASHINGTON:  Your Honor, at this time I'd ask to

19  admit Government's Exhibit 2.

20         THE COURT:  Is there any objection?

21         MR. GLOBER:  No objection, Your Honor.

22         THE COURT:  All right.  Government's 2 will be

23  received.

24     (Government's Exhibit 2 was received in evidence.)

25  BY MS. WASHINGTON:

1    Q.    Please turn to the next one, Government's Exhibit 3.

2    A.    (Complies.)

3    Q.    Do you know what this is?

4    A.    Yes, ma'am.  This is a -- the same location and the same

5    type of Google Earth photo but from a -- I guess a more distant

6    view.

7    Q.    And can you tell us generally about this area in terms of

8    the Melissa Court address relative to the things around it?

9    A.    It's closer to the intersection of Old Middleburg Road and

10   Ricker Road in a residential area.

11         MS. WASHINGTON:  Your Honor, at this time I'd ask to

12   admit Government's Exhibit 3.

13         THE COURT:  Is there any objection?

14         MR. GLOBER:  No objection, Your Honor.

15         THE COURT:  All right.  Government's Exhibit 3 will

16   be received.

17      (Government's Exhibit 3 was received in evidence.)

18   BY MS. WASHINGTON:

19   Q.    Now, you indicated you were doing multiple things to

20   essentially verify and further your investigation of the

21   defendant.

22         What were other things besides physical surveillance

23   that you were doing?

24   A.    On March 5th we placed a recorded call from Mr. Clayton's

25   phone to Mr. Bronner, and during that call the CS negotiated

1  the price of what we believed to be 1 ounce of heroin.

2  Q.   And have you had an opportunity to listen to Government's

3  Exhibit 1?

4  A.   Yes, I have.

5  Q.   And is that exhibit this phone call that you just

6  referenced?  Is that in front of you as a disc that you

7  listened to earlier this morning?

8  A.   Yes, ma'am, it was.

9         MS. WASHINGTON:  Your Honor, at this time I'd like to

10  introduce Government's Exhibit 1 into evidence.

11         THE COURT:  Is there any objection?

12         MR. GLOBER:  No objection, Your Honor.

13         THE COURT:  All right.  Government's Exhibit 1 will

14  be received.

15      (Government's Exhibit 1 was received in evidence.)

16         MS. WASHINGTON:  And at this time I'd ask to play

17  Government's Exhibit 1.

18         THE COURT:  All right.  Are you doing that, or is she

19  doing that?

20         COURTROOM DEPUTY:  She's doing it.

21         THE COURT:  All right.  Go ahead.

22      (Audio played.)

23  BY MS. WASHINGTON:

24  Q.   Who was on that call that we just listened to?

25  A.   That was Kasper Clayton and Mr. Ronald Bronner.

1    Q.    And what was the purpose of that call?

2    A.    The purpose of that call was to, one, make contact, and it

3    also corroborated the confidential source's testimony that he

4    or she could purchase narcotics from Mr. Bronner.

5           We later used that interaction to also obtain a cell

6    phone ping based on the phone being utilized to coordinate the

7    sale of narcotics.

8    Q.    So in looking at -- or in listening to that call, there's

9    talk of "LeBron James."

10          What was being discussed during that call?

11   A.    In our initial debrief, in addition to the addresses, the

12   homes, the hotels that were identified, Mr. Clayton also stated

13   that when speaking on the phone, Mr. Bronner likes to use heavy

14   code words, things of that nature, to disguise what the two

15   individuals are talking about when speaking.

16          On this particular case, you can see that the CS

17   initially called it "LeBron James."  Mr. Bronner sounded

18   confused at that point, then referred to it as "up on 28th

19   Street" and ended up with the code name "dog food."

20          And based on the -- asking for the ounce and the

21   price, we believe that to be consistent with the price of

22   heroin.

23   Q.    And there's reference to something like "clean clean."

24          Do you know what that was referencing?

25   A.    Correct, which is also another street-slang term.

1  Q.   Is it unusual to hear code words when people might be

2  discussing a drug transaction over the phone?

3  A.   Throughout every case that I've ever encountered,

4  individuals try to limit their exposure on telephones and

5  often, if not always, use code words for hat.

6          THE COURT:   What is "clean" a reference to?

7          THE WITNESS:   "Clean clean" in this particular case

8  was what we believed Mr. Bronner would be referring to as

9  heroin.

10 BY MS. WASHINGTON:

11 Q.   Now, you indicated that there was a ping as a result of

12 that phone call.

13          What was that ping on, what line?

14 A.   It was on the cellular telephone possessed by Mr. Bronner

15 at that time.

16 Q.   And what did you learn from that ping?

17 A.   That Mr. Bronner was visiting the locations of Melissa

18 Court West and I believe also the 204 address.

19          I'm not -- at some point, Mr. Bronner's

20 phone coverage changed providers, I believe, and that line was

21 ended.  So I believe it was during the initial period that we

22 learned those locations.

23 Q.   And how did that information further your investigation?

24 A.   It also further corroborated what we were seeing as far as

25 the addresses that he was frequenting and also let us know what

1  time that he was moving in between those two places.

2  Q.    Now, after doing the ping and this physical surveillance,

3  did you use any other investigative techniques to further your

4  investigation?

5  A.    We continued using mobile surveillance, primarily in the

6  area of 204 Lane Avenue and also 137, where we continued to

7  make the same observations.

8  Q.    And at some point was the decision made to try to obtain a

9  pole camera?

10  A.    Yes, it was.

11  Q.    And when did you decide to use that method?

12  A.    I would say the middle of March.  I know the camera went

13  up -- I believe March 16th is when the footage started being

14  recorded.

15        So I would say several days prior to that I would

16  have made the request to the FDLE -- ESST is what we refer to

17  them as.  It's the Electronic Surveillance Support Team, who

18  are responsible for installing and maintaining those cameras.

19  Q.    And why did you want to use a pole camera?

20  A.    As I stated before, the two times that I'd tried to do

21  surveillance at that location and due to only being able to do

22  drive-bys and to prevent my vehicle from being identified as

23  frequenting both the 204 -- or Lane Avenue houses and the

24  Melissa Court house, it was my decision that a pole cam would

25  prevent me from being exposed on surveillance in that area.

1    Q.    And you indicated something about an electronic

2    surveillance team at FDLE.

3            Are they the ones that pick where it gets installed

4    after your request is made?

5    A.    That is correct.  There are several factors that go into

6    that, depending on the type of camera being installed.

7            This particular case, I don't believe there were

8    power lines in Mr. Bronner's area, so a lighting fixture, which

9    I would say is -- I don't know how tall, seven, eight foot tall

10   on the sidewalk across the street was used for the installation

11   of that camera.

12           THE COURT:  Do you -- do you have any record that

13   would show the date that the pole camera was activated?

14           THE WITNESS:  The beginning of the footage that was

15   stored on the server that we provided the copies of, that is

16   the date that I received.

17           I could look back at my e-mail and say when I was

18   told that the camera was up and functioning so that I could log

19   in, but as far as a written receipt or anything like that, no,

20   sir.

21           THE COURT:  All right.  It just happens one of the

22   things courts look to is exactly how long a pole camera has

23   been operating, and so that's why I'm asking about the specific

24   date of when it was activated.

25           And then I would ask the same question about when it

1  was deactivated so that I might know how long it was actually

2  operating.  That's why I'm asking the question.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Go ahead.

5  BY MS. WASHINGTON:

6  Q.   And what was the exact location in terms of what was the

7  pole camera installed to view?

8  A.   The front area of Mr. Bronner's home.

9  Q.   At this time I'd like you to refer to Government's Exhibit

10 4.

11 A.   (Complies.)

12 Q.   Do you know what that is?

13 A.   Yes, ma'am.  This is the -- a Google street view of

14 Mr. Bronner's residence at Melissa Court.

15 Q.   And was this consistent with what you had seen in your

16 attempts to do physical surveillance?

17 A.   Yes.

18          MS. WASHINGTON:  Your Honor, at this time I'd like to

19 admit Government's Exhibit 4.

20          MR. GLOBER:  No objection, Your Honor.

21          THE COURT:  All right.  Government's Exhibit 4 will

22 be received.

23      (Government's Exhibit 4 was received in evidence.)

24          THE COURT:  Where did you get this picture?

25          THE WITNESS:  This is a Google street view, same as

1  on the applications for phones, is where this picture

2  originated.

3          THE COURT:  All right.

4  BY MS. WASHINGTON:

5  Q.   I'd like to turn you to Government's Exhibit 5.

6  A.   (Complies.)

7  Q.   And what are we looking at here?

8  A.   This is a -- footage that shows the angle of the pole

9  camera and also the area that it was capturing at this time,

10  the front of his home.

11          MS. WASHINGTON:  Your Honor, at this time I'd like to

12  admit Government's Exhibit 5 into evidence.

13          THE COURT:  Is there any objection?

14          MR. GLOBER:  No, Your Honor.

15          THE COURT:  Government's Exhibit 5 will be received.

16      (Government's Exhibit 5 was received in evidence.)

17  BY MS. WASHINGTON:

18  Q.   So would this have been a picture that was of the actual

19  outside that you could see from looking at that camera?

20  A.   Yes, ma'am.  There were options to pan and zoom as well,

21  but at the particular time that this photograph was taken, this

22  was the view of that camera.

23  Q.   Would you be able to move that camera to observe the other

24  homes in the area?

25  A.   Yes, ma'am.

1  Q.    And would that be all homes in the neighborhood, or what

2  homes could you see from moving the camera?

3  A.    I would -- just my -- I don't remember exactly, but I

4  would say, based on my experience and uses of a camera, just

5  all homes within view from that particular point.

6  Q.    And was that a stationary camera?

7  A.    Yes, ma'am, it was.

8  Q.    You indicated pan or zoom.

9         Why would you have been using pan or zoom with that

10 camera?

11 A.    Sometimes, just based on the quality of the image, which

12 can sometimes be very poor, we're able to look in and zoom on

13 tags and also persons to identify them.

14 Q.    Could you zoom in to see inside windows?

15 A.    This particular case, I don't recall being able to do that

16 at all with Mr. Bronner's house.

17        As you can see in this photograph, it appears there's

18 blinds, and also the quality of the image is pretty poor most

19 of the time.

20 Q.    If you'd turn to Government's Exhibit 6.

21 A.    (Complies.)

22 Q.    Do you know what this is?

23 A.    Yes, ma'am.  This is a closer view of the same residence

24 at Melissa Court and also a vehicle and its tag standing in the

25 driveway.

1   Q.   So would this have been an example of something the camera
2   might have been used to zoom into?
3   A.   Yes, ma'am.
4   Q.   And these options here, pan, tilt, and zoom, are those the
5   extent of what you can move the camera?
6   A.   Yes, ma'am.
7        MS. WASHINGTON:  Your Honor, at this time I'd like to
8   admit Government's Exhibit 6 into evidence.
9        THE COURT:  Any objection?
10       MR. GLOBER:  No objection.
11       THE COURT:  Government's Exhibit 6 will be received.
12    (Government's Exhibit 6 was received in evidence.)
13  BY MS. WASHINGTON:
14  Q.   If you'd turn to Government's Exhibit 7.
15  A.   (Complies.)
16  Q.   Do you know what that is?
17  A.   Yes, ma'am.
18  Q.   And what is that?
19  A.   This is a photograph taken of the camera footage that
20  shows Mr. Bronner using the telephone in front of Melissa
21  Court.
22  Q.   And there appears to be some box to the right of that.
23       What is that there?
24  A.   It appears to be --
25  Q.   Is it a clock?

1   A.    -- a small wooden box or a package.

2   Q.    And it -- also here, it looks like there's just some sort

3   of clock.

4         Is that something that's in the pole camera system?

5   A.    Yes, ma'am.  Looking at the footage, a lot of times the

6   clock will populate and will show you the time and date of when

7   that occurred.

8         MS. WASHINGTON:  Your Honor, at this time I'd like to

9   move Government's Exhibit 7 into evidence.

10        THE COURT:  Is there any objection?

11        MR. GLOBER:  No objection, Your Honor.

12        THE COURT:  Government's Exhibit 7 will be received.

13      (Government's Exhibit 7 was received in evidence.)

14  BY MS. WASHINGTON:

15  Q.    For the pole camera, was there any sound to any of this

16  footage?

17  A.    No, ma'am.

18  Q.    Was there any sort of setting that allowed you to see at

19  night when using the camera?

20  A.    It has infrared capability.  I would hate to rely on it

21  for anything important.

22        As you can see from the footage that was provided, at

23  nighttime it's very blurry.  If there's any kind of

24  backlighting, a lot of times it will prevent the camera from

25  being able to focus.  So it's hit or miss, but it does have the

1    capability.

2           THE COURT:  Did you use the capability, though, is

3    the question.  Did you try to use it, or did you use the --

4           THE WITNESS:  Yes, sir.

5           THE COURT:  -- infrared?

6           THE WITNESS:  We tried to use it, yes.

7           THE COURT:  Would this -- Government's Exhibit 7 be

8    an example of when it was used?

9           THE WITNESS:  Yes, sir.

10   BY MS. WASHINGTON:

11   Q.   Was it possible to search all the pole camera footage, for

12   example, for either a license plate or a car color or anything

13   of that nature?

14   A.   No, ma'am.

15   Q.   Was there a log that was created that was searchable in

16   any way?

17   A.   It's a constant recording from start to finish, and I'm --

18   it's just like the CDs that were turned over as evidence.  You

19   have to manually search through a period of time to try to find

20   an event that may pique your interest.

21          To save room on the server, the camera's motion

22   activated, so it also depends on the weather.  Sometimes if

23   it's very windy, it will pick up large amounts of coverage when

24   there's nothing going on.

25          But for the most part, like I said, to save recording

1  room, it tries to only record when there's movement.

2  Q.    What was the means or sort of the technology that

3  transmitted that information about the pole camera's footage to

4  you or to a server generally?

5  A.    It's my understanding that the camera transmits via a

6  cellular connection, kind of like a phone, to a server that's

7  housed and controlled by FDLE.

8          I have a username and password that allows me to log

9  in to that server and view the footage.

10 Q.    So given there's the cellular usage or service of that

11 pole camera, were there times when it wasn't transmitting or

12 there were problems with the service?

13 A.    They routinely go down.  With any kind of network issue,

14 bad weather, things of that nature, it's very common for those

15 to stop transmitting, at which time it would just say "unable

16 to connect with camera" or something along those lines.

17         THE COURT:  Yeah.  I think the -- the question is,

18 though, what about this case?  Did it happen in this case?  Do

19 you know if it happened in this case?  I mean, things can

20 commonly happen --

21         THE WITNESS:  Yes, sir.

22         THE COURT:  -- but we're focused on not what commonly

23 happens.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  We're focused on what happened in this

 1    case.

 2            THE WITNESS:  I can't recall a specific incident, but

 3    I would be willing to bet that it did occur multiple times, as

 4    can be concluded by the footage.

 5            THE COURT:  And you say that because that's been your

 6    experience in the past?

 7            THE WITNESS:  Yes, sir.  I would -- I would expect

 8    there to be multiple instances where there are breaks in

 9    coverage, as I review the footage.

10            THE COURT:  I'm sorry?

11            THE WITNESS:  I said as I review the footage, I would

12    assume that there would be multiple breaks in time, in

13    coverage.

14            THE COURT:  Well, but you did review the footage,

15    though, in this case, correct?

16            THE WITNESS:  Your Honor, I viewed specific parts of

17    this footage, but I would say that there are vast areas that

18    haven't been reviewed in their entirety, just based on time.

19            It's a very tedious task, and with the length of

20    the -- the duration of usage of the camera, I know for a fact

21    there are probably a substantial, large amount that haven't

22    been reviewed.

23            THE COURT:  All right.  But of what you did review,

24    was there an interruption in the service, or in what you

25    reviewed, was the -- was the transmission constant?

1    THE WITNESS:  I don't recall a specific incident

2  where there wasn't coverage --

3    THE COURT:  All right.

4    THE WITNESS:  -- I think, would be my best honest

5  answer.

6    THE COURT:  Go ahead.

7  BY MS. WASHINGTON:

8  Q.    And from what you were able to see from the pole camera

9  footage you observed, was anything that you saw different from

10  the view you had those two times you attempted physical

11  surveillance?

12  A.    Not necessarily.  Like I said, it prevented me from being

13  exposed, but had I -- and it's, I would say, elevated higher

14  than I would sit on the street.

15    But if I were to park in that same area, I believe it

16  would be the same view that I would have myself, if not more

17  limited, just based on the span of coverage that the camera

18  provides.

19  Q.    How did the information you got from the pole camera aid

20  you in your investigation?

21  A.    With this particular case, with us looking at multiple

22  locations, it allowed me to be -- to have a view of that house

23  while also being at the other location.

24    Just an example, if I were parked at 204 Lane Avenue

25  South, I could see Mr. Bronner depart and wait till his arrival

1  at 204 Lane Avenue.

2  　　　　THE COURT:  You could see him depart Melissa Court

3  based on looking at the --

4  　　　　THE WITNESS:  The camera.

5  　　　　THE COURT:  -- pole camera?

6  　　　　THE WITNESS:  Yes, sir.

7  　　　　THE COURT:  All right.

8  　　　　THE WITNESS:  And also if we were following him back

9  to that location, I would be able to observe him arrive at the

10 house without having to drive near his residence.

11 BY MS. WASHINGTON:

12 Q.   Meaning you were able to observe him return to the Melissa

13 Court residence without having to drive there?

14 A.   Correct.

15 Q.   In addition to the pole camera, what other techniques were

16 you using to further your investigation?

17 A.   As I said, we were using take-aways.  We had two persons

18 that were pulled over leaving the 204 Lane Avenue address.  We

19 had multiple surveillance operations there, which we have

20 photographs of.

21 　　　　We were able to identify associates that were

22 identified by the confidential source of Mr. Bronner's.  Two,

23 for example, were David Sutherland and Alexis Daughtry.

24 　　　　During our debrief, Ms. Daughtry was described as

25 operating Mr. Bronner's narcotics business in his absence and

1   also maintaining the residence at 204 Lane Avenue and also, in

2   the past, hotel rooms at the hotel next door.

3          THE COURT:  Did you say -- was any of that included

4   in the affidavit?

5          THE WITNESS:  In the search warrant affidavit?

6          THE COURT:  Yes.

7          THE WITNESS:  I believe so, Your Honor.

8          Yes, sir.  Beginning of the paragraph on February

9   26th, it describes the debrief, and it describes the residence

10  at Melissa Court and also the hotel room at 460 Lane Avenue

11  South and also . . .

12         THE COURT:  Well, I might have misunderstood what you

13  just testified to.  I thought you were testifying to -- about

14  what other persons, other than the original CS -- the

15  information that you learned from the original CS.

16         THE WITNESS:  I was -- it was corroborated by our

17  observations there.

18         Mr. Clayton had identified persons who were

19  associated with Mr. Bronner, and we observed them physically at

20  those locations as he described and also were able to ID them

21  as the persons he described.

22         THE COURT:  All right.  But what I'm saying is the

23  information about those persons and that you were able to

24  verify that those persons were who they said they were, that's

25  not included in the affidavit though.

1        THE WITNESS:  No, sir, I don't believe so.

2        THE COURT:  Okay.

3        THE WITNESS:  Not by name.

4        THE COURT:  Well -- so if you're looking at that

5   paragraph, and this is -- we don't have -- we don't have an

6   exhibit number because this -- the search warrant and affidavit

7   aren't in evidence, so I can't refer to an exhibit.  We'll

8   refer to your affidavit --

9        THE WITNESS:  Yes, sir.

10        THE COURT:  -- that will sometime be submitted as an

11   exhibit.

12        The affidavit for both Melissa Court and 204 Lane

13   Avenue are identical.  Is that correct?

14        THE WITNESS:  Except for the description for the

15   driving directions and minor details for the addresses, yes.

16        THE COURT:  All right.  So when you go to the

17   paragraph that starts February 26, 2018, in the affidavit,

18   that's the same in both affidavits.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Right?

21        THE WITNESS:  I mean, I believe so.  I have both.

22        THE COURT:  And so when you're talking here with the

23   CS, with the CS-18-157670, that's the person who you've now

24   identified by name.

25        THE WITNESS:  Yes, sir.  That's correct.

1    And to answer your question about my observations, if

2    you will look on March 27th, 2018, 9:37 a.m., I observed

3    Mr. Bronner exit and enter the passenger door of a vehicle.

4    That vehicle was occupied by David Sutherland, who

5    was also, I believe, the renter of that vehicle, and was the

6    events that I -- one of the events that I was referring to as

7    far as identifying those persons as described by the CS, just

8    not as -- not listed by name in the affidavit.

9    THE COURT:  Yeah.  I guess -- I guess what I'm trying

10   to get at, though, is in the affidavit you did not tie the CS's

11   information to your observation.

12   You're telling me that now --

13   THE WITNESS:  Yes, sir.

14   THE COURT:  -- and you're testifying to it.  I may be

15   missing it.  That's why I'm asking the question.

16   But anywhere in that paragraph do you say, "This

17   corroborated the CS because it's the same person the CS told me

18   was doing X, Y, and Z."

19   THE WITNESS:  And I didn't understand your question.

20   That is correct, Your Honor.

21   THE COURT:  So I'm correct --

22   THE WITNESS:  That is not in the affidavit.

23   THE COURT:  All right.  That's not in the affidavit.

24   THE WITNESS:  Yes, sir.

25   THE COURT:  That's what I was trying to get at

1   because you're testifying to a lot of information that you --

2   that you have done and a lot of the steps you took in your

3   investigation, and that's all fine, and it's very interesting.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  But when the Court has to decide probable

6   cause, I'm locked in --

7              THE WITNESS:  Yes, sir.

8              THE COURT:  -- and I can't consider anything outside

9   the four corners of this affidavit.

10             THE WITNESS:  I understand that.

11             THE COURT:  And so the CS's credibility has been

12  called into question by the defendant, and so I'm trying to

13  focus on what's in the affidavit that corroborated the CS.  And

14  that's why I wanted to make sure I didn't miss that you had

15  tied those together.

16             THE WITNESS:  Yes, sir.  I understand.

17             THE COURT:  So that you know why I'm asking that.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  It's not a random question.  It's related

20  to the affidavit.

21             THE WITNESS:  Thank you.

22             THE COURT:  All right.  Go ahead.

23  BY MS. WASHINGTON:

24  Q.   Going to the search warrant and the affidavit, at some

25  point you determined that you were ready to seek a search

1  warrant.  Why?

2  A.   Based on the observations that we had and also the two

3  take-aways that we had, when narcotics were recovered from

4  persons leaving that location, one such person who identified

5  Mr. Bronner as distributing narcotics at that location, we

6  believed we had the -- based on the affidavit, we believed we

7  had the probable cause necessary to obtain a search warrant for

8  that location.

9            THE COURT:  When you're saying at that location --

10           THE WITNESS:  I -- yes, sir.

11           THE COURT:  -- at that location -- there are two

12  locations.  Which one are you talking about?

13           THE WITNESS:  204 Lane Avenue South, 137 Lane Avenue

14  South, and also 4361 Melissa Court.

15           THE COURT:  So locations.

16           THE WITNESS:  Yes, sir, multiple.  Three in total.

17           THE COURT:  All right.

18  BY MS. WASHINGTON:

19  Q.   And it sounds like you've recently reviewed the affidavit

20  for all three of those?

21  A.   Yes, ma'am.

22  Q.   The part of the affidavit referencing a recorded phone

23  call, that was the call that was introduced as Exhibit 1?

24  A.   Yes, ma'am, it is.

25  Q.   There's a reference to a March 15th, 2018, meeting with a

1    CS and a JSO source of information.

2            MS. WASHINGTON:  It's on 00090 of the affidavit for

3    the Court.

4            THE WITNESS:  Yes, ma'am.  I have it.

5    BY MS. WASHINGTON:

6    Q.    Do you recall reviewing that part of the affidavit?

7    A.    Yes, I do.

8    Q.    And the CS that's referenced, that's Mr. Clayton, correct?

9    A.    That's correct.

10   Q.    Who is the JSO source of information?

11   A.    His name was Quentin Gavin.

12   Q.    And is Mr. Gavin related to Mr. Clayton?

13   A.    I believe they are distant cousins.

14   Q.    And this meeting, was the purpose of that meeting to talk

15   about the defendant?

16   A.    It was -- it ended up being a small portion of that

17   meeting.  There were other JSO investigations that were the

18   primary focus of that meeting.

19   Q.    Do you know if either Mr. Clayton or Mr. Gavin had any

20   animosity toward the defendant?

21   A.    Mr. Gavin I know for a fact did.

22   Q.    And why do you say that?

23   A.    Mr. Gavin explained a situation between he and Mr. Bronner

24   where a female who had a relationship with both of them became

25   pregnant with his child and said that Mr. Bronner had paid for

1    her to have an abortion.

2            And I guess the two had been exchanging words or

3    threats toward each other during that time.

4    Q.    As a result of the animosity between Mr. Gavin and the

5    defendant, did you make a decision as to whether you could use

6    Mr. Gavin as a source of information?

7    A.    I chose not to attempt to use Mr. Gavin.

8    Q.    Why not?

9    A.    Due to his hatred for Mr. Bronner and the possibility of

10   violence erupting between the two, I didn't want to be

11   responsible or liable for anything that would occur, and also

12   didn't feel that it would aid our investigation and deal with

13   a -- what I would call a headache.

14           THE COURT:  When -- when you say you didn't use him,

15   you mean you didn't want to use him proactively, for instance,

16   to try to make an undercover buy?

17           THE WITNESS:  Yes, sir.  We didn't want to use him as

18   a confidential source.

19           We obtained what information he provided at this

20   particular meeting, but we did not attempt to solicit any other

21   information from him.

22           THE COURT:  But you did use his information in

23   drafting the affidavit, and what he told you is included in the

24   affidavit.

25           THE WITNESS:  Yes, sir, it is.

1    THE COURT:  And that's -- and he's what's referred to

2    as the SOI, or the source of information.

3    THE WITNESS:  Correct.  He was there with

4    Mr. Clayton.  As far as the information that the source of

5    information provided, as far as his hatred between the two, I

6    can't say that it aided the investigation or provided necessary

7    information for this affidavit.

8    The CS provided the information as far as

9    Mr. Bronner's new location, the 204 Lane Avenue --

10   THE COURT:  What --

11   THE WITNESS:  -- and also --

12   THE COURT:  Yeah.  What -- where are we now, what

13   paragraph?

14   THE WITNESS:  I'm on March 15th, page 4, listed on

15   the affidavit.

16   MS. WASHINGTON:  Your Honor, this is document 19-1,

17   page 4.  It says 00090 in the right-hand corner.

18   THE COURT:  All right.  Let me just ask you about

19   that, because you say that it was the CS who said that the --

20   that the operation had moved?

21   THE WITNESS:  Yes, sir.

22   THE COURT:  But your affidavit says the CS and SOI

23   stated that Bronner had moved his business.

24   So in the affidavit at least, you allege that both of

25   them provided the information.

1          THE WITNESS:  Yes, sir.  And my reasoning for that,

2     both persons were interviewed at the same time.  Mr. Gavin was

3     also very familiar with Mr. Bronner's operations.  His

4     information, I would say, is the exact same as that provided by

5     the CS.

6          As far as differentiating the two, I can't say that

7     there was a difference or he had anything that the CS did not

8     have.

9          THE COURT:  Well, did the source of information know

10    that Mr. Bronner had moved his business from the Knights Inn

11    hotel?

12         THE WITNESS:  He was there as we discussed that, and

13    I would say agreed with because he did not offer any different

14    details from that, if that makes any sense to you.

15         THE COURT:  So you assumed he -- you assumed --

16    because he didn't say, "I don't know," or, "I don't know that

17    information," you assumed that the SOI knew that?

18         THE WITNESS:  Based -- based on his knowledge of

19    Mr. Bronner, the two females -- I know during that conversation

20    the female in question that had the abortion was accused of

21    staying or reportedly staying at the Lane Avenue house and

22    frequenting there.  So that, to me, verifies his knowledge of

23    that location being used.

24         But throughout this investigation, the majority of

25    the information obtained by myself came from the confidential

1   source.

2          THE COURT:  Well, let me -- let me keep asking you

3   about -- let me ask you about the next part of this, because

4   you say, "The CS and SOI stated the 204 Lane Avenue South was

5   used primarily as a point of sale for small, street-level

6   amounts of heroin, and 137 Lane Avenue South was used as a

7   point of sale for larger quantities of narcotics and storage,

8   due to the close proximity of the two addresses.

9          "The CS and the SOI explained that Bronner traveled

10  to and from his residence at the 4361 Melissa Court West to the

11  addresses to resupply the narcotics being sold and to pick up

12  U.S. currency obtained from the sale of narcotics.

13         "The CS and SOI identified associates of Bronner, who

14  utilize" -- "who are utilized to transport Bronner himself to

15  and from the described locations to limit his exposure to law

16  enforcement.  The CS and SOI stated associates of Bronner are

17  also responsible for distributing narcotics on his behalf."

18         So I guess what I'm getting at is when you're looking

19  at that, when -- who did you take this to, what judge?

20         THE WITNESS:  I don't recall off the top of my head.

21  I'm trying to read the signature.

22         THE COURT:  Well, good luck.  Good luck reading it.

23  I couldn't read it.

24         THE WITNESS:  Yeah.  It's --

25         THE COURT:  I mean, I know who the judges are over

1    there --

2        THE WITNESS:  Yes.

3        THE COURT:  -- but I couldn't read the signature.

4        THE WITNESS:  I can look back at the duty list that

5    day and also the ops plan, because I know I list it in the ops

6    plan, what judge signed the affidavit, and provide that name to

7    Your Honor.

8        THE COURT:  Well, here's my point, though.  Whatever

9    judge is reading this thinks that two people are providing all

10   of this information to you, I'm guessing, because you're

11   attributing all of that information to both people.

12       And so that's why my question is -- and I'm following

13   up on what you said, that it was really the CS who provided you

14   the information that you relied on --

15       THE WITNESS:  Yes, sir.

16       THE COURT:  -- because -- because the SOI had this

17   situation you described as -- I think you used the word "hate"

18   or "hateful" or something.

19       THE WITNESS:  Yes, sir.

20       THE COURT:  So you were relying on the -- on the CS's

21   information.

22       THE WITNESS:  That's correct.

23       THE COURT:  Okay.  But my point is when you're --

24   when somebody's reading this --

25       THE WITNESS:  Yes, sir.

1          THE COURT:  -- and -- for instance, the judge who was

2   reading this would think that the CS is corroborating the SOI

3   and the SOI is corroborating the CS.  So that's why I'm trying

4   to get --

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- to the -- let me finish.

7          To the extent you can, get you to be specific about

8   who told you what.  That's what I'm trying to get at.

9          THE WITNESS:  Yes, sir.

10         The event that I'm describing is a three-person

11  conversation.  These two arrived together in the same vehicle.

12  We sat down, myself, I believe TFO Hickox on this particular

13  date, and also JSO Detective Guthrie, so this is a five-person

14  conversation.

15         And other cases and information are being discussed

16  that I -- I can't mention in front of the defendant during this

17  setting.

18         And at this time we're talking about Mr. Bronner with

19  the CS.  You've got bits and pieces of information that are

20  being provided by the source of information, but those aren't

21  any different than what the CS himself is telling us.

22         THE COURT:  Okay.  They may not be different -- all

23  right? -- but in reading this paragraph, I read -- would read

24  this that they both provided you with all of that information

25  that's in that paragraph, that you're attributing that to both

1    of them, that both of them knew all of that.

2          Not that -- not that there might be something that

3    one knew and one didn't.  I would think that all of that

4    information was known by both of them, reading that paragraph.

5          Is that accurate?

6          THE WITNESS:  I would say that both of those persons

7    did have the same amount of information, and both had knowledge

8    of everything listed in that -- in my affidavit.

9          THE COURT:  And they advised you of that at the

10   meeting.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  All right.  Is there a report of that

13   meeting?

14         THE WITNESS:  Yes, sir, there is.

15         THE COURT:  All right.  You don't need to find it

16   now.  I just -- I just wanted to know if there was.

17         Go ahead, Ms. Washington.

18         MS. WASHINGTON:  Thank you, Your Honor.

19   BY MS. WASHINGTON:

20   Q.   Based on your investigation and your interactions with

21   Mr. Clayton, was there anything to suggest to you that there

22   was any sort of animosity between the defendant and

23   Mr. Clayton?

24   A.   No, ma'am.  Based on the call, you could tell that there

25   was a friendly relationship between the two.

1    I've never seen a narcotics distributor sell

2    narcotics to someone they have a problem with or believe is --

3    has anger towards them.  It just doesn't fit the script in this

4    particular case.

5    Mr. Clayton's interactions with Mr. Bronner, to have

6    the knowledge that he had, is not something that someone that

7    had animosity towards you or had an issue with would have

8    because you wouldn't be associating with them.

9    Q.    For Mr. Clayton, did you ever ask him to purchase or make

10   a sale with Mr. Bronner to try to further the investigation?

11   A.    Yes, I did.

12   Q.    And what happened?

13   A.    Prior to the recorded telephone call, I had inquired if

14   Mr. Clayton would indeed perform a controlled purchase.

15   And he said that he would not because -- I don't

16   remember the exact verbiage, but he didn't feel he wanted to do

17   that to Mr. Bronner and didn't want to be put in that position

18   of doing a controlled purchase and also being exposed at a

19   later time, which ended up being the case anyway.

20   Q.    Were Mr. Clayton and the defendant housed together in the

21   Duval County Jail?

22   A.    I believe that multiple instances I was contacted by

23   Mr. Clayton's attorney, Tyler Gates, who requested that I

24   contact Mr. Guthrie and have Mr. Clayton removed from his area

25   due to him fearing Mr. Bronner.

1  Q.    And to be clear, you talk about Mr. Guthrie.

2        That's Detective Guthrie that's referenced in the

3  affidavit?

4  A.    Yes, ma'am, from the Jacksonville Sheriff's Office.

5  Q.    To your knowledge, did Mr. Bronner ever request to be

6  moved from Mr. Clayton?

7  A.    Not to my knowledge.

8        We were -- we were very focused on keeping the two

9  separated, and I don't recall any other times that they would

10 have been placed together other than those that we had to

11 respond to and have JSO move him to a different location.

12 Q.    At the time you requested the search warrants, did you

13 have any knowledge that Mr. Clayton was selling drugs?

14 A.    It was my understanding that Mr. Clayton had been involved

15 with that in the past.  I've never had an informant who had

16 never committed a crime or been involved with the type of

17 investigation that they're assisting with.

18       As far as his individual actions or anything

19 occurring during his time as a confidential source, no.

20 Q.    So you understood him to have a criminal history involving

21 drug sales, but at least at the time you sought the search

22 warrant, you weren't aware of any ongoing or actual selling

23 activity of Mr. Clayton at that time.

24 A.    No, ma'am, I was not.

25 Q.    If you had known that he was selling drugs at the same

1  time he was working as a confidential source for DEA, what

2  would you have done?

3  A.    I would have done my best to arrest him myself.  I'm well

4  known for that.  I'm quick to put a confidential source in jail

5  who I believe is taking advantage of me or thinking that I'm

6  not smart enough to catch something.

7  Q.    And so it sounds like that's happened to you before, then.

8  A.    Absolutely.

9  Q.    And at some point did you learn that Mr. Clayton, in fact,

10  was selling drugs?

11  A.    Yes.  We terminated our relationship, I believe, in July

12  of the same year, which would have been 2018.  I believe

13  several months later Mr. Clayton was arrested by the

14  Jacksonville Sheriff's Office.

15  Q.    I'd like to direct you to Government's Exhibit 8.

16         Is this what you were just referring to?

17  A.    Yes, ma'am.  This is the confidential source agreement,

18  and it's the last page of the agreement that is completed when

19  a confidential source is deactivated.

20         The redacted portions, I'll admit, here are

21  Mr. Clayton's initials and also his signature.  These are dated

22  on July 5th, 2018.

23         MS. WASHINGTON:  Your Honor, at this time I'd ask to

24  move Government's Exhibit 8 into evidence.

25         THE COURT:  Is there any objection?

1          MR. GLOBER:  No objection, Your Honor.

2          THE COURT:  Government's Exhibit 8 will be received.

3      (Government's Exhibit 8 was received in evidence.)

4  BY MS. WASHINGTON:

5  Q.    So based on these dates here, this agreement was

6  terminated after you served the search warrant?

7  A.    Yes, ma'am, it was.

8  Q.    And after Mr. Bronner's arrest?

9  A.    Yes.

10  Q.    You indicated there was a police report referencing

11  Mr. Clayton?

12  A.    Yes, there was.

13  Q.    And this is the one that's included as part of the

14  defendant's motion?

15  A.    That's correct.

16  Q.    And have you had an opportunity to review the narrative in

17  that report?

18  A.    I have.  That's the first time I've seen that report.

19  Q.    And are the dates of the sales referenced in that report

20  after the date you sought the search warrant?

21  A.    I don't have them in front of me, but I know that they

22  were at a later date.

23  Q.    At some point was a decision made to take the pole camera

24  down?

25  A.    Yes, it was.

1   Q.   How does that work?  When did you ask?

2   A.   Again, I don't -- there's no receipt or anything like

3   that.  I would -- in this case I know I did send an e-mail,

4   most likely, to Special Agent Stephen Busey, telling him we

5   were done investigating that location, and the pole camera

6   would have been removed after that.

7         I believe the dates on the disc that were provided as

8   evidence have a date listed past this.  That was the time that

9   extended past this operation until they were able to go there

10  and remove that camera.

11  Q.   So if the discs indicate that there's a March 16th to --

12  2018, through a May 1st, 2018, date, would that, do you

13  believe, correspond to the dates of that pole camera?

14  A.   I would say that that's very correct.

15  Q.   And these are the dates of the disc that are referenced in

16  Defense Exhibit C as part of the motion document 19-3.

17  A.   Yes, ma'am.

18         MS. WASHINGTON:  Your Honor, at this time I have no

19  further questions.

20         THE COURT:  All right.  Before I turn it over to

21  Mr. Glober, let me ask a few questions so I don't -- I don't

22  forget.

23         In reading the affidavit, I -- and, again, I could

24  have missed some of this, but in reading the affidavit, it was

25  unclear to me exactly how the person who we're referring to now

1    as the CS in the affidavit -- how did that CS know Mr. Bronner?

2          THE WITNESS:  The two were involved in a narcotics

3    relationship, I would say, prior to my meeting him.  I mean,

4    that was my understanding, that he had purchased narcotics from

5    Mr. Bronner in the past and may have even sold to him at some

6    point.  But those two were, I guess, joined by that common bond

7    with each other.

8          THE COURT:  All right.  But that -- that

9    information's not set out in the affidavit.

10          THE WITNESS:  I -- their relationship, I don't

11   believe, is described at all.

12          THE COURT:  All right.  Now, when you identified

13   Mr. Bronner as -- or Jabo as Mr. Bronner, did you do a criminal

14   history check on him?

15          THE WITNESS:  Yes, I did.

16          THE COURT:  All right.  And did you determine that he

17   was on federal supervised release?

18          THE WITNESS:  Yes, sir, I did.

19          THE COURT:  All right.  Was there a point in time

20   that you -- you're on the DEA task force?

21          THE WITNESS:  That's correct.

22          THE COURT:  And who -- who is your supervisor?

23          THE WITNESS:  Michael Mayer.

24          THE COURT:  Is he -- is he with DEA?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  All right.  So do you work out of the
2    office over here --
3          THE WITNESS:  Woodcock --
4          THE COURT:  -- on the other side of the river?
5          THE WITNESS:  Woodcock and Carmichael area, yes,
6    sir --
7          THE COURT:  All right.
8          THE WITNESS:  -- the DEA office in Jacksonville.
9          THE COURT:  All right.  So -- and did you bring this
10   case to his attention?
11         THE WITNESS:  Correct.  He was part of this case from
12   the beginning until the end.
13         THE COURT:  All right.  And did you -- at what point
14   did you think if you made a case on Mr. Bronner that you
15   would -- you would take it federally?
16         THE WITNESS:  This was a state case when we started.
17   As I explained during the -- I believe it was the detention
18   hearing, it was my choice to take this as a state investigation
19   initially.
20         I did reach out.  The probation person who was here
21   at that hearing had a note in her file.  I reached out to his
22   probation officer and told him the details about the case that
23   we were building on Mr. Bronner, and the response that I got
24   was, "Let me know what you find out."
25         THE COURT:  All right.  I guess I'm curious because

1    if you have someone who's on federal supervised release and the

2    information you have is that they're dealing up to ounces of

3    heroin, I'm -- I guess I'm just a little bit surprised that you

4    didn't view that as a federal investigation from the start.

5    That's why I was asking.

6            THE WITNESS:  Yes, sir.  We're not directed in any

7    way.  It's, I would say, personal preference which system you

8    choose to use for prosecution.

9            THE COURT:  All right.  Now, in terms of these search

10   warrants, the defendant is moving to suppress two search

11   warrants, one for the Melissa Court and one for 204 Lane

12   Avenue.

13           Did you get a search warrant for 137 Lane Avenue?

14           THE WITNESS:  Yes, sir, I did.

15           THE COURT:  And what -- what happened with that?

16           THE WITNESS:  So prior to -- I don't recall the exact

17   date.  Prior to our execution of these search warrants, the

18   Jacksonville Sheriff's Office had searched that location in

19   reference to, I believe, stolen property, possible vehicles,

20   and had reported that nothing was found in that location.

21           It was my personal belief that anything that would

22   have been there would have been moved.  I would use the word

23   "spooked," would have been my take on that.  I don't believe

24   that any narcotics would have still been there after just being

25   hit by the Jacksonville Sheriff's Office, and we decided not to

1  hit that location.

2  THE COURT:  All right.  Now, in terms of these two

3  search warrant -- or all three, then, the three affidavits, did

4  your -- did your supervisor who you just mentioned, did he

5  review the affidavits?

6  THE WITNESS:  I don't believe so, sir.

7  THE COURT:  All right.  Did anybody at DEA or anybody

8  in your chain of command at FDLE review the affidavits and

9  applications?

10  THE WITNESS:  No, sir.  It would have went straight

11  to the State Attorney's Office for review.

12  THE COURT:  All right.  So, then, you took it to an

13  assistant state attorney for review.

14  THE WITNESS:  That's right.

15  THE COURT:  And who reviewed it there?

16  THE WITNESS:  I don't recall.  I could look back at

17  the chain, the e-mail chain, from that date and get you a name

18  on that, as well as the judge's name who signed it.

19  THE COURT:  Well, did -- what do you do?  I'm just

20  curious.  What -- do you just drive over here across the street

21  with --

22  THE WITNESS:  We drive to the assistant state

23  attorney's office.  When we get there, we'll meet with the

24  clerks downstairs, tell them we have a search warrant, and

25  they'll direct us to the filing attorney for that day.

1       And we'll go meet with that person, allow them to

2   review it, advise any revisions or spelling corrections that

3   need to be made, at which time they'll give us the okay, and

4   then we'll go to the duty judge for that day.

5       THE COURT:  All right.  And do you -- do you remember

6   that day, taking these over to the State Attorney's Office?

7       THE WITNESS:  Nothing particular about that day.  I

8   just can tell you the date that it occurred based on the

9   signature.

10      THE COURT:  And how long do you think you were there

11  in terms of the duty AUSA reviewing the affidavit?

12      THE WITNESS:  I would estimate under an hour.

13      THE COURT:  With that -- with that -- in other words,

14  did the duty AUSA spend an hour reading your affidavit?

15      THE WITNESS:  That was coming in the door.  I would

16  say probably 20 to 30 minutes.  I know a lot of times with a

17  search warrant, they'll have their division chief review the

18  warrant as well.

19      THE COURT:  Do you know if that happened here?

20      THE WITNESS:  I don't recall.

21      MS. WASHINGTON:  Your Honor, I think you said AUSA.

22  I think you meant ASA?

23      THE COURT:  ASA.

24      THE WITNESS:  Yes.

25      THE COURT:  If I said AUSA, I meant ASA.

1          All right.  Just one minute.

2      (Brief pause.)

3          THE COURT:  Can you -- can you estimate how many

4  times you think you checked -- or how many times you checked

5  the pole camera during the approximate six weeks it was up?

6          Did you check it every day?  Did you check --

7          THE WITNESS:  Every -- yeah.  Yes, sir.  I would say

8  every day.

9          THE COURT:  More than once?

10          THE WITNESS:  Multiple times per day, I would log in

11  and see if there was anything outrageous.

12          If I went by -- during my trips to and from

13  Jacksonville almost daily, I would stop on Lane Avenue on my

14  way home to see what cars were there.  I would later look and

15  see if those cars were visiting the house.

16          THE COURT:  And in terms of the CS, whose name now --

17  it's -- what's his last name?

18          THE WITNESS:  Clayton.

19          THE COURT:  Clayton?

20          -- who's been identified as Clayton, what was his

21  motive for doing this?

22          THE WITNESS:  He --

23          THE COURT:  Was he --

24          THE WITNESS:  -- was paid.

25          THE COURT:  He was being paid?

58

1          THE WITNESS:  Yes, sir.  At the conclusion of this

2     investigation, he was paid.

3          THE COURT:  Yeah.  And how much was he paid?

4          THE WITNESS:  I want to -- I couldn't say exactly,

5     but I know it was between, I believe, 800 to 1200, in that --

6     in that area.

7          THE COURT:  And -- and when he was signed up, was

8     that clear, that the reason he was doing it was for money?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  I mean, in other words, sometimes people

11    are signed up because they're trying to work off, you know,

12    whatever case --

13         THE WITNESS:  Yes, sir.  He was working for pay.

14         THE COURT:  That was clear.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  And he would have signed -- he would have

17    signed an initial CS agreement with you, the DEA form

18    agreement?

19         THE WITNESS:  That's correct.  He was processed as a

20    confidential informant, which includes fingerprints, pictures,

21    criminal history, things of that nature.

22         THE COURT:  And a pledge not to sell drugs while he's

23    working?

24         THE WITNESS:  That's correct.

25         THE COURT:  So he would have been paid -- that's --

1    I'm talking about Clayton would have been paid prior to July

2    5th, 2018, when he was terminated.

3            THE WITNESS:  Yes, sir, he would have.

4            THE COURT:  Was he paid any money prior to your

5    seeking the search warrant?

6            THE WITNESS:  No, sir, I don't believe so.

7            THE COURT:  Because that was, what, April 20 --

8            THE WITNESS:  Yes, sir.  This was, I would say, a

9    short investigation and a short duration that he worked as a

10   confidential source, so I would say with confidence that he was

11   paid at the conclusion of his services.

12           THE COURT:  So after April 23rd, 2018.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Let me ask you this.  I'm -- of course, I

15   only have the exhibits that have been provided from the pole

16   camera, and I don't know exactly -- I'm going to ask -- at some

17   point, Ms. Washington, ask you to further describe what you

18   intend to actually use from the pole camera.

19           But just looking at Government's Exhibits 5, 6, and

20   7 -- although Government's 5, Exhibit 5, where you're looking

21   at the house, looks like it's up a little bit high on a pole --

22   you know, in other words, it doesn't look like you're standing

23   on the street.

24           When you look at Government's Exhibit 6 where the --

25   where you have the white -- looks like a Jeep, again, it looks

1    like you're looking down on the Jeep a little bit.

2            With Government's Exhibit 7, which appears that it

3    may be Mr. Bronner, it looks like that might be a lower view of

4    it.

5            But here's my question.  In terms of what the pole

6    camera captured, other than the angle of it, if you had been

7    standing on the ground next to the pole, could you have seen

8    the same thing that was captured by the pole camera?

9            THE WITNESS:  It's my belief that I could have, yes.

10           THE COURT:  And that's -- I know Ms. Washington asked

11   you if you had done surveillance and if you basically -- you

12   know, the two times you had been there before, if you had

13   basically seen the same thing.

14           But I just wanted to ask you if you thought a person,

15   based on your experience with the area and knowing what the

16   pole camera did -- because I only know -- I only know these

17   three pictures.

18           THE WITNESS:  Yes, sir.

19           THE COURT:  But knowing what the pole camera did,

20   it's your testimony that basically, although the angle might be

21   different, you would still see the same thing.

22           THE WITNESS:  There are no shrubs, fences, or brush

23   or anything that would have obstructed my view that the pole

24   camera would allow me to see better or to advance my

25   capabilities.

1          The pole camera, the way it's -- I would say that I

2     would have had much more visibility being there in person

3     because the device is located in, I would say, a recess, so

4     you're limited on how far left and right, up and down you can

5     go.

6          Had I been there myself, I would have been able to

7     see the cars coming down the driveway, more visibility than the

8     camera offers.

9          THE COURT:  All right.  Just one minute.  I'm about

10    done.

11       (Brief pause.)

12         THE COURT:  Now, you said you -- you obtained an

13    order for a ping.

14         Where did you get that order?  What court did you get

15    that?

16         THE WITNESS:  That was the same State Attorney's

17    Office, and also a Duval County --

18         THE COURT:  And do you know what date you obtained

19    that?

20         THE WITNESS:  I would have to look at the orders.  I

21    do not have copies in front of me.

22         THE COURT:  Okay.  And was it a different judge?

23         THE WITNESS:  Yes, sir, I'm going to say it was,

24    because I always go see the duty judge, and it changes on a

25    rotation.  And it has to be a circuit judge that signs these,

1  not a county judge, so you're also limited on availability

2  certain days.

3          THE COURT:  All right.  Well, let's -- we've got to

4  decide whether we're going to take lunch now.  I'm guessing we

5  probably should, even though we haven't gotten as far as we

6  need to.

7          But I think probably everybody's hunger level isn't

8  based on our timing here.  It's based on when we had breakfast

9  and when we feel like we need lunch.

10          So why don't we -- why don't we recess until

11  1 o'clock and then Mr. Glober can cross-examine Agent

12  Yarborough, and we can finish our questioning of him.  And then

13  if Mr. Glober has any evidence to present, we'll hear that.

14          Ms. Washington, I am -- and I meant to ask this

15  earlier.  Try to determine exactly what you think you'll be

16  offering from the pole camera, whether you'll be offering

17  snippets of the video, whether you'll be offering still shots

18  that are close to what these are, if you know yet.

19          But --

20          MS. WASHINGTON:  I don't, Your Honor, but I certainly

21  can give the Court a better idea after the lunch break.

22          THE COURT:  All right.  If you could, please, just to

23  the extent you can.  I know the trial's not until January, but

24  it will just help me understand a bit better.

25          This -- of course, this whole pole camera area, as

1    Mr. Glober pointed out, is one that -- that -- let's put it

2    this way.  It's an issue that I think people thought was -- had

3    been somewhat settled.

4            And now there are courts that are -- that are taking

5    another look at it based on technology and obviously other --

6    other -- based on courts looking at other technology and how it

7    might relate to this.

8            So as much information as I can know about the pole

9    camera and how it was used and how you intend to use it will be

10   helpful.

11           MS. WASHINGTON:  Yes, Your Honor.

12           THE COURT:  All right.  So we'll be in recess till

13   1 o'clock.

14           COURT SECURITY OFFICER:  All rise.

15      (Recess from 12:20 p.m. until 1:04 p.m.; all parties

16   present.)

17           COURT SECURITY OFFICER:  All rise.  This Honorable

18   Court is now in session.

19           Please be seated.

20           THE COURT:  We're back in Mr. Bronner's case,

21   3:19-cr-109-J-34JRK.

22           Of course, Ms. Washington represents the United

23   States.  Mr. Glober represents Mr. Bronner.  Mr. Bronner is in

24   the courtroom.  And Special Agent Yarborough was testifying.

25           So if you can resume your seat on the witness stand,

1    please, sir, I have a couple of questions for you before I turn

2    the floor over to Mr. Glober for cross-examination.

3              And, sir, I'll remind you, you're still under oath.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Let me just ask you one or two questions.

6    I think it will be two.

7              Did you -- did you talk to anyone or consult with

8    anyone about whether you needed a warrant to place the pole

9    camera on the -- on the pole outside of the Melissa Court

10   address?

11             THE WITNESS:  No, sir, I did not consult with anyone.

12             THE COURT:  All right.  And so your understanding was

13   that you did not need a warrant.  Is that correct?

14             THE WITNESS:  Yes, sir, based off my past actions and

15   other cases.  I've never been asked for a search warrant or

16   told that I was required to have one to place a camera in a

17   setting that is visible, that doesn't give us any view other

18   than what a person would have from that location in public on

19   the street, in other words, if it doesn't invade their privacy,

20   the interior of their home, anything of that nature, what I

21   would -- what I would put that as an area that requires an

22   expectation of privacy.

23             THE COURT:  All right.  And then -- and then you had

24   mentioned that you used the infrared component of the camera.

25             About how many times do you think you used that?

1          THE WITNESS:  It's -- it's hard to give an accurate
2    number.  I would say just to see what time Mr. Bronner returned
3    home, things of that nature.
4          You could make out -- it looked like a sedan, and
5    then the following day -- because, like, you could see the
6    lights arrive, but you couldn't see a lot of detail with that
7    vehicle, I would say, for the most part.
8          So the next morning I could verify that that was --
9    like, in several cases was a green Mercedes car.  That vehicle
10   would not move, and then once it got daylight, I could verify
11   that that was indeed the green sedan.
12         THE COURT:  All right.  So -- well you said several
13   times that happened.
14         So would you have used the infrared, if you can't put
15   an exact number on it, several times?
16         THE WITNESS:  I would -- 30 plus, possibly --
17         THE COURT:  All right.
18         THE WITNESS:  -- would be a fair estimate.
19         THE COURT:  All right.  Thank you.
20         Mr. Glober?
21                      CROSS-EXAMINATION
22   BY MR. GLOBER:
23   Q.   Good afternoon, Agent.
24   A.   Good afternoon.
25   Q.   I want to ask you a couple of questions about standing.

1   Although I know the government has conceded that, I'd like to

2   have the record reflect a little bit on that -- on that

3   subject.

4           It was your information, from doing some records

5   checking, that Mr. Bronner resided at 30 -- excuse me, 4361

6   Melissa Court?

7   A.    I believe that was correct, yes.

8   Q.    All right.  And that was consistent with your observations

9   on those times that when you did go by Melissa Court, sometimes

10  you would see Mr. Bronner there.

11  A.    I would say that the vehicles that were described by the

12  CS were there, and I would see Mr. Bronner pass by that

13  location.

14          The times that I did surveillance in person that I

15  described, when I was, I would say, exposed, people looking in

16  my car and stuff like that, I would see him turn and go towards

17  the house.

18          After we got the pole camera installed, I was able to

19  use that to see him exit vehicles and whatnot.

20  Q.    Okay.  And that's at the Melissa Court --

21  A.    Yes.

22  Q.    -- address.

23          Okay.  And then with respect to the 204 South Lane

24  Avenue, the other search warrant location, did you see

25  Mr. Bronner use a key to get into that location on March 26th

1  and 27th of 2018?

2  A.    There was an incident where I did see him use the key.

3  Let me verify that exact date in my report here.

4          Yes, sir.  That was on March 26th, I believe, at 9:15

5  a.m.

6  Q.    And then again on the 27th?

7  A.    I believe on the twenty- -- let's see.

8  Q.    And if it helps, I'm on page 5 of the search warrant, the

9  third full paragraph up from the bottom.

10  A.    Are you on the search warrant or the report of

11  investigation?

12  Q.    I'm sorry.  I'm in the affidavit for search warrant --

13  A.    Okay.

14  Q.    -- page 5, and I believe that you recount in this

15  affidavit, "Bronner was again observed producing a key from his

16  pocket and unlocking the front door."

17  A.    That's correct.

18  Q.    Okay.

19  A.    That is stated there.

20  Q.    All right.  Do you agree that you have a duty to the

21  magistrate or the judge whom you are asking to issue a search

22  warrant that the information that you provide be accurate?

23  A.    Yes, sir, absolutely.

24  Q.    So usually the judge is not going to know anything that's

25  not in your affidavit, right?

1    A.    That's correct.

2    Q.    There may be some other cases where maybe the judge would

3    have heard something in the press or have some independent

4    knowledge, but almost always their knowledge is limited just to

5    the affidavit you provide, correct?

6    A.    That's correct.

7    Q.    So the affidavit has to be truthful.

8    A.    That's correct.

9    Q.    It has to be accurate.

10    A.    Yes.

11    Q.    It has to contain information that would indicate that

12    there's probable cause, right?

13    A.    That's correct.

14    Q.    Because the judge is determining whether there's probable

15    cause for a search or not, right?

16    A.    That's correct.

17    Q.    And if there's information indicating that there is not

18    probable cause, that needs to be in the warrant also.

19    A.    That's correct.

20    Q.    Because the judge has to have a -- a complete picture,

21    right?

22    A.    That's correct.

23    Q.    So if a judge only has some of the information, that judge

24    can't render an appropriate finding of probable cause or no

25    probable cause, right?

1    A.    That would be my understanding.

2    Q.    Included in the complete picture would be whether a

3    confidential informant is reliable, right?

4    A.    That's correct.

5    Q.    Confidential source is the term y'all use?

6    A.    Either.

7    Q.    Okay.  It would also include whether a confidential source

8    has any particular bias against the target of the

9    investigation.

10   A.    I wouldn't say always, no.

11   Q.    So sometimes it's okay to bring a warrant to a judge

12   seeking a finding of probable cause where you know that a

13   confidential source has bias but you don't disclose that to the

14   Court?

15   A.    Sir, if I questioned the reliability or if the source had

16   any reason to be untruthful, that person's information would

17   never be provided in the affidavit, if I had reason to question

18   that.

19          As described when I was questioned by Your Honor on

20   this affidavit earlier, the source's personal relationship with

21   Mr. Bronner was not listed in the affidavit, nor is it normally

22   issued in any affidavit.

23          THE COURT:  I just want to interrupt because --

24   because what we have here is we have Mr. Bronner, at least at

25   this point, moving in part to suppress the evidence obtained by

1    the warrant based on the application not containing information

2    about the CS's relationship with Mr. Bronner.

3              And I think now we've learned that it's not the CS.

4    It's who's referred to as the SOI, which is source of

5    information.

6              Is that your understanding?

7              MR. GLOBER:  Your Honor, that is my understanding.

8              THE COURT:  So my point is, if we just use source, we

9    don't know if we're talking about the confidential source or

10   the source of information.

11             So let's be very specific in asking the questions and

12   in answering to either refer to the confidential source, who is

13   Clayton, or the source of information.

14             Whatever you want to ask and whatever the answer is

15   is fine, but let's make it absolutely clear which person we're

16   talking about.

17             MR. GLOBER:  Yes, Your Honor.

18             THE COURT:  Thank you.

19   BY MR. GLOBER:

20   Q.   So speaking in global terms, not necessarily just for this

21   case, do you believe that it's essential, as a general practice

22   of yours, to inform a Court deciding on a search warrant if a

23   source of any information in the warrant has a particular bias

24   against the target of the investigation?

25   A.   If I believe that that person's bias causes them to give

1    incorrect or fraudulent information, absolutely.

2            Now, I base that off of other similar investigations.

3    It's very common in my line of work that persons in retaliation

4    tell about another person's illegal activity.  Angry spouses

5    who God only knows how they really feel about that person, they

6    still provide accurate information.  I don't see how this would

7    be any different.

8            In this particular case, Mr. Gavin was very upfront

9    on his feelings with Mr. Bronner and also provided information

10   that was deemed accurate and also corroborated by what we

11   found, what we learned during our investigation.  And he was

12   very detailed, as listed in the report and not the affidavit,

13   during that interview.

14   Q.    Again, I'm trying to get a sense, generally speaking, of

15   what your practice is.

16           If you detect that there's a particular bias on the

17   part of anyone providing information that factors into a

18   warrant application, do you disclose that as a matter of

19   practice to the Court?

20   A.    Again, if that testimony is verified and believed by me to

21   be truthful, I'm not going to list that person's personal

22   feelings in an affidavit for a search warrant.

23   Q.    Okay.

24           THE COURT:  Let me broaden the question.

25           If you had other information, such as a confidential

1    source -- and I'm talking not about this case but globally, as

2    Mr. Glober just said -- is it your practice generally to list

3    whether someone providing information is getting paid, whether

4    someone who's providing information has a prior felony

5    conviction, or whether someone who's getting paid has provided

6    inconsistent -- made inconsistent statements about certain

7    matters?

8           Do you generally include those items in an affidavit

9    so that the judge has an idea of who the judge is evaluating in

10   terms of credibility?

11          THE WITNESS:  I'm trying to think of how to simply

12   answer that.

13          If we had a confidential source who provided

14   questionable information, that information -- there would be no

15   affidavit to draft based on that information alone.

16          If it was half truthful, that information would be

17   supported by independently gathered facts from other

18   investigative techniques.

19          As in this case, I wouldn't rely on that person's

20   statement alone, but if bits and pieces could be used to

21   support the affidavit, I would -- in that particular case, I

22   would also -- I guess that would be a good example of when you

23   would include inconsistencies in that.

24          I don't want to be responsible for presenting

25   something to a judge I know is not truthful, as I hope we all

1   would, but it's not an easy question to answer.

2          THE COURT:  Well, I just can tell you that typically

3   what I see is that when someone's applying for an affidavit, a

4   law enforcement officer, if they're paying the person for

5   information, they let the Court know that because that could be

6   a reason for that person to fabricate something.  Even if the

7   agent doesn't think they are, it could be a reason -- you're

8   going to have to not speak out, Mr. Bronner.

9          THE DEFENDANT:  Okay.

10         THE COURT:  That could -- that could be a reason for

11  the person to want to enhance things.  It could be a reason for

12  the person to make a false statement or to make something up.

13  It doesn't mean it is.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  No different than a felony conviction.

16  You know, when a convicted felon testifies in a court

17  proceeding, for instance, in a jury trial, a jury is instructed

18  to take that into account as to whether the person is credible

19  or not.

20         And so I think the question -- where Mr. Glober's

21  going with this and my follow-up is, if you -- and what I'm

22  understanding your answer to be, if you have no reason to

23  question the credibility of the person providing information,

24  then you don't include that type of information.

25         Is that accurate?

1          THE WITNESS:  Yes, sir.  And in my line of work, as

2    it relates to using the state court, that information is very

3    limited about the CS.

4          Now, once the case begins judicial process, that

5    information is later disclosed, as it has been today.  But it

6    is not normal practice to list anything about the CS, their

7    manner of being recruited, payment, anything like that in an

8    affidavit, for their protection.

9          THE COURT:  And is that consistent with FDLE policy

10   and training, is that consistent with what you've learned on

11   the DEA task force, or is that just basically, taking all that

12   together in your experience, that's how you do it?

13         THE WITNESS:  That's -- in the three places I've been

14   employed, that's normal practice.  The only time that that

15   information has ever been revealed, I've been asked by a judge,

16   as they've signed the affidavit, questions about the CS or any

17   information, at which time that's provided.

18         But in a normal documented or clerked affidavit, that

19   information is not listed.

20         THE COURT:  And in this case, by the way, did the

21   judge ask you any questions or ask for any information outside

22   the four corners of the affidavit?

23         THE WITNESS:  No, sir, not to my knowledge.

24         THE COURT:  All right.  Go ahead.

25   BY MR. GLOBER:

1    Q.    Your first involvement with Kasper Clayton was on February

2    23 --

3    A.    That's --

4    Q.    -- Is that right?

5    A.    That's when I was contacted by Trooper Earrey --

6    Q.    Okay.

7    A.    -- and we agreed to set up a meeting for the 26th.

8    Q.    So as of February 26th, 2018, you had -- you had never met

9    Kasper Clayton before?

10   A.    No, sir, I had not.

11   Q.    And did I understand you correctly that you logged him in

12   as a CS within the DEA system --

13   A.    That's correct.

14   Q.    -- on February 26th?

15   A.    That's when we began the process of.

16   Q.    Okay.

17   A.    It's a week or two-long process.  The documents have to be

18   gathered and sent down to Miami for approval, and it takes --

19   Q.    Okay.  Do you know what sort of vetting occurs down in

20   Miami?

21   A.    I don't know the full process.  I know the -- we get a

22   checklist of all the required documents, and that person

23   reviews that all of the criteria has been met for that.

24   Q.    All right.  Does that criteria require any active

25   investigation of the CS?

1    A.    As in investigating that person?

2    Q.    Yes.

3    A.    Beyond a criminal history and a debriefing, no, sir.

4    Q.    Okay.  So a criminal history tells you what crimes a

5    person has been convicted of or sometimes arrested for in the

6    past --

7    A.    Correct.

8    Q.    -- right?

9    A.    For the most part, yes.

10   Q.    But it doesn't give you any information about what the

11   person is doing currently.

12   A.    No, sir, it does not.

13   Q.    Did you ask Kasper Clayton whether he was currently

14   involved in selling drugs on February 26, 2018?

15   A.    Verbatim, I -- I can't say yes or no.  Due to his

16   involvement and the, I guess, fresh nature of his information

17   about Mr. Bronner, I assumed that he was most recently involved

18   in that.

19          THE COURT:  Did -- but did you ask him?  And when you

20   debrief him, you want to know everything that he's done with

21   Mr. Bronner.

22          Did you -- did you debrief him specifically about

23   what he had done with Mr. Bronner?

24          THE WITNESS:  In great detail, I did a debriefing

25   report on this, as listed.  I know it's not in the affidavit,

1 | but for the most part, yes.

2 |        As far as that question -- this has been some time

3 | ago -- I don't recall, and it's not documented in my report.

4 |        THE COURT:  Well, in terms of what you would have

5 | done or what is done when someone's signed up as a CI, do you

6 | know if there's any kind of research done or investigation to

7 | see if the person's been signed up as a CI in the past?

8 |        THE WITNESS:  If it's -- if it has occurred before at

9 | the Drug Enforcement Administration, I know you will be

10 | notified from Miami because they won't generate a new number

11 | for that person.  They will have had an older number in the

12 | system, and you'll be iden- -- I guess, notified of that.

13 |        As far as other agencies, I'm not sure.

14 |        THE COURT:  All right.  And then what about -- what

15 | about the -- what is it called?  Is it called NADDIS?

16 |        THE WITNESS:  Yes, sir.

17 |        THE COURT:  And that's the Drug Enforcement

18 | Administration's, for lack of a better way of describing it,

19 | database that's contains -- that's basically centralized so

20 | that if -- if someone has an investigation of Mr. Bronner in

21 | Jacksonville, they can access this to see if anybody else in

22 | the country's looking at him, really, right?

23 |        THE WITNESS:  That's correct, yes.

24 |        THE COURT:  And so if there are any active

25 | investigations, what's inputted is what agents glean from their

1   interviews and reports, and --

2           THE WITNESS:  Right.

3           THE COURT:  -- that's put in NADDIS, right?

4           THE WITNESS:  Yes.

5           THE COURT:  All right.  Do you know if NADDIS was

6   searched to see if Mr. Clayton was under active investigation

7   by DEA?

8           THE WITNESS:  Yes.

9           THE COURT:  That's part of the process.

10          THE WITNESS:  That's part of the process.

11          THE COURT:  All right.

12          THE WITNESS:  If that person's been documented in any

13  DNA -- DEA paperwork, it's my knowledge that they'll be

14  assigned a NADDIS number.

15          And say I input a Kasper Clayton, it would bring up

16  he was mentioned in this report on this date by this person,

17  things of that nature.

18          I do not recall if he was listed in NADDIS.  I don't

19  believe he was, but I could go back to the documentation and

20  say yes or no on that.

21          THE COURT:  Well, I guess my question, though, is, if

22  he was actively under investigation, would DEA sign him up as a

23  CI?

24          THE WITNESS:  Not without contacting the agents who

25  did have that investigation, and it would -- we have to -- we

1    would have to deconflict it at that point.

2            THE COURT:  All right.  Okay.

3            Go ahead.

4    BY MR. GLOBER:

5    Q.    I'm going to make sure I understood something you said a

6    couple minutes ago, and that was -- did you assume, when you

7    met with Mr. Clayton on February 26, that due to the freshness

8    of his information about Mr. Bronner, that Mr. Clayton was

9    somehow involved in the drug trade?

10   A.    That's correct.

11   Q.    And I'm trying to square that with something you said

12   earlier, and that was -- and, again, I'm paraphrasing what I

13   think you said -- that you wouldn't tolerate confidential

14   informants or confidential sources working for you and selling

15   drugs at the same time.

16   A.    Yes, sir.  That's -- that's -- in the agreement that they

17   sign, they're not allowed to commit any crimes.  They're not

18   allowed to represent themselves as a DEA employee.  They're

19   supposed to report any criminal activity that they become

20   involved in.

21            Kasper never gave me any reason to question that.

22   Q.    So the -- Government's Exhibit No. 8 is sort of the tail

23   end of the DEA agreement.

24            Do I have that right?  That's --

25   A.    The last page?

1   Q.   Yes.

2   A.   That was the termination page, yes, sir.

3   Q.   Okay.  And there's a corresponding initiation of the

4   agreement page, I assume.

5   A.   That's right.

6   Q.   Where he agrees, "Look, I'm going to give you information,

7   but I'm not going to get involved in any drug dealing."  Is

8   that right?

9   A.   That's my understanding.

10  Q.   Or commit other crimes.

11  A.   Correct.

12  Q.   Right.  And you had the impression that somebody who you

13  believed up until this point in time had been actively involved

14  in the drug business --

15  A.   That's correct.

16  Q.   -- was going to stop because he signed this agreement with

17  you, right?

18  A.   Sir, it's a verbal agreement that they sign and initial.

19  And it's explained to them at any point in time they could get

20  in trouble or get in any other -- I guess a new case or

21  anything like that, that our contract is going to be complete

22  at that time.

23  Q.   Did you tell Mr. Clayton at the front end how much money

24  he was looking to make for the work he was doing for you with

25  regard to Mr. Bronner?

1    A.    No, sir.  We never reveal that.

2    Q.    How is that discussion carried out, typically?

3    A.    We just advise them that they will receive payment once

4    the investigation is complete.

5    Q.    As far as you know, is it commonly known on the street how

6    much payment for this kind of work goes for?

7    A.    It varies.  Some -- there's a lot of discretion given to

8    the agent.  I'm usually on the low end of the scale of what I

9    pay people.  Some people deserve much more in other people's

10   eyes.

11        Based on Mr. Clayton's cooperation with the phone

12   call and just providing information -- he didn't conduct

13   controlled buys, anything of that nature -- I didn't feel that

14   he deserved a large payment.

15   Q.    Okay.

16        THE COURT:  Let me just -- before I -- before we get

17   off this subject about -- about selling drugs, did you -- when

18   you were debriefing him, that is, Mr. Clayton, who was referred

19   to as the CS in the affidavits attached to the applications,

20   did you -- did you ask him, "Are you still in the game?  Are

21   you still -- are you still dealing drugs?"

22        THE WITNESS:  He advised me at that time that he

23   could purchase multiple ounces of narcotics from Mr. Bronner at

24   that time.

25        THE COURT:  And so you assumed that he had -- he

1    was -- he was in the game.

2        THE WITNESS:  He was -- he was still accepted amongst

3    people selling narcotics as being in the game.

4        THE COURT:  Okay.  All right.

5    BY MR. GLOBER:

6    Q.   With respect to Mr. Clayton's criminal history, is it

7    consistent with your memory that he was convicted on -- three

8    times in the past before February of 2018 for selling cocaine?

9    A.   I can't say for sure that that's accurate, but it sounds

10   very reasonable.

11   Q.   It sort of fits the profile?

12   A.   Yes, sir.  Yes, sir.

13   Q.   Okay.  I want to ask you some further questions about

14   Mr. Clayton's motivation to get involved with what you do.

15        He was not working off any charges.

16   A.   No, sir.  We did not have a case on him.

17   Q.   Did he come to you, or did you go to him?

18   A.   Mr. -- I'm sorry, Trooper Josh Earrey contacted me and

19   said that he had used Kasper in the past.  He'd gave him

20   information on the street.  How that relationship developed,

21   I'm not sure.  I didn't ask.

22        At that point we agreed to meet on February 26th.

23   Q.   Is it fair to say that people can make a lot of money in

24   the drug business?

25   A.   Actively selling narcotics?

1   Q.   Yes.

2   A.   Absolutely.

3   Q.   Especially if they're dealing with quantities of, like, an

4   ounce of heroin, an ounce of cocaine, or larger?

5   A.   It's decent money.

6   Q.   More than $800 or $1200.

7   A.   I would say so, yes.

8   Q.   Do you believe that Mr. Clayton's sole motivation for

9   working with you was to make some money?

10  A.   I would say yes.

11  Q.   You don't think there was a mixed motivation, like maybe

12  he wanted to stir the pot in the local drug-selling community?

13  A.   I think in his mind we were going to be able to do more.

14  Mr. Clayton had other information on other individuals I don't

15  want to reveal at this time, but Mr. Bronner's particular case

16  is the only one that we explored with him.

17  Q.   You at no time advised the judge signing the warrants of

18  Mr. Clayton's criminal history.

19  A.   No, I did not.

20  Q.   I want to ask you about what steps you took to determine

21  whether Mr. Clayton was reliable.

22  A.   Okay.

23  Q.   To start with, at what point in time did Mr. Clayton tell

24  you he was not willing to do a controlled buy?

25  A.   I believe it was during our initial meeting.  He had that

1    relationship.  Like I said, he said he could purchase multiple

2    ounces from Mr. Bronner.

3            When we introduced the idea of possibly wiring him up

4    and having him do a buy, he was not comfortable with that and

5    said he didn't want to do that to -- to Bronner.

6    Q.    So he -- in that initial meeting, he said, "Look, I can do

7    these things.  I can buy ounces, multiple ounces," but he also

8    said, "But I won't do it"?

9    A.    He's describing his relationship with Mr. Bronner.

10           It is standard practice and also governed under

11   Rachel's Law in Florida not to put an informant or a person at

12   our direction in an uncomfortable situation or a situation of

13   danger, so we have to follow those guidelines.  I can't

14   pressure him to do that.

15   Q.    So what was it you thought Mr. Bronner could do for you in

16   that initial meeting?

17           THE COURT:  Mr. Clayton?

18   BY MR. GLOBER:

19   Q.    Excuse me, Mr. Clayton.

20   A.    Provide information, recorded phone calls.  We could have

21   recorded interactions.  There are multiple avenues other than

22   controlled buys that can be pursued.

23   Q.    Now, when you met with Mr. Clayton on February 26, he told

24   you that Mr. Bronner was maintaining a room at the Knights Inn.

25   A.    That's correct.

1   Q.   And the Knights Inn, that's right there on Lane Avenue
2   also, right?
3   A.   I believe it's 460 South Lane Avenue.
4   Q.   Okay.  So the two houses that we've talked about on Lane
5   Avenue are 137 and 204?
6   A.   That's correct.
7   Q.   And so the Knights Inn is a couple blocks south of there?
8   A.   I would say one block --
9   Q.   Okay.
10  A.   -- yes.
11  Q.   Very close.
12  A.   Very close, yes, sir.
13  Q.   Mr. Clayton told you that Mr. Bronner was selling drugs
14  out of the Knights Inn.  Is that right?
15  A.   That's correct.  He said that he controlled multiple rooms
16  there that were occupied by females that would sell on his
17  behalf, and he would also sell at that location as well.
18  Q.   Did he tell you how he knew that?
19  A.   From his involvement with Mr. Bronner here, and I believe
20  he had also been at that location with him.
21  Q.   So do you remember whether he told you that he'd been to
22  that location himself?
23  A.   It was my understanding that he had been there.
24  Q.   Okay.  And so he'd seen it with his own two eyes.
25  A.   Yes.

1  Q.   Did he say whether he took his cousin Mr. Gavins -- is

2  that his name?

3  A.   I believe Mr. Gavin also frequented that hotel and sold

4  narcotics at the location.

5  Q.   Is there any possibility that you -- you may have

6  considered at the time that Mr. Bronner and maybe Mr. Gavins

7  and Mr. Clayton were competitors with each other?

8  A.   Due to the large amount of traffic in that area, I don't

9  believe that there was a competition.  It was -- there was

10  enough customers for everyone.  It's a sad situation in that

11  part of town.

12  Q.   And was there some prostitution going on at the Knights

13  Inn, according to what Mr. Clayton told you?

14  A.   That's correct.

15  Q.   And you mentioned earlier there was a disagreement between

16  Mr. Bronner and Mr. Gavins regarding a woman.

17        Was it one of these women at the Knights Inn?

18  A.   I don't know the exact name or the details surrounding

19  that.

20  Q.   All right.

21        THE COURT:  And Gavins -- is it Gavin or Gavins?

22        THE WITNESS:  Gavin.

23        THE COURT:  Gavin, without an S?

24        THE WITNESS:  Singular, yes, sir.

25        THE COURT:  And that's the source of information, or

1  SOI, in the affidavit.

2          THE WITNESS:  That's correct.

3          THE COURT:  All right.

4  BY MR. GLOBER:

5  Q.   And on February 26, Mr. Clayton told you that Mr. Bronner

6  was storing drugs at his Melissa Court address.

7  A.   That's correct.

8  Q.   Did he tell you how he knew that?

9  A.   He had been to that location before.

10         THE COURT:  Did he -- he told you that?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.

13         THE WITNESS:  He was familiar with that location.

14  BY MR. GLOBER:

15  Q.   And on February 26, Mr. Clayton told you that he saw a

16  rifle at the Melissa Court address.

17  A.   That information was listed.  Let me make sure it's in

18  this debriefing.

19         THE COURT:  Let -- here's what I -- I want to try to

20  keep the record straight, and maybe I'm the only one getting

21  confused, is that -- and this happened with Ms. Washington.

22  There -- and I did it too.

23         There are questions being asked about what -- what

24  Clayton, the CS, and Gavin, the SOI, told the agent, and then

25  he's looking at something, testifying whether he told them

1    that.  And obviously, Mr. Glober, at this point you're asking

2    questions.

3              Of course, I'm focusing on what's in the affidavit,

4    and so if it relates to, "When you debriefed him, did he tell

5    you X?"

6              "Yes."

7              "Is X in the affidavit?"

8              That -- that may be helpful to the Court.  So just

9    if -- because I'm -- as far as I can tell right now, I'm stuck

10   on the four corners of this affidavit.

11             And just depending on how the ruling comes out, I

12   could find that there were material omissions, and I have to

13   put that into the affidavit.  Or there could be -- I think what

14   you have focused on, the pole camera.  It could be, depending

15   on how the Court rules, I'd have to take that out of the

16   affidavit.

17             But I want to be careful, when the agent's answering,

18   that we don't get a record that starts to look like there's a

19   lot more in the affidavit than there is, because that -- that

20   could be hard for a reviewing court to ferret out.

21             MR. GLOBER:  Yes, Your Honor.

22             THE COURT:  Thank you.

23             Do you get -- you get where we're going here with

24   this, Agent?

25             THE WITNESS:  Yes, sir.

1    THE COURT:  Because the focus here is what did you
2    put in the affidavit.
3    THE WITNESS:  That's correct.
4    THE COURT:  And, for instance, just if the CS, who
5    is -- is Clayton, told you that he knew that there were drugs
6    in a house because he had been to the house and seen them, you
7    put in here -- "He knows there are drugs at the house," you put
8    in the affidavit, but you don't necessarily put in the
9    affidavit that he knows that because he was at the house and
10   had seen it.
11   THE WITNESS:  Yes, sir.
12   THE COURT:  You see?
13   So it -- it -- I want to make sure that we're clear
14   on talking about what you knew and what you put in the
15   affidavit.
16   Okay.  Go ahead.
17   MR. GLOBER:  Yes, Your Honor.
18   BY MR. GLOBER:
19   Q.   Let me -- let me rephrase that.  And I'm looking at page 4
20   of your affidavit --
21   A.   Correct.
22   Q.   -- the second paragraph.
23   Mr. Clayton, the CS, according to your affidavit --
24   you put in your affidavit that he saw a rifle at the 4361
25   Melissa Court address, right?

1  A.   That's correct.

2  Q.   This is not in your affidavit, but I want to ask you about

3  it.

4       Did he tell you how he came to see the rifle there?

5  A.   He advised that he had seen it inside of the house.  That

6  information was also repeated during a separate debriefing.

7  That's why I had to look at both reports.

8       But he was aware of firearms in the areas frequented

9  by Mr. Bronner.

10 Q.   And this is not in the affidavit, as I read it, but I want

11 to ask you, did he tell you where in the Melissa Court

12 residence he saw a rifle?

13 A.   I don't recall.  Let me look and see if I listed it.

14      It's not listed in the affidavit, the exact location

15 of where he saw that.

16 Q.   All right.  Similarly, I'm referring to your affidavit on

17 page 4 where you indicate that the CS advised that he saw a

18 handgun at the 204 Lane address.

19      That's in your affidavit.

20 A.   Yes, it is.

21 Q.   What's not in your affidavit is what circumstances were

22 happening where he saw the handgun.

23 A.   Yes, sir.

24 Q.   What were they?  Did he tell you what circumstances?

25 A.   At some point, but as it's listed in my affidavit, it's

1   not the exact location.

2          And I would point out, anytime that we do an

3   affidavit like this, as much -- as limiting the exposure of the

4   confidential source -- obviously Mr. Bronner's going to read

5   this at some point in time.  I try to be as vague as I can to

6   protect the identity of the confidential source.

7          But in this case, I mean, obviously it's known now.

8   Q.   And just to follow up, it's not in the affidavit, but did

9   Mr. Clayton tell you what kind of handgun it was?

10  A.   I -- I don't recall.

11  Q.   Or where in the house he saw it?

12  A.   I don't recall.  It's not listed in here.

13  Q.   Now, two weeks later than that, according to your

14  affidavit, on March 15 -- and, again, I'm on page 4 but at the

15  bottom, the bottom paragraph -- you indicate -- and this is

16  during your meeting with the confidential source and source of

17  information.

18          The affidavit indicates that "They stated that

19  Bronner had moved his business from the Knights hotel and had

20  obtained two residences, 204 Lane Avenue South and 137 Lane

21  Avenue South."

22  A.   Yes, sir.

23  Q.   Mr. Clayton didn't mention that to you back on February

24  26?

25  A.   No, sir.  During -- there's a break in this where I was

1  gone for a week to training, and when we came back and

2  resumed -- while I was gone, I remember being contacted -- and

3  this is outside of the affidavit.  I was contacted and told

4  about this.

5         And when I got back, we had a meeting.  After that is

6  when we verified that Ms. Daughtry had the electric utility in

7  her name.  That was whenever they were first establishing the

8  Lane Avenue address.

9  Q.    So your affidavit, for the statements in this paragraph,

10  regarding moving the business and some other ones in that same

11  paragraph, it relies on the confidential source and also the

12  source of information.

13  A.    That particular paragraph, yes.

14  Q.    Everything in that paragraph?

15  A.    Which paragraph?  Are you -- are you referring to the

16  bottom paragraph?

17  Q.    It starts with March 15, 2018.

18  A.    Yes.  It lists CS and SOI in that paragraph.

19         THE COURT:  I think the question was, every sentence

20  that has information begins with, "The CS and SOI stated" --

21         THE WITNESS:  I believe so.

22         THE COURT:  -- or "identified," but all of the

23  information in that paragraph is attributed to both of them, is

24  the question.

25         THE WITNESS:  Yes.  As I stated earlier, it was a

1    joint debriefing.  There were five persons in that room.

2    BY MR. GLOBER:

3    Q.    And you testified earlier, I understand, if I remember

4    correctly, that Mr. Gavin, the SOI, had a hatred for

5    Mr. Bronner.

6    A.    There was a very hostile relationship there, yes.

7    Q.    But nowhere in your affidavit do you mention any sort of

8    hatred or other bias that the SOI may have had for Mr. Bronner.

9    A.    No, sir.  The anger of that person does not make their

10   information invalid or untrue if it's corroborated by facts.

11           Mr. -- the SOI alone, his statement was not used for

12   the affidavit, and his information was also later verified as

13   well.  So I don't think that questions the credibility of his

14   information based on his personal feelings.

15   Q.    I understand what you're saying, Agent, but isn't that a

16   determination for the Court who's deciding whether to issue a

17   warrant or not?

18   A.    I said it's not normal practice to list the feelings of an

19   informant in an affidavit.

20   Q.    I want to turn your attention to the affidavit on page 4

21   to the paragraph that begins March 5, 2018.

22   A.    Yes, sir.

23   Q.    And this one is so short, I'm just going to read it.  "On

24   March 5, 2018, TFO M. Yarborough" -- that's you, right?

25   A.    (Nods head up and down.)

1    Q.    Yes?

2    A.    Yes.

3    Q.    -- "recorded a telephone conversation between the CS" --

4    who is Clayton, right?

5    A.    Correct.

6    Q.    -- "and Bronner.  When asked what the price would be for

7    the CS to purchase one" -- it says "once" but you mean "one

8    ounce"?

9    A.    Yes.

10   Q.    -- "one ounce," once ounce, "of heroin from Bronner, the

11   CS was informed by Bronner that he would sell him/her one ounce

12   for $2100 to $2200."

13          That's what your affidavit says.

14   A.    That's correct.

15          THE COURT:  Is that the call on Exhibit 1?

16          MR. GLOBER:  Yes, Your Honor, it is.

17          THE COURT:  All right.  Government's Exhibit 1.

18          Okay.  Go ahead.

19   BY MR. GLOBER:

20   Q.    Now, there was some translation that took place in between

21   that call and the paragraph you put in the affidavit --

22   A.    That's correct.

23   Q.    -- right?

24   A.    Yes.

25   Q.    So you were referring to heroin in the affidavit, and you

1  believe it was heroin, right?

2  A.    Yes.  I still do.

3  Q.    However, the words that were uttered included "clean

4  clean," "dog food," "LeBron James."  I may be missing

5  something.

6  A.    I believe that was the majority of the names.

7  Q.    Yeah.

8          Did it appear to you, as you heard these different

9  names being uttered on the call, that maybe there was an

10  ambiguity in communication between the two people on the call?

11  A.    That's correct.  Initially, until they both figured out

12  the code word that they wanted to use, yeah, there was some

13  unknowns there, yes.

14  Q.    Have you heard the term "clean clean" in any other context

15  besides that one phone call?

16  A.    I've heard a million names.

17  Q.    Okay.

18          THE COURT:  But he specifically asked you have you

19  heard "clean clean" before as a code for heroin.

20          THE WITNESS:  I've heard "clean," "dirty," things of

21  that nature, but not the exact phrase "clean clean."

22  BY MR. GLOBER:

23  Q.    All right.  Have you heard "LeBron James" as a code for

24  heroin?

25  A.    Only once.

1  Q.    On this call?

2  A.    Not on this -- yes, on this call or on a prior

3  investigation?

4  Q.    On any other --

5  A.    Not related to this case, no.

6  Q.    Have you heard "dog food" before?

7  A.    Yes.

8  Q.    Is that commonly used for heroin?

9  A.    Yes.

10  Q.    What about "up on 28th Street"?  I think I heard that

11  also.

12  A.    Haven't heard that one.

13  Q.    So if you haven't heard "clean clean" or "up on 28th

14  Street," you had a question in your mind whether that was

15  heroin they were talking about, right?

16  A.    Based on the context of the call, my experience listening

17  to these types of calls and conducting these types of

18  investigations, I had no doubt that had we intended to do a

19  controlled purchase, we would have received heroin that day.

20  Q.    So going back to the affidavit, to the paragraph that

21  starts off "On March 5, 2018," you didn't include "clean

22  clean," "dog food," "up on 28th Street," or "LeBron James"

23  anywhere in that paragraph, right?

24  A.    No, sir, I did not.

25  Q.    You made a determination that you believed they were

1    talking about heroin.

2    A.    Correct.  That paragraph is a statement of what I believe

3    occurred on that phone call.

4    Q.    But as far as providing raw data to the judge making the

5    call on this affidavit, on the search warrant application, you

6    didn't provide that raw data to the judge.

7    A.    The slang terms?

8    Q.    Yeah.

9    A.    No, sir, I did not.

10   Q.    You provided your conclusion.

11   A.    That's correct.

12         THE COURT:  Let me ask you this, because I'm not sure

13   it's clear.  It may be clear in the record, but it may not be

14   clear to me.

15         Other than this March 5th, 2018, conversation, had

16   you ever heard "LeBron James" used as a code for heroin before?

17         THE WITNESS:  Yes, sir, in the past.

18         THE COURT:  Okay.  Did you say one other occasion in

19   the past?

20         THE WITNESS:  I would say yes, one other occasion.

21         THE COURT:  Okay.  All right.  Thank you.

22   BY MR. GLOBER:

23   Q.    Do you agree that it would have made for a more complete

24   rendition of the facts in this affidavit to include some of the

25   raw data, such as these terms "clean clean," "dog food," "up on

1    28th Street," "LeBron James," as opposed to just putting your

2    conclusion?

3    A.    With that statement being written by me, in good faith of

4    what I believe occurred on that phone call and my attempts to

5    mask the CS's identity, I believe that that is correctly stated

6    on the affidavit.

7         THE COURT:  Do you think someone reading the

8    affidavit, like the judge, would interpret that to mean that

9    the word "heroin" was used during the call, since it says

10   that -- that when asked about what the price would be for the

11   CS to purchase one ounce of heroin -- do you think the judge

12   reading that thought that the word "heroin" was used?

13        THE WITNESS:  It -- no, sir, I don't believe so,

14   because it doesn't describe a verbatim or transcript type

15   message from that call.  I believe any person reading that

16   would assume that there was additional discussion and other

17   language used on that call.

18        THE COURT:  Do you think that person would have to

19   have at least some knowledge of what happens in the drug trade

20   and understand that people don't just get on the phone and say,

21   "Hey, send over the heroin"?

22        THE WITNESS:  Yes, sir.  I believe that's common

23   knowledge.

24   BY MR. GLOBER:

25   Q.    Would it have been possible for you to have added a

1    sentence to that paragraph saying that the participants in the

2    phone call used code words which you believe mean heroin?

3    A.    I mean, anything's possible.  I could --

4              THE COURT:  Have you ever done that before?

5              THE WITNESS:  Possibly.  Not -- I mean, not right

6    offhand.

7              THE COURT:  Okay.

8    BY MR. GLOBER:

9    Q.    Government's Exhibit 8, the termination of the agreement

10   with Mr. Clayton, is dated July 6, 2018?

11   A.    I don't have it in front of me, but I believe that is the

12   correct date.

13             THE COURT:  I believe it's the 5th.

14             MR. GLOBER:  It's the 5th, July 5?

15             COURTROOM DEPUTY:  It's right there.

16             THE COURT:  It's right in front of you.

17             MR. GLOBER:  Thank you.

18   BY MR. GLOBER:

19   Q.    Yes.  July 5, 2018.

20   A.    Okay.

21   Q.    Where did Mr. Clayton sign that?  Where was he when he

22   signed it?

23   A.    I believe it was when we made payment, if I recall

24   correctly.  I don't recall the exact location.  We normally --

25   we can meet people random places, behind buildings, things of

1   that nature, so that they're not seen meeting with law

2   enforcement.  But primarily at our office is where we conduct

3   our business.

4   Q.   Why did the relationship end at that point in time?

5   A.   We were no longer using him as an active source.

6   Q.   At that point in time, July 5, 2018, were you aware that

7   Mr. Clayton was involved in the drug business, actively

8   involved?

9   A.   I would say during that time my interaction with him was

10  very limited.  We weren't focused on using him in an

11  investigation, but to my knowledge, he was not.

12  Q.   So you didn't fire him because you caught him selling

13  drugs.

14  A.   No, sir.  No, sir.

15  Q.   Okay.  Regarding the phone call that was recorded on March

16  5, 2018, did Mr. Clayton ever buy the one ounce of heroin that

17  you are saying they were discussing?

18  A.   No, sir.  And the purpose --

19  Q.   Did that --

20  A.   The purpose of him saying that he was on the way to a drug

21  test was to prevent Mr. Bronner from being like, "I've got it

22  right now.  I'm waiting on you," setting up a deal that we

23  couldn't complete.

24  Q.   Why --

25  A.   That was the ruse that I came up with.

1    Q.    And you couldn't complete it because Mr. Clayton didn't

2    want to --

3    A.    He didn't --

4    Q.    -- do that.

5    A.    Correct.

6    Q.    Did you think it might be a problem that eventually

7    Mr. Bronner, if he was involved in this, would say, "Hey, what

8    happened to this thing?  You were going to buy an ounce from

9    me"?

10    A.    No, sir.  It's -- we cancel deals all the time, and it's

11    never --

12    Q.    It's just forgotten?

13    A.    They're -- normally, they're busy.  They don't care.  That

14    person will call back later.  They're not held --

15    Q.    So --

16    A.    They're not held to it.  It's not set aside specifically

17    for you, is my understanding.

18            THE COURT:  Did Mr. Clayton, after March 5th, tell

19    you at any point that Mr. Bronner was trying to get in touch

20    with him?

21            THE WITNESS:  I don't recall that being the case.

22            And even on the call, I believe at the end

23    Mr. Bronner told him, "Let me know.  That way I'll have it on

24    deck for you," which means I'll have it ready.  And we never

25    told him to have it ready.

1    BY MR. GLOBER:

2    Q.    Did you ever take any steps with Mr. Clayton to verify

3    that when he was working for you that he wasn't actively

4    selling drugs himself?

5    A.    Other than the time that Mr. Clayton was in my presence, I

6    was not actively investigating or following him or searching

7    his whereabouts, if that --

8    Q.    Did you --

9    A.    -- if that answers your question.

10   Q.    Right.

11          Did you ever ask anybody else, "Hey, is Mr. Clayton

12   selling drugs to you or to anybody else as far as you know?"

13   A.    I don't know who I would ask.

14   Q.    I don't know either.

15   A.    Yeah.

16   Q.    I'm just saying --

17   A.    I would put it like this.  During our interactions with a

18   confidential source, that person has a lot of interaction with

19   the other agents and TFOs that are in that building.  Those

20   people know his name; they know his face.  If they would have

21   heard something, that would be reported to me.

22   Q.    So how often was Mr. Clayton going into your building

23   during this February 26, 2018, through April 23, 2018, period?

24   A.    It wasn't a lot.  During the times that it's documented as

25   a debrief, he was there.

1          Unless we're doing an operation, a lot of that

2    information, if it's anything pressing, they can handle with a

3    phone call, things of that nature.

4    Q.    Now, ultimately -- and I believe you weren't part of this,

5    but ultimately a search warrant was executed at Mr. Clayton's

6    house, right?

7    A.    No, sir.  I did not know that.

8    Q.    In November of 2018?

9    A.    Oh, are you referring to the arrest docket?

10   Q.    Yes.

11   A.    Okay.  Yes, yes.

12   Q.    Did you ever go by his house during the time he was

13   working for you?

14   A.    No, sir, I did not.  At the time he was working for me,

15   Mr. Clayton was normally in Kingsland, Georgia, normally.  When

16   I would contact him by telephone, or he would contact me, he

17   was normally in Kingsland, Georgia.

18   Q.    Did you ever go up to his Kingsland, Georgia, address --

19   A.    No, sir.

20   Q.    -- and see what was up?

21   A.    No, sir, I did not.

22   Q.    Do you know whether anybody did --

23   A.    No, sir.

24   Q.    -- anybody with DEA or --

25   A.    No, sir.

1    Q.    -- any law enforcement at all?

2    A.    I'm not sure of any law enforcement visits at that

3    location.

4    Q.    If you found out that he was selling drugs during this

5    period of time, would you have put it in your affidavit?

6    A.    There probably would have never been an affidavit drafted

7    if I'd questioned the information that I had been provided.

8    Q.    But somebody selling drugs can still give you information

9    you can act on, right?

10    A.    It wouldn't have been information that I would have been

11    comfortable putting in an affidavit if I'd had direct knowledge

12    of any interaction with law enforcement or things of that

13    nature, so . . .

14            When I sign my name to an affidavit, it's made in

15    good faith.

16    Q.    So nobody called your attention to Mr. Clayton being

17    involved in the drug business during this period of time,

18    February 26, 2018, through the search warrant application April

19    23, 2018.

20    A.    No, sir, not to my knowledge.

21            THE COURT:  That's correct, though.  What he said is

22    correct.  No one brought it to your attention, correct?

23            THE WITNESS:  Yes.  I had no reason to question his

24    integrity.

25            THE COURT:  But answer the question, please.

1        Is it correct that no one brought any information to

2   you about the CS, Mr. Clayton, dealing drugs on his own?  Is

3   that correct?

4             THE WITNESS:  Yes.

5             THE COURT:  Okay.

6   BY MR. GLOBER:

7   Q.   But you didn't go looking for that information either.

8   A.   No, sir, I did not.

9   Q.   I want to ask you some questions about the pole camera at

10  4361 Melissa Court.

11       Am I correct in understanding it went up on March 16,

12  2018, and came down on May 1, 2018?

13  A.   That's my understanding.

14  Q.   And it was positioned to offer a view of the front of the

15  house?

16  A.   That's correct.

17  Q.   And also the driveway.

18  A.   Correct.

19  Q.   And also one side of the house.

20  A.   Based on the availability of the mounting locations.

21  Q.   Yes.  But it also offered a view of one side of the house.

22  A.   Correct, like the leading edge of the house.

23  Q.   You were able to visualize people from that pole camera

24  who came to visit Mr. Bronner?

25  A.   Yes.

1  Q.   And you could visualize people leaving Mr. Bronner's house

2  there at Melissa Court.

3  A.   That's right.

4  Q.   You could see cars coming and going.

5  A.   Correct.

6  Q.   You could link observations at Melissa Court that were

7  done by the pole camera with observations made by humans down

8  at the Lane Avenue addresses, 137 and 204 Lane Avenue.

9  A.   That's correct.

10 Q.   And you used it basically every day it was up, right?

11 A.   I would say the majority of the time, yes.

12        THE COURT:  Well, wait, now.  Let's focus in a

13 little.

14        If it's up for six weeks, a majority of the time

15 would be three weeks and a day, so that's --

16        THE WITNESS:  I would say there were multiple spot

17 checks per day or during an operation, surveillance, things of

18 that nature.

19 BY MR. GLOBER:

20 Q.   So virtually every day?

21 A.   At some point, yes.

22        THE COURT:  At some point during every day or at some

23 point you did look at it every day?

24        THE WITNESS:  I would say for the most part.  I'm

25 sure there were days on the weekends or if I wasn't at work, I

1    didn't feel the need to look at it.

2    BY MR. GLOBER:

3    Q.    But virtually every day during the period it was up, you

4    looked at it at some point during that day.

5    A.    I -- I don't think that's an accurate way to -- I see what

6    you're saying now, your question.

7         If I didn't look at it on a particular day, I could

8    always go back and look at a particular time to see if there

9    was anything that struck my curiosity or I thought was relevant

10   to the case, yes.

11        THE COURT:  Okay.  So let me ask it this way.  And I

12   know -- I know you're wondering why we're picking this to

13   death, but this has become part of the legal analysis of all

14   this, so that's why we're zeroing in on it.  And we may be

15   barking at the moon, but we -- you know, at least at this

16   point, we all think we need to.

17        You either could look at it live, or you could look

18   at the recording of it.  Is that correct?

19        THE WITNESS:  That's correct.

20        THE COURT:  All right.  So in terms of looking at the

21   recording, combining that with looking live, do you think you

22   looked at the camera and saw something from every day it was

23   up, just about?

24        THE WITNESS:  Related to pertinent information coming

25   from that case?

1       THE COURT:  Yeah.  I'm saying -- I'm just saying that

2  pole camera -- like, if you -- let's say you didn't look at it

3  on Monday and Tuesday or maybe you didn't look at it on

4  Saturday and Sunday because you weren't working.

5       When you got back Monday, did you go back and look at

6  the video of Saturday and Sunday?

7       THE WITNESS:  Yes.

8       THE COURT:  All right.  And so if you looked at it

9  live on Monday, Tuesday, Wednesday, and then you missed it

10  Friday, Saturday, Sunday, when you got back the following

11  Monday, did you go back and look at Friday, Saturday, and

12  Sunday?

13       THE WITNESS:  Normally.

14       THE COURT:  At least --

15       THE WITNESS:  Normally, yes.

16       THE COURT:  At least breeze through it?

17       THE WITNESS:  Yes, sir.

18       THE COURT:  Okay.  So I guess that's the question.

19       Either live or via video, did you check what was

20  going on every day?

21       THE WITNESS:  No.

22       THE COURT:  All right.  And so how many days do you

23  think you missed in six weeks?

24       THE WITNESS:  I mean, it's going to be a guesstimate.

25  I would say one to three days --

1          THE COURT:  All right.

2          THE WITNESS:  -- possibly.

3          THE COURT:  All right.

4          THE WITNESS:  It's not something I can give an

5    accurate number on, sitting here.

6          THE COURT:  All right.  I can tell you, as this is

7    litigated, agents are going to start taking note of how many

8    times they're looking at it --

9          THE WITNESS:  Yes, sir.

10          THE COURT:  -- because that's one of the things that

11   courts who are looking at this, they want to know how --

12   because in certain courts -- and I'm not saying what -- I'm not

13   even sure that -- the law could change by tomorrow.

14          But how often something is monitored goes to the

15   question of how intrusive it is.  So if there's a camera up

16   across the street from Mr. Bronner's house for six weeks but

17   you only look at it one day, then it's hard to argue that that

18   was overly intrusive.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  But if you looked at it for six weeks

21   every single day, either video or live, Mr. Glober's going to

22   argue that that's much more intrusive.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  So that's why we're asking.

25          THE WITNESS:  And as I stated earlier, I'm sure there

1    are large gaps of time and probably a large portion of those

2    recordings that I haven't seen.

3            THE COURT:  All right.  He's just trying to focus in

4    on how many days out of the number it was up did you look at

5    it, either videotaped or live.

6            Is that right?

7            MR. GLOBER:  Yes, Your Honor.

8            THE COURT:  All right.  I think you said all but

9    about three days, possibly.

10           THE WITNESS:  Yes, sir, maybe three days.

11           THE COURT:  Okay.  All right.

12   BY MR. GLOBER:

13   Q.   The video is time-stamped.

14   A.   That's correct.

15   Q.   So you could search by date and time.

16   A.   Yes.

17   Q.   In that fashion it is digitally searchable.

18   A.   Yes.

19   Q.   By the time the warrants were issued on April 23 of 2018,

20   the pole camera had been up for over a thousand hours.

21           Do you agree with that?

22   A.   I don't know the -- I don't have the math in front of me,

23   but a rough estimate, that -- that may be right.

24   Q.   Yeah.  24 hours a day times 43 days, approximately.

25   A.   In that area.

1  Q.    Specifically with regard to the 4361 Melissa Court

2  address, you only did live surveillance there a couple times,

3  right?

4  A.    That's correct.

5  Q.    And was it both times that neighbors approached your

6  truck?

7  A.    Yes.

8  Q.    And generally speaking, that's not a bad thing --

9  right? -- for neighbors to be aware of a strange vehicle in the

10 neighborhood.

11 A.    That's correct, but we never know who he's friends with in

12 that neighborhood that could tell him, "The cops are right down

13 the street."

14 Q.    Did the people who came and looked your truck over -- did

15 it appear that they figured out you were the police?

16 A.    On this particular time, I got out with a hard hat and a

17 vest and acted as if I were working on a telephone box --

18 Q.    So maybe they did --

19 A.    -- in that area.

20 Q.    -- maybe they didn't.

21 A.    Yes, sir.

22 Q.    Okay.  So the pole camera was really indispensable for you

23 at that location.

24 A.    We were very limited on our abilities to perform

25 surveillance without the pole camera.

1    Q.    All right.  So you can only show up in that neighborhood

2    with a hard hat and vest so many times, right?

3    A.    Correct.

4    Q.    With respect to evidence in your affidavit that relates to

5    the Melissa Court house as opposed to the Lane Avenue houses,

6    it's mainly derived from the telephone -- or, excuse me, the

7    pole camera, right?

8    A.    I would say yes.

9            MR. GLOBER:  Your Honor, I don't have any other

10    questions.

11            THE COURT:  All right.  Let me just ask one question

12    before I turn it back over to Ms. Washington.

13            In your affidavit, on page 4, in the paragraph

14    starting, "On February 26, 2018," seven lines down there is a

15    sentence that starts, "The CS stated Bronner stored large

16    quantities of cocaine and heroin at his residence at 4361

17    Melissa Court West, Jacksonville, Florida 32210."

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Did he tell you how he knew that?

20            THE WITNESS:  Multi-ounce quantities that he had seen

21    there, and it was my understanding that he had purchased that

22    amount of quantity before in the past.

23            THE COURT:  All right.  Anything else?

24            MR. GLOBER:  No, Your Honor.

25            THE COURT:  All right.  Ms. Washington?

113

1     MS. WASHINGTON:  Very briefly, Your Honor.

2                    REDIRECT EXAMINATION

3  BY MS. WASHINGTON:

4  Q.   Officer Yarborough, one of the things mentioned was

5  talking about monitoring Mr. Clayton here in this case.

6           Is it your practice, when you sign someone up in

7  terms of DEA, that you do any sort of supervision once they're

8  signed up as a cooperator?

9  A.   No, ma'am.

10 Q.   And why is that?

11 A.   Time constraints, the feasibility of trying to do that.

12 These people are not under our custody.  We don't have any

13 authority to follow them around, to come in their house and dig

14 through their belongings without consent, and it's not normal

15 practice to do so.

16          The only time that we are under, I guess, strict

17 supervision and searching them is when we are doing

18 confidential -- I'm sorry, controlled buys, things of that

19 nature, when they meet with us.

20 Q.   And so would you say that's really the only terms of

21 supervision that occurs in -- in a confidential source

22 relationship?

23 A.   That is a normal confidential source relationship.

24 Q.   And just following up on the questions about the pole

25 camera, although the pole camera ran later -- I think you'd

1  indicated it was due to when FDLE was able to take it down --

2  would you have stopped watching any footage once Mr. Bronner

3  was arrested?

4  A.    After the search warrant execution, I don't know that I

5  ever looked at it again.  I never had any reason to.

6            MS. WASHINGTON:  Nothing further, Your Honor.

7            THE COURT:  All right.  Do you have another question?

8            MR. GLOBER:  If I may, Your Honor.

9            THE COURT:  Yes, of course, yeah.  We're not in any

10  hurry.

11                    RECROSS-EXAMINATION

12  BY MR. GLOBER:

13  Q.    Regarding the pole camera, how many feet above the ground

14  would you estimate it was?

15  A.    Without asking Mr. Bronner the height of the streetlights

16  in his neighborhood, I would -- I would estimate, just from

17  driving through there, maybe seven feet.  The purpose is to

18  light up the sidewalk area, so they're not very tall.

19  Q.    You never saw Mr. Clayton at any of Mr. Bronner's

20  locations?

21  A.    No, sir.

22            MR. GLOBER:  No other questions, Your Honor.

23            THE COURT:  All right.  Let me ask you a couple of --

24  couple of additional questions.

25            In your affidavit, on page 5, there are two -- there

1   are three references to surveillance on March 27th, 2018,

2   starting at about the middle of the page.

3          And you have the surveillance at 137 Lane Avenue

4   that's in the -- the first March 27th, 2018, paragraph, and

5   then you reference 204 Lane Avenue.

6          That's physical surveillance that was performed.  Is

7   that correct?

8          THE WITNESS:  Yes, sir, and I also have photographs

9   from those.

10         THE COURT:  That you took or someone else -- some

11   other law enforcement officer took?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  All right.  When you go to paragraph --

14   the next paragraph, "March 27, 2018, at approximately 11:26

15   a.m., Bronner was observed arriving as a passenger in a vehicle

16   at 4361 Melissa Court West," the information in that paragraph

17   you obtained from the pole camera.  Is that correct?

18         THE WITNESS:  Yes.

19         THE COURT:  All right.  And then the next paragraph,

20   "March 27, 2018, at approximately 5:22 p.m., Bronner returned

21   to 4361 Melissa Court West," the information in that paragraph

22   was obtained via the pole camera.

23         THE WITNESS:  Yes.

24         THE COURT:  All right.  Now I want to go back,

25   because this is -- this is something that I'm not clear on.

1   Maybe the record will be after I go back and look at the

2   transcript.

3           But, obviously, you can tell from the questions that

4   there are issues that have been raised about the credibility of

5   the confidential source and the source of information.

6           And this paragraph on page 4, the last paragraph that

7   carries over to page 5, "On March 15th, TFO Yarborough, TFO D.

8   Hickox, and Jacksonville Sheriff's Office Detective K. Guthrie

9   met with and debriefed the CS, who was accompanied by a

10  documented JSO source of information."

11          So we're talking about the CS; that's Clayton.  We're

12  talking about the SOI; that's Gavin.  Correct?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  All right.  And then we've probably beat

15  this to death, but every sentence in that paragraph after what

16  I just read, other than the next one, which is -- well, the

17  next sentence is, "The CS had requested to meet with TFO

18  Yarborough due to he/she and the SIO having new information

19  regarding Ronald Bronner's illegal activities."

20          From there on, all of the information is attributed

21  to both the CS and the SOI, to Clayton and Gavin.

22          THE WITNESS:  Yes.

23          THE COURT:  And so I think I asked you this a number

24  of times, and I'm not -- I'm not sure that I -- I'm sure I'm

25  not clear about it yet.

1    I'm trying to determine what information during that

2    debriefing the CS provided to you and that was the CS's

3    information; what information -- when you attribute it to both

4    of them, you attribute it to both of them because the SOI just

5    sat silent and didn't say something to the effect of, "No,

6    that's not right"; and what information both of them actually

7    provided to you; and what information just the SOI, Gavin,

8    provided to you, because those are all of the options.

9        THE WITNESS:  Yes, sir.

10       THE COURT:  And so when you're reading this, I'm

11   thinking -- at least when I read this, I assumed that -- that

12   all of the information was provided by both of them in detail.

13       And -- but I think by the way you answered the

14   question previously, some of it, or even most of it maybe, was

15   the CS, because I think you said something to the effect that

16   you didn't really feel like you relied that much on the SOI's

17   information because of the situation with the woman that we

18   were talking about.

19       THE WITNESS:  Yes, sir.

20       THE COURT:  So -- and I know you said you had a

21   report, and you said you could find it.  And I said, "Well, you

22   know, we'll get back to that."  I thought maybe we would.

23       But I -- I need for you, again, if you would, please,

24   to try to explain to me who provided what information to you

25   that's contained in that paragraph.

1        THE WITNESS:  So as I explained earlier -- I think

2   you and I -- I was very confused as to what you were asking.

3        As it relates to the source of information and the

4   CS, as it's listed in this affidavit, that information was

5   equally provided.  Both of those persons had knowledge of this

6   information.

7        As it relates to the report, there is substantially

8   more information that the SOI provided that is not listed in

9   this affidavit.

10       THE COURT:  All right.  So -- and so I'm trying to --

11  just, in my mind, having been in a few debriefings over the

12  years, trying to see how this goes when you have a CS and SOI

13  in the same room at the same time.

14       THE WITNESS:  Yes, sir.

15       THE COURT:  Right?

16       And how you determine who to attribute the

17  information to.

18       THE WITNESS:  And, again, like I said, looking back,

19  I wish I had done separate, just for the clarification here.

20       But as it states, that day, there were five of us in

21  there.  And this is a group conversation as we're all trying to

22  look on maps and figure out exactly where they're talking

23  about, things of that nature.

24       But I would put this as an example.  If myself and

25  Mr. Glober here were having a conversation, and Mr. Bronner's

1    engaged in this conversation, and he's telling me an address

2    and --

3            THE COURT:  "He" meaning Mr. Glober?

4            THE WITNESS:  Mr. Glober, yes, sir.

5            So say Mr. Glober's, "It's right there at the

6    two-story white house," Mr. Bronner chimes in, "Yeah, with the

7    green shutters across from this" -- I mean, this is a group

8    conversation.

9            Not one person has more information than the other,

10   both of these individuals, because these are pretty basic

11   facts.  I wouldn't say there was anything secretive that was

12   not common knowledge of the persons buying drugs in that area.

13   But as it relates to that meeting that day, I would say that

14   those persons equally had knowledge of those facts.

15           Like I said, as it relates to the report from that

16   day, there's substantially more information that the source of

17   information provided that the CS did not have knowledge about.

18           THE COURT:  All right.  Well, let me ask you this,

19   then.  If you go to the sentence in that paragraph -- I

20   understand what you're saying.

21           If you go to the sentence in the paragraph that

22   states, "The CS and SOI stated 204 Lane Avenue South was used

23   for primarily as a point of sale for small street-level amounts

24   of heroin and 137 Lane Avenue South was used as a point of sale

25   for larger quantities of narcotics and storage due to the close

1    proximity of the two addresses," what was their basis for

2    knowing that?  In other words, how did those two know that,

3    that that's what happened?

4              THE WITNESS:  From being present at that house, would

5    be my understanding, or either watching, learning, talking to

6    females.  Because remember, there was the female in common that

7    Mr. Gavin had, so that would be a possible avenue for that.

8              As to how they knew the exact layout and what was

9    going on there, I can't say for sure.

10             When we send these people out, when they leave me, I

11   tell them, you know, "Try to listen out, learn as much as you

12   can," things of that nature.

13             THE COURT:  Yeah, but when you're interviewing them

14   in a debriefing and they say, "Hey, he switched his place," do

15   you say, "How'd you figure that out?  I mean, how do you know

16   that?"  Because you -- I'm guessing that you want to assure

17   yourself that they're not just coming in and making stuff up.

18             So, you know, when somebody knows something, you

19   know, the question, it seems to me, that's logically asked is,

20   "How do you know it?" because you as the law enforcement

21   officer want to know if it's firsthand hearsay, secondhand

22   hearsay, thirdhand hearsay or if they put their eyes on it so

23   it's firsthand knowledge.

24             And so that's what I'm trying to get at here, because

25   you don't indicate that in the affidavit, correct?

1          THE WITNESS:  Correct.

2          THE COURT:  All right.  So the judge who's reading

3   this doesn't know if the CS and SOI were at the locations of

4   137 and 204 Lane Avenue.  The judge reading this doesn't know

5   if this was heard from someone who had gone in there and bought

6   dope.

7          They don't know if this is from someone who knew

8   someone who went in and bought dope.  They don't know if it's

9   someone who knew someone who knew someone who knew the girl

10  you're -- or the woman you're talking about.  So the judge

11  doesn't know that --

12         THE WITNESS:  Yes.

13         THE COURT:  -- because it's not in here.

14         So I'm asking you, do you know that?  Do you know how

15  they have that information?

16         THE WITNESS:  Based on the other report, not -- with

17  the information not included in the affidavit, yes.  And based

18  on the observations -- because you -- like, as you asked me,

19  how do I know that, because I went to that location myself and

20  sat and watched and had pictures of Mr. Bronner across the

21  street performing the same acts that were described to me.

22         THE COURT:  Yeah.  I understand that, but you're

23  putting in here that they told you this at that time.

24         THE WITNESS:  That's correct.

25         THE COURT:  Okay.  That's what you're -- you're

1   saying they told you that at that time.

2          You may have, as you set out here, did surveillance

3   afterwards and verified what happened here, but I'm focusing

4   exactly on what you're telling the judge that the CS and the

5   SOI told you.

6          I'm not focusing on whether you later corroborated

7   it.  That's important, but that's another issue.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  My question is, do you know how they knew

10  this, that sentence I read to you?

11         THE WITNESS:  Do I know, yes, but it's not listed in

12  the affidavit in detail.

13         THE COURT:  Okay.  All right.  And so my question is,

14  you know how it was.

15         Was it someone told them that, or did they actually

16  go to these two residences?

17         THE WITNESS:  It was firsthand knowledge.

18         THE COURT:  So they were at the residences.

19         THE WITNESS:  My understanding, yes.

20         THE COURT:  All right.  And did you ask them why they

21  went to these residences?

22         THE WITNESS:  As described in the report, Mr. Gavin

23  went into great detail about how he would break down dope and

24  some more of the details with Mr. Bronner's business in the

25  past.

1          THE COURT:  I know.

2          So I guess what I'm getting at, when he reported this

3   to you, was Mr. Gavin actually over there doing some work and

4   still working and then he came and told you what happened?

5          THE WITNESS:  Mr. Gavin's interaction was very

6   limited.  This is the only time that I ever met him.  Where he

7   was at the day before that meeting, prior, sir, I can't say.

8          THE COURT:  Yeah.  I'm --

9          THE WITNESS:  He wasn't under my control or --

10         THE COURT:  I'm doing a terrible job asking these

11  questions because I'm not getting my point across.

12         Because -- because what I'm concerned about here is,

13  in deciding whether there's probable cause in this, one of the

14  things the Court is going to have to do is look at (1) what was

15  the basis of knowledge -- okay? -- for the information that's

16  contained in this affidavit.  That's one.

17         And (2) if cooperating individuals or cooperating

18  sources are relied upon, how can -- or how could the judge who

19  read this determine their veracity, okay?  That's what I'm

20  going to have to look at.

21         All right.  So one of the ways a Court looks at

22  whether a CS was providing truthful information that was

23  relayed to the Court or whether the affiant was verifying that

24  is to look at other corroborating information, right?

25         THE WITNESS:  Yes.

124

1              THE COURT:  Okay.  And that's what you've said right
2    in here, that the information provided by the CS -- you say
3    that, I think, right at the end.
4              You say that the -- that the information made during
5    the investigation verified information from the confidential
6    source, right?
7              THE WITNESS:  Yes.
8              THE COURT:  And verified I'm assuming means all of
9    the things that you have in the affidavit, surveillance, the
10   two traffic stops where the people told you where they got the
11   drugs, the pole camera, right?
12             THE WITNESS:  Yes.
13             THE COURT:  Are those -- is there -- that's the
14   verified information?
15             THE WITNESS:  That's -- yes, yes.
16             THE COURT:  That's what you're referring to there,
17   right?
18             THE WITNESS:  Yes, all the investigative techniques
19   and activity that were listed in the affidavit.
20             THE COURT:  Right.  And when I look at this, one of
21   the other ways that a judge might determine whether the
22   information from the CS is verified is that you have a second
23   person who's saying the same thing -- right? --
24             THE WITNESS:  Yes.
25             THE COURT:  -- the SOI.

1          So that's another way the judge would look at this

2    and say, "Wow, this just isn't the CS.  There's a whole nother

3    person here who knows this information."

4          And so that's why I'm trying to drill down here on,

5    back to the basis of knowledge, how the CS and the SOI knew all

6    of this information in -- in the paragraph on page 4 that

7    starts March 15th, 2018.

8          So that's why I'm focusing on that because I just --

9    I just want to know how the CS and the SOI knew what they put

10   in here, okay?

11         And if they knew it because they were at these houses

12   and saw those drugs and saw the drug dealing going on --

13   because that's what it says, that the house is being used as a

14   point of sale for small amounts of heroin, that Lane Ave- --

15   137's used as a point of sale for larger narcotics.  That's

16   pretty specific information.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.  So my question is, were they at

19   those two residences and did they see that and that's how they

20   knew it, or did someone else tell them that?

21         And if they were at that house and doing it, my

22   curiosity gets to me, and that curiosity is, "What was the CS

23   doing there?"

24         So that's where I'm kind of going with this.  So can

25   you help me with how the CS --

1          THE WITNESS:  Yes, sir.

2          THE COURT:  -- and the SOI knew that information?

3          THE WITNESS:  As I stated, the source of information

4    explained that he was involved deeply in Mr. Bronner's

5    narcotics business.  That's how he had the knowledge about the

6    things that he had knowledge of.

7          As it relates to the CS, I don't tell these people

8    not to associate, don't be around them.  If --

9          THE COURT:  And I'm not attacking what you do.

10          THE WITNESS:  Okay.

11          THE COURT:  I just want to know what he did.

12          THE WITNESS:  It was my understanding that both of

13    these individuals had been to that location.

14          THE COURT:  And so that would have been sometime

15    after the original debriefing.

16          THE WITNESS:  Correct.

17          THE COURT:  Okay.  Because the original debriefing --

18    this was a change.  The March 15th, 2018, information is a

19    change in the way things were operating.

20          THE WITNESS:  Correct.

21          THE COURT:  All right.  So from that paragraph and

22    the information they provided you, you knew that -- from them

23    that this was -- this was the new way of operating.

24          THE WITNESS:  Correct.

25          THE COURT:  All right.  And so they knew this

 1    firsthand.

 2              THE WITNESS:  Yes.

 3              THE COURT:  All right.  All right.  I'm sorry if I

 4    didn't ask that clearly because I'm -- let me just see if I

 5    have any other questions.  Hold on one second.

 6         (Brief pause.)

 7              THE COURT:  All right.  So let's now go -- whose turn

 8    is it?  I've used my turn and everybody's else's.  But I've

 9    done enough of these to know that if you don't ask the

10    questions now, you've got to reopen the hearing later or go

11    without the answers.

12              So, Ms. Washington, do you have anything else at this

13    point?

14              MS. WASHINGTON:  No, Your Honor.

15              THE COURT:  Mr. Glober, do you have any other

16    questions?

17              MR. GLOBER:  If I may, very briefly.

18              THE COURT:  Yeah.  Let's do this.  Let's take about a

19    ten-minute recess.  You regroup a little bit.  We're not in any

20    hurry here.  You take your time, whatever you think you want to

21    ask, and then -- and then we'll -- we'll see what the schedule

22    is from there, okay?

23              MR. GLOBER:  Yes, Your Honor.

24              THE COURT:  All right.  So we're in recess.

25              COURT SECURITY OFFICER:  All rise.

1          (Recess from 2:26 p.m. until 2:43 p.m.; all parties

2     present.)

3               COURT SECURITY OFFICER:  All rise.  This Honorable

4     Court is now in session.

5               Please be seated.

6               THE COURT:  All right.  We're back in United States

7     of America against Ronald Leon Bronner, 3:19-cr-109-J-34JRK.

8     Mr. Bronner's present in the courtroom.

9               We took a break because Mr. Glober thought he might

10    have some additional questions.  I wanted to look at my notes.

11              So do you have some additional questions?

12              MR. GLOBER:  I do not, Your Honor.

13              THE COURT:  All right.  Well, I do, as you might

14    guess.

15              So, Agent Yarborough, if you'd retake the stand,

16    please.

17              I'll remind you, sir, you're still under oath.

18              THE WITNESS:  Yes, sir.

19              THE COURT:  All right.  Let me just ask you a couple

20    of questions here.  As I was reviewing my notes, this may be a

21    product of bad note-taking, or maybe I just didn't explore it.

22              Now, you learned of or you were introduced to the CS,

23    Mr. Clayton, through Trooper Earrey?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  All right.  Now, Trooper Earrey, is he

1   on -- is he on the DEA task force?

2          THE WITNESS:  He actually just found out he's going

3   to be in the future, but at this time he -- he was not.

4          THE COURT:  All right.  And can you tell me again, if

5   you know, how Trooper Earrey knew the confidential source,

6   Clayton?

7          THE WITNESS:  How their relationship started, I don't

8   know.  I know that Trooper Earrey has contacts throughout the

9   neighborhoods in Jacksonville.  He's very well known for

10  narcotics interdiction work and has befriended a lot of these

11  people.  But the nature of their relationship, I -- I don't

12  recall.

13         THE COURT:  And did you determine -- when you either

14  spoke to Trooper Earrey or when you first spoke to the

15  confidential source, did you determine what motivated the

16  confidential source to come in or to -- to either tell Trooper

17  Earrey he wanted to provide information or for -- for him to

18  decide that he wanted to?

19         THE WITNESS:  Yeah.  If I recall correctly, it was my

20  understanding -- Trooper Earrey's limited on how he can use

21  informants.  I mean, he's in a marked patrol car and is not in

22  an investigative capacity.

23         I think, after a period of getting information from

24  Kasper and their interactions, he suggested that Kasper meet

25  with me, who does primarily do that and can also pay for

```
 1   information.
 2           THE COURT:  All right.
 3           THE WITNESS:  So I guess it would have been a
 4   referral, per se, "I can't help you, but you should talk to
 5   Matt."
 6           THE COURT:  All right.  Meaning you.
 7           THE WITNESS:  Yes, sir.
 8           THE COURT:  All right.  So let me -- let me ask you
 9   this, shifting gears completely here.
10           You've testified to a number of practices that --
11   that you use or follow when applying for search warrants.
12           About how many search warrants have you applied for
13   in your career?
14           Let's start with Baker County.  How long were you at
15   Baker County?
16           THE WITNESS:  Almost eight years.
17           THE COURT:  All right.  So when did you start there?
18           THE WITNESS:  In 2008 I started there.
19           THE COURT:  All right.  So who was -- was Joey Dobson
20   the sheriff then?
21           THE WITNESS:  Yes, sir, he was.
22           THE COURT:  All right.  So -- so you started in 2008.
23           You were on the road for how long?
24           THE WITNESS:  Approximately four years.
25           THE COURT:  All right.  And then you moved into
```

1  narcotics?

2          THE WITNESS:  That's correct.

3          THE COURT:  All right.  Now, who was in charge of

4  narcotics there?

5          THE WITNESS:  Lieutenant Brad Dougherty at that time,

6  and Chuck Brannen, who was a major, had just left about that

7  time.

8          THE COURT:  And where did he go, Bradford?  Did he go

9  to Bradford County?

10          THE WITNESS:  He retired, and I believe he's now with

11  the House of Representatives.

12          THE COURT:  All right.  So then you were, what,

13  two-and-a-half years in narcotics at Baker County?

14          THE WITNESS:  I would have been close to

15  three-and-a-half.

16          THE COURT:  Three-and-a-half?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  All right.  Now, did you apply for many

19  or any search warrants when you were on the road?

20          THE WITNESS:  No, sir, not that I recall.

21          THE COURT:  All right.  So then the three-and-a-half

22  years in narcotics, how many search warrants do you think you

23  applied for?

24          THE WITNESS:  I would estimate 40 to 50, possibly.

25          THE COURT:  And were those all state?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Now, Baker County had

3    somebody on the DEA task force then, right?

4          THE WITNESS:  Correct.  Randy Crews was on there at

5    that time.

6          THE COURT:  And he's the undersheriff now, right?

7          THE WITNESS:  Major, yes, sir.

8          THE COURT:  Major?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Is that his title, or is he the No. 2

11    guy?

12          THE WITNESS:  Major.  Baker doesn't have an

13    undersheriff, per se.  The title's major, but he fulfills the

14    capacity of undersheriff.

15          THE COURT:  All right.  All right.  So then you went

16    to FDLE from there.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  All right.  And did you -- what did you

19    work when you were initially at FDLE?

20          THE WITNESS:  Narcotics is the only thing that I've

21    worked since my time there.

22          THE COURT:  All right.  And so you've been with FDLE

23    for how long?

24          THE WITNESS:  Since November of 2015.

25          THE COURT:  When were you assigned to the DEA task

 1    force?

 2            THE WITNESS:  I reported there in July of 2016.  I

 3    believe I was sworn in in September of 2016.

 4            THE COURT:  Did that coincide with Randy Crews

 5    leaving --

 6            THE WITNESS:  No, sir.

 7            THE COURT:  -- or did you overlap with him?

 8            THE WITNESS:  We overlapped by a few months.

 9            THE COURT:  By a few months.  All right.

10            And so how many search warrants have you applied for

11    since you've been -- approximately, since you've been on the

12    task force?

13            THE WITNESS:  Less than 20.

14            THE COURT:  More than 10?

15            THE WITNESS:  Ish.  Let's say 12.  I think 12 or 15

16    would be a fair number --

17            THE COURT:  All right.

18            THE WITNESS:  -- not including ping orders.

19            THE COURT:  All right.  I'm talking about not

20    electronic related but residences, cars --

21            THE WITNESS:  Oh, I would --

22            THE COURT:  -- safes, whatever.

23            THE WITNESS:  I would -- let's go with 10 or 12 --

24            THE COURT:  All right.

25            THE WITNESS:  -- I believe, would be a fair --

1           THE COURT:  I'm not trying to pin you down exactly,

2    but I just think, given your testimony about -- about your

3    practices, it's good to have a number --

4           THE WITNESS:  Yes, sir.

5           THE COURT:  -- to it.

6           Have you applied for any federal search warrants?

7           THE WITNESS:  No, sir, I haven't.

8           THE COURT:  All right.  Let me see.

9           Now, how about pole cameras?  How many times, in

10   investigations that you've been leading -- you were the lead in

11   Mr. Bronner's investigation for the task force, correct?

12          THE WITNESS:  That's correct.

13          THE COURT:  How many times leading an investigation

14   have you used a pole camera?

15          THE WITNESS:  Maybe four times.

16          THE COURT:  And have they all been -- have they all

17   been with FDLE --

18          THE WITNESS:  Yes, sir.

19          THE COURT:  -- and/or the task force?

20          THE WITNESS:  Yes.  Yes.

21          THE COURT:  In other words, you didn't use the DEA

22   guys for this.  You used your FDLE guys?

23          THE WITNESS:  Correct.

24          THE COURT:  And you testified -- and I'm not trying

25   to quote you, but you testified at some point that you didn't

1    apply for a warrant because you didn't think you needed one for

2    the pole camera.

3              THE WITNESS:  Correct.

4              THE COURT:  Is that -- was that -- did you -- is that

5    something you knew from the previous pole cameras or something

6    that was part of your training, law enforcement training?

7    What -- where did you come up with that idea?

8              THE WITNESS:  With my involvement in any case during

9    my career that a pole camera has been used, I don't recall of

10   any being placed that required or had a search warrant.

11             THE COURT:  All right.  So it's really your

12   experience.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Okay.  All right.  Now, I asked you a

15   couple of questions about this before, and you, I think,

16   explained it to a degree.  But I want to make sure I understand

17   it, because I was asking you about Mr. Bronner being on federal

18   supervision, and I'm guessing -- and I think you testified to

19   this.

20             You figured that out pretty quickly once you figured

21   out that Jabo was Mr. Bronner.

22             THE WITNESS:  Correct.

23             THE COURT:  All right.  And then you were in touch

24   with his probation officer?

25             THE WITNESS:  Yes.  I believe it was Cedric Donar.

1          THE COURT:  Donar?

2          THE WITNESS:  Donar, yes.

3          THE COURT:  All right.  And then you said something

4    to the effect that you basically decide whether to go state

5    with something or to -- to pursue it with the state or to

6    pursue it federally.  Is that right?

7          THE WITNESS:  That's correct.

8          THE COURT:  And so in this instance, you decided to

9    pursue it state?

10         THE WITNESS:  That's correct.

11         THE COURT:  All right.  Did you contact any federal

12   prosecutor about it?

13         THE WITNESS:  No, sir, I did not.  Maybe I should

14   have, looking back.

15         THE COURT:  I'm not second-guessing you.

16         THE WITNESS:  Yeah.  No, sir.

17         THE COURT:  I'm just curious.

18         THE WITNESS:  I spoke to Mr. Donar, his probation

19   officer, for guidance there, and I wouldn't say I was shunned,

20   but pretty much just, "Yeah, well, let me know what you find

21   out."  There was very little interest shown.

22         THE COURT:  Well, what about your -- your DEA

23   supervisor, though?  Did he have any -- any suggestion that you

24   try to go federal with it?

25         THE WITNESS:  We're not steered in any manner.  It's

1    pretty much up to the -- I believe the agents themselves are

2    motivated to use the federal system.  That's why they were

3    created in the first place.

4               THE COURT:  The DEA agents?

5               THE WITNESS:  Yes, sir.

6               But as far as the TFOs, we have a lot more

7    preference, and it's completely acceptable if we decide to use

8    the state system.

9               THE COURT:  All right.  And -- but yet, you used the

10   state system.  Mr. Bronner was arrested on April 28th, 2018 --

11   27th?

12              THE WITNESS:  Correct.

13              THE COURT:  When the search warrants were executed?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  All right.  And then I was just looking

16   at -- back.  I think the indictment in this case was June 26th,

17   2019.  That was ten months later.

18              THE WITNESS:  That's correct.

19              THE COURT:  What happened?  I mean, why all of a

20   sudden -- not all of a sudden.

21              What -- what transpired over those ten months that

22   all of a sudden -- not all of a sudden, because that's not

23   right, but for this to shift from the state path to the

24   federal?

25              THE WITNESS:  I'll refer to Ms. Washington for the

1    majority of that.

2    But I will say that upon learning of his arrest, she

3    reached out to me and explained his involvement in the -- I'm

4    not sure what the technical term is for it, but the special

5    probation program that he was a part of and asked for the

6    details on the case.  And I -- I believe I later met with her.

7    THE COURT:  All right.  So in other words, you

8    didn't -- you didn't initiate that.  The U.S. Attorney's Office

9    did.

10    THE WITNESS:  That's correct.

11    THE COURT:  Okay.  That's all I was trying to get at

12    is how did it happen.

13    THE WITNESS:  Yes, sir.

14    THE COURT:  And, again, I'm not trying to

15    second-guess anything.  None of -- none of this is probably

16    really my business more than curiosity, but just trying to

17    understand the entire picture here of all of this is what I'm

18    trying to do.

19    All right.  Let me see if I have anything else.  One

20    second.

21    (Brief pause.)

22    THE COURT:  All right.  I think -- I think that's all

23    I have.

24    Ms. Washington, do you have any other questions?

25    MS. WASHINGTON:  No, Your Honor.

1          THE COURT:  Mr. Glober?

2          MR. GLOBER:  No, Your Honor.

3          THE COURT:  All right.  You may step down, Special

4   Agent Yarborough.  Thank you.

5          THE WITNESS:  Thank you.

6          THE COURT:  All right.  Well, we have a couple of

7   housekeeping matters.  First, we -- well, let me see.

8          Do you have any evidence to present, Mr. Glober?

9          MR. GLOBER:  No, Your Honor.

10          THE COURT:  All right, then.

11          And, Ms. Washington, other than the search warrant

12   applications and affidavits, is there anything else that you

13   intend to submit?

14          MS. WASHINGTON:  No, Your Honor.

15          THE COURT:  All right.  Well, why don't we do this.

16   Why don't we set -- set a date for a brief hearing next week so

17   that the government can submit those exhibits.  They're --

18   they're going to obviously be critical to the -- to the case

19   here.  And then we can talk about -- we can talk about a

20   briefing schedule.

21          Now, let's see.  It's October 9th, so it's the new

22   fiscal year.

23          So, Ms. Washington, will you be asking Mr. Hahn if

24   you can order the transcript in this matter?

25          MS. WASHINGTON:  Yes, Your Honor.

1          THE COURT:  All right.  Thank you.

2          That's why it's good that the deadline was September

3   30th and we didn't have this till after the 1st because it's

4   hard to get a transcript in late August and September,

5   but . . .

6          All right.  So you'll be ordering the transcript.  I

7   think it will be a good idea to also -- we'll see what happens

8   at the next hearing, but -- let's see.

9          This is Judge -- is this Judge Howard or -- this is

10  Judge Howard?

11         COURTROOM DEPUTY:  Yes, sir.

12         THE COURT:  It's Judge Howard.  She'll have to have

13  the entire transcript anyway.

14         But what we'll do is we'll get back together.  We'll

15  set a date in a minute for the government to submit those

16  exhibits.

17         And if there is another exhibit or any other

18  testimony that either of you think is appropriate, that would

19  be the time to present it because we'll deem the evidence

20  closed after -- after that.

21         Do you need a minute, Mr. Glober?

22         MR. GLOBER:  No, Your Honor.

23         THE COURT:  All right.  Now, you know, as I've

24  thought about it, Ms. Washington, if you -- if you do have a

25  set of copies of the applications and affidavits and if

1    Mr. Glober does not object to the authenticity of them, you

2    know, you -- you don't have to do it right this second, but you

3    could submit those too.

4              You know, the state, they -- they -- I'm not sure how

5    they store their search warrants now.  That was changed at one

6    point.

7              But why don't you get with Mr. Glober and talk to him

8    about that, because he attached them to his filing, so I'm

9    guessing if what you want to submit is identical to what he

10   submitted, then there wouldn't be a question of authenticity,

11   and then that could streamline this.

12             MS. WASHINGTON:  Yes, sir.

13             THE COURT:  So maybe you could talk to him after the

14   hearing about that.

15             Now, Monday's a holiday next week, right?

16             COURTROOM DEPUTY:  Yes, sir.

17             THE COURT:  Did we set something for Wednesday

18   already or not?

19             COURTROOM DEPUTY:  We set something for Tuesday

20   morning.  We don't have anything on Wednesday.

21             THE COURT:  All right.  How do you-all look Wednesday

22   morning?  Monday's a holiday, remember, so --

23             MS. WASHINGTON:  Your Honor, I'm before the grand

24   jury that morning.

25             THE COURT:  All right.  How about -- how long are you

1    in the grand jury?

2            MS. WASHINGTON:  Possibly a few hours.  We're still

3    finalizing some things.  I don't have an exact estimate just

4    yet.

5            THE COURT:  Do you think 2 o'clock would be --

6            MS. WASHINGTON:  I think that would be fine, Your

7    Honor.  Thank you.

8            THE COURT:  What do you think of 2 o'clock on

9    Wednesday, the 16th, Mr. Glober?

10            MR. GLOBER:  That works, Your Honor.

11            THE COURT:  All right.  So we'll continue this

12    evidentiary hearing in Mr. Bronner's case to 2 o'clock, October

13    16th, 2019.

14            And then we'll close the evidence after that, and we

15    can get an idea of how long it will take to get the transcript,

16    and then we can set the briefing deadlines based on that.

17            This gets a little bit out of order when the

18    government doesn't respond, and they didn't this time because I

19    didn't give them time, so I'm not being critical of it.  I'm

20    just -- it throws it a little bit off in terms of how we do it.

21            So you-all can give some thought to whether -- and I

22    think this may be the best way to do it, is to have Mr. Glober

23    file a supplemental memorandum, because there may be other

24    information that's been developed that he wants to rely on in

25    moving to suppress.

1          And then -- and then I'll -- Ms. Washington can reply

2    to that.  But we're not going to set those dates now because I

3    think it will be better if you-all have the transcript before

4    you file your motions.

5          And then if either one of you want oral argument, we

6    can have oral argument after that.

7          All right.  I think that's everything we can do now

8    today.  I can't think of anything else.

9          Ms. Washington, is there anything else today?

10          MS. WASHINGTON:  No, Your Honor.

11          THE COURT:  Mr. Glober?

12          MR. GLOBER:  No, Your Honor.

13          THE COURT:  All right.  Then we're in recess.

14          COURT SECURITY OFFICER:  All rise.

15      (The proceedings were concluded at 3:01 p.m.)

16                                    -  -  -

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA    )

6

7          I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11          DATED this 25th day of October, 2019.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25