**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                     Case No. 3:19-cr-109-J-34JRK

RONALD LEON BRONNER
    a/k/a "Jabo"

_____

## REPORT AND RECOMMENDATION[1]

### I. Status

This cause is before the Court on the Motion to Suppress (Doc. No. 19; "First Motion"), filed September 30, 2019, and the Supplemental Motion to Suppress Evidence (Doc. No. 26; "Second Motion"), filed October 23, 2019, as amended by the Order (Doc. No. 45), entered December 20, 2019, granting the Motion to Amend Supplemental Motion to Suppress Evidence to Conform to Evidence (Doc. No. 42; "Motion to Amend"), filed December 16, 2019.[2] The Government opposes the suppression of the evidence. See United States' Consolidated Response in Opposition to Defendant's Motion to Suppress Evidence and Supplemental Motion to Suppress Evidence (Doc. No. 41; "Government's Response" or "Govt.'s Resp."), filed December 9, 2019; United States' Supplemental Memorandum to its Consolidated Response in Opposition to Defendant's Motion to Suppress Evidence and Supplemental Motion to Suppress Evidence (Doc. No. 46;

---

[1]    "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], … a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." Id.; see also 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2]    Any reference to the Second Motion is a reference to it as amended.

"Government's Supplemental Memorandum" or "Govt.'s Supp. Mem."), filed December 23, 2019.

In general, the Motions involve the search of two residences on April 27, 2018, Defendant's arrest on the same date, and statements he made before and after his arrest. The residences were located at 204 Lane Avenue South, Jacksonville, Florida 32254 ("204 Lane Avenue") and 4361 Melissa Court, West, Jacksonville, Florida 32210 ("Melissa Court"). Both searches were conducted pursuant to state search warrants issued by the Honorable Roberto Arias, County Judge, in and for Duval County, Florida.[3] The affidavits supporting the applications for the respective search warrants are identical, except for the description of the property to be searched, so the undersigned refers to the affidavits as a single "Affidavit." Compare Exhibit 11 (Doc. No. 24-4) (Melissa Court), with Exhibit 12 (Doc. No. 24-5) (204 Lane Avenue).[4]  The Affidavit includes information provided by two sources, observations made during physical surveillance, statements made during traffic stops, and video recordings obtained from a pole camera installed on a light pole across the street from the Melissa Court residence.

In the First Motion, Defendant seeks to suppress the evidence obtained from the execution of the search warrants and the evidence derived from the pole camera. Defendant argues there was no probable cause to issue the search warrants for two reasons: 1) the Affidavit contains material misrepresentations and omissions with respect to the information provided by the two sources; and 2) the search warrants were based

---

[3]     A search warrant was also obtained for another residence located at 137 Lane Avenue South, Jacksonville, Florida 32254 ("137 Lane Avenue"). As explained in more detail below, that warrant was not executed and is not at issue here. See supra p. 12 n.17.

[4]     Although the affidavits are identical in substance, their pagination differs. For ease of reference, when citing the Affidavit, the undersigned cites the Melissa Court affidavit only.

partly on evidence from the Melissa Court pole camera, which Defendant argues was installed in violation of his Fourth Amendment rights.

In the Second Motion, Defendant seeks to suppress the statements he made to law enforcement at 204 Lane Avenue (before his arrest) and all statements he later made at the Drug Enforcement Administration's ("DEA('s)") office (after his arrest).[5] Defendant's argument is two-fold. First, Defendant contends that he was not advised of his <u>Miranda</u> rights until after he was arrested and that although he was read his <u>Miranda</u> rights before making the incriminating statements at the DEA office, he did not validly waive his rights. Second, Defendant argues his arrest was unlawful and any post-arrest statements should thus also be suppressed as fruit of the poisonous tree. Defendant initially asserts that his arrest was unlawful because it was the product of evidence seized during the execution of the search warrants that, as argued in the First Motion, were not supported by probable cause. Alternatively, Defendant contends that even assuming the search warrants were valid, law enforcement did not have probable cause to believe he had committed or was committing a felony.

Responding to the First Motion, the Government argues that the omissions in the Affidavit were neither intentional nor reckless, that Judge Arias had a substantial basis to find the two sources credible, and that the installation of the pole camera was not unconstitutional. As to the Second Motion, the Government asserts that Defendant's statements at 204 Lane Avenue were not in response to a custodial interrogation under

---

[5]     Defendant's challenge to his pre-arrest statements was incorporated into the Second Motion when the Motion to Amend was granted.

Miranda, that Defendant's statements at the DEA office were voluntary,[6] and that Defendant's arrest was based upon probable cause.

Upon consideration, the Motions are due to be denied for the following reasons: 1) the pole camera in this case did not violate the Fourth Amendment; 2) the Affidavit contained sufficient probable cause upon which to issue the search warrants; 3) Defendant's pre-arrest statement did not implicate Miranda; 4) Defendant knowingly, voluntarily, and intelligently waived his Miranda rights before making his post-arrest statements; and 5) Defendant's warrantless arrest was supported by probable cause and did not taint Defendant's post-arrest statements.

## II. Procedural Background

On April 27, 2018, the day the search warrants were executed, Defendant was arrested on state drug charges. About fourteen months later, on June 26, 2019, a federal grand jury returned a two-count indictment charging Defendant with knowing and intentional possession with intent to distribute cocaine base, a Schedule II controlled substance, in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(B), and with knowing and intentional possession with intent to distribute heroin, a Schedule I controlled substance, in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C). See Indictment (Doc. No. 1). The underlying facts of the federal charges appear to be the same as those of the state charges brought on April 27, 2018. On July 3, 2019, Defendant made his initial appearance in

---

[6]     The Government does not address Defendant's argument that Defendant did not validly waive his Miranda rights. The Government instead focuses on the overall voluntariness of Defendant's statements.

federal court and was arraigned. <u>See</u> Clerk's Minutes (Doc. No. 9). He pleaded not guilty. <u>Id.</u> At the time of the arraignment, Defendant was fifty years old.[7]

Thereafter, the First Motion was filed. An evidentiary hearing on the Motion was held on October 9, 2019. <u>See</u> Clerk's Minutes (Doc. No. 22; "Oct. 9, 2019 Minutes"); Transcript of October 9, 2019 Evidentiary Hearing (Doc. No. 27; "Tr. I"), filed October 25, 2019. At the conclusion of the testimony, the Court continued the hearing to October 16, 2019 to allow the Government to submit certain additional exhibits. <u>See</u> Tr. I at 139-43. The October 16, 2019 hearing was held accordingly. <u>See</u> Clerk's Minutes (Doc. No. 24; "Oct. 16, 2019 Minutes"); Transcript of October 16, 2019 Evidentiary Hearing (Doc. No. 28; "Tr. II"), filed October 25, 2019.

Defendant then filed the Second Motion. On October 30, 2019, the Court held an evidentiary hearing on the Second Motion. <u>See</u> Clerk's Minutes (Doc. No. 30; Oct. 30, 2019 Minutes); Transcript of October 30, 2019 Evidentiary Hearing (Doc. No. 34; "Tr. III"), filed November 15, 2019.

On December 9, 2019, the Government's Response to both Motions was filed. Defendant thereafter filed the Motion to Amend seeking to challenge Defendant's pre-arrest statements at 204 Lane Avenue. The Court granted the Motion to Amend and directed the Government to file a supplemental memorandum to its Response or move to reopen the evidentiary hearing. Dec. 20, 2019 Order at 2. The Government opted for the former and filed its Supplemental Memorandum. On January 3, 2020, Defendant filed a Reply to the United States' Consolidated Response to Defendant's Motions to Suppress

---

[7]        The arraignment has not been transcribed.

- 5 -

(Doc. No. 47; "Reply"). On January 17, 2020, the Government filed a Sur-Reply in Opposition to Defendant's Reply to Motion to Suppress (Doc. No. 48; "Sur-Reply").

At Defendant's request, the Court heard oral argument on February 13, 2020. See Clerk's Minutes (Doc. No. 51); Defendant's Request for Oral Argument (Doc. No. 49), filed January 23, 2020; Order (Doc. No. 50), entered January 28, 2020.

The Motions are now ripe for consideration.

### III. Evidentiary Hearings[8]

The Government presented one witness at the evidentiary hearing regarding the First Motion (held on October 9, 2019 and continued on October 16, 2019): Special Agent Matthew Yarborough.[9] See Oct. 9, 2019 Minutes; Oct. 16, 2019 Minutes. In addition, the Government submitted thirteen exhibits that were received into evidence with no objection

---

[8]    Unless otherwise noted, the undersigned credits each witness's testimony in all material respects. In making these credibility determinations, the undersigned considered various factors including the witnesses' demeanor, the consistencies or inconsistencies within the witnesses' testimony, and any interest the witnesses may have in the outcome of the hearing; but, the undersigned did not consider the official rank or status of the witnesses. United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

[9]    At the time of the hearing, Agent Yarborough was a special agent with the Florida Department of Law Enforcement ("FDLE"), and he was assigned to the DEA Task Force in Jacksonville, Florida. Tr. I at 9-10. He was the lead task force agent in Defendant's investigation. Tr. I at 134. Agent Yarborough began working for FDLE in November 2015. Tr. I at 132. He was assigned to the DEA Task Force in mid-2016. Tr. I at 132-33; see also Tr. I at 10. During his time with the DEA Task Force, he applied for about ten or twelve search warrants, and they were all state search warrants. Tr. I at 133-34.

Prior to joining FDLE, Agent Yarborough worked at the Baker County Sheriff's Office ("BCSO") for approximately seven and a half to eight years. Tr. I at 10; see also Tr. I at 130. Agent Yarborough was a patrol deputy for four years, and he was then assigned to "narcotics investigations" for the remainder of his time with BCSO. Tr. I at 10; see also Tr. I at 130-31. He did not apply for any search warrants when he was a patrol deputy, but he applied for about forty to fifty search warrants while he was in narcotics. Tr. I at 131. They were all state search warrants. Tr. I at 131-32.

from Defendant. <u>See</u> Oct. 9, 2019 Minutes; Oct. 16, 2019 Minutes. Defendant presented no witnesses and submitted no exhibits. <u>See</u> Oct. 9, 2019 Minutes; Oct. 16, 2019 Minutes.

At the October 30, 2019 evidentiary hearing on the Second Motion, the Government presented two witnesses: Special Agent Michael Mayer[10] and Agent Yarborough. The Government submitted one exhibit that was received into evidence with no objection from Defendant. <u>See</u> Oct. 30, 2019 Minutes. Defendant presented no witnesses and submitted no exhibits. <u>See</u> <u>id.</u>

Some of the testimony elicited at the October 30, 2019 hearing is relevant to the First Motion. As such, the undersigned summarizes the testimony relevant to each Motion in turn.

**A. First Motion**

A court's after-the-fact review to determine whether probable cause existed to issue a search warrant is usually limited to the four corners of the affidavit submitted as part of the application for the search warrant. Accordingly, the information contained in the Affidavit authored by Agent Yarborough is set out in detail. In addition, given the challenges made to the Affidavit, including the omission of material information, Agent Yarborough's testimony is summarized as well.

**1. Initial Meeting with Confidential Source**

Agent Yarborough testified that on February 23, 2018, Florida Highway Patrol ("FHP") Trooper Joshua Earrey advised him that he knew someone who had information

---

[10]     Agent Mayer has been with DEA for fifteen years. Tr. III at 9. He is the group supervisor of the DEA Task Force in Jacksonville, Florida. Tr. III at 8. He has held that position since March 2017. Tr. III at 8. Agent Mayer was Agent Yarborough's supervisor during Defendant's investigation. Tr. III at 72. Prior to becoming a supervisor in Jacksonville, Agent Mayer was a supervisor at DEA headquarters in Virginia, and before that, he was a special agent in Virginia and in Ohio. Tr. III at 8-9.

regarding an individual selling cocaine and heroin in Jacksonville. Tr. I at 10. According to the Affidavit, on February 26, 2018, Agent Yarborough, Trooper Earrey, and Task Force Officer D. Hickox met with the person Trooper Earrey knew "to discuss information regarding illegal drug activity in Duval County." Affidavit at 4. Agent Yarborough testified that after this initial meeting, the person was "signed up" as a confidential source ("CS"). Tr. I at 11.[11]  (This person is referred to throughout the Affidavit as the CS.)

The Affidavit provides the following regarding the February 26, 2018 meeting with the CS. The CS "stated a black male known only to him/her[12] as 'Jabo' was distributing multi-kilogram quantities of cocaine and heroin in Jacksonville, Florida." Affidavit at 4. Agent Yarborough confirmed that "Jabo" was Defendant by "reviewing law enforcement databases and questioning the CS . . . ." Id. The CS advised that Defendant "stored large quantities of cocaine and heroin at his [Melissa Court] residence . . . ." Id. The CS stated that he "could purchase multi-ounce quantities of cocaine and heroin" from Defendant. Id. According to the CS, Defendant used the Melissa Court residence to "store narcotics," and he "maintained a hotel room at the Knights Inn[ ] hotel located at 460 Lane Avenue South, Jacksonville, Florida 32254." Id. The CS advised that he had seen a handgun at the 204 Lane Avenue residence[13] and a rifle at the Melissa Court residence. Id. Agent Yarborough represented in the Affidavit that based on his "training and experience, firearms are often located and affiliated with drug transactions." Id.

---

[11]    At the hearing, Agent Yarborough and counsel for the parties at times referred to the CS by his name (initials: KRC). See, e.g., Tr. I at 11, 12, 75.

[12]    The CS is a male.

[13]    As noted below, the CS informed Agent Yarborough at a later date that Defendant moved his business from the Knights Inn hotel to the 204 Lane Avenue residence. Affidavit at 4.

The Affidavit does not indicate how the CS knew that Defendant stored large quantities of narcotics at the Melissa Court residence. Agent Yarborough testified it was his understanding that the CS knew this because the CS had seen "[m]ulti-ounce quantities" at the residence, and "he had purchased that amount of quantity before in the past." Tr. I at 112; see also Tr. I at 87 (Agent Yarborough testifying the CS told him he knew Defendant stored narcotics at the Melissa Court residence because "[h]e had been to that location before").

The Affidavit does not contain information regarding the criminal history of the CS, and Agent Yarborough did not inform Judge Arias of the CS's criminal history. Tr. I at 83. Agent Yarborough testified he knew the CS had "multiple previous narcotics charges." Tr. I at 12. Agent Yarborough believed the CS had prior felony convictions, but he did not know how many. Tr. I at 12-13.[14]

Agent Yarborough testified he did not know whether the CS was engaged in drug trafficking while he was working as a confidential source, a claim made in the First Motion. Tr. I at 12, 48; see First Motion at 2. Agent Yarborough did not recall whether he asked the CS if he was selling drugs. Tr. I at 76-77. No one informed Agent Yarborough that the CS was engaged in drug trafficking, and he confirmed that he did not "go looking for that information either." Tr. I at 105. Agent Yarborough indicated that it is not his practice to supervise a confidential source because of "[t]ime constraints[ and] the feasibility of trying to do that." Tr. I at 113. Agent Yarborough testified that when the CS was signed up, the Narcotics and Dangerous Drugs Information System ("NADDIS") was searched to check

---

[14]     When Agent Yarborough was asked on cross-examination if the CS had been convicted "three times in the past before February of 2018 for selling cocaine," he responded that he could not "say for sure that that's accurate, but it sounds very reasonable." Tr. I at 82.

if the CS was under active investigation by DEA. Tr. I at 77-78. Agent Yarborough did not recall whether the CS was listed in NADDIS, but he did not think he was. Tr. I at 78.[15]

The Affidavit does not specify the nature of Defendant's relationship with the CS, but Agent Yarborough testified that "[t]he two were involved in a narcotics relationship . . . prior to [Agent Yarborough] meeting him." Tr. I at 52. According to Agent Yarborough, there was nothing suggesting there was any animosity between Defendant and the CS. Tr. I at 46. Agent Yarborough stated he has never seen "a narcotics distributor sell narcotics to someone they have a problem with or believe is -- has anger towards them." Tr. I at 47.

### 2. Recorded Phone Call Between Defendant and the CS

According to the Affidavit, on March 5, 2018, the CS evidently was directed to call Defendant, and Agent Yarborough recorded the telephone conversation. Affidavit at 4. The Affidavit states that during the conversation the CS asked Defendant how much it would cost the CS to buy an ounce of heroin from Defendant, and Defendant told the CS he would sell him one ounce for $2,100 to $2,200. Id. The Affidavit does not contain additional information regarding this call.

Agent Yarborough testified the purpose of the phone call was to contact Defendant and corroborate the CS's statement that he could purchase narcotics from Defendant. Tr. I at 20. Agent Yarborough stated that during the call, the CS used the name "Lebron James" to presumably refer to heroin. Tr. I at 20. Defendant then referred to heroin as "up on 28th Street," "dog food," and "clean clean." Tr. I at 20-21. The Affidavit does not indicate

---

[15]      According to Agent Yarborough, if the CS had been under active investigation, he still could have been signed up as a confidential source. Tr. I at 78. First, however, Agent Yarborough would have had to have contacted the "agents who did have that investigation," and they would have had to "deconflict it at that point." Tr. I at 78-79.

that these terms were used as code for heroin. The CS and Defendant never used the word "heroin" in the conversation. Agent Yarborough testified he believes it is "common knowledge" that individuals use code words when conducting drug transactions. Tr. I at 98. The CS told Agent Yarborough that "when speaking on the phone, Defendant likes to use heavy code words, things of that nature, to disguise what the two individuals are talking about when speaking." Tr. I at 20. This information was not included in the Affidavit.

Agent Yarborough testified in substance that at the initial meeting with the CS, he asked the CS whether he (the CS) could buy drugs from Defendant (that is, whether he could perform a controlled purchase of illegal drugs for law enforcement). Tr. I at 47, 83-84. The CS said that he could, but that he would not do so because he "didn't feel he wanted to do that to [Defendant] and didn't want to be put in that position of doing a controlled purchase and also being exposed at a later time . . . ." Tr. I at 47; see also Tr. I at 84. This information was not included in the Affidavit. Agent Yarborough testified that "[b]ased on the context of the [March 5, 2018] call, [his] experience listening to these types of calls and conducting these types of investigations, [he] had no doubt that had [the CS, at law enforcement's direction,] intended to do a controlled purchase, [they] would have received heroin that day." Tr. I at 96.

### 3. Meeting with the CS and a Source of Information

The Affidavit states that at some point during the investigation, the CS asked to meet with Agent Yarborough because the CS and another source of information ("SOI")[16] had "new information regarding [Defendant's] illegal activities." Affidavit at 4. Agent

---

[16]     At the hearing, Agent Yarborough and counsel for the parties at times referred to the SOI by his name (initials: QG). See, e.g., Tr. I at 39, 86.

Yarborough testified that the SOI and the CS are "distant cousins," Tr. I at 39, but this information is not in the Affidavit. According to the Affidavit, on March 15, 2018, Agent Yarborough, Officer Hickox, and JSO Detective K. Guthrie met with both the CS and the SOI at the same time. Affidavit at 4.

The Affidavit states as follows with regard to this meeting. Both the CS and the SOI stated that Defendant "moved his business from the Knights Inn hotel and had obtained two residences, 204 Lane Avenue . . . and 137 Lane Avenue . . . ." Id.[17] The CS and the SOI indicated that the 204 Lane Avenue location "was used primarily as a point of sale for small street level amounts of heroin" and that the 137 Lane Avenue location "was used as a point of sale for larger quantities of narcotics and storage due to the close proximity of the two addresses." Id. According to the CS and the SOI, Defendant traveled to and from Melissa Court to 204 Lane Avenue and 137 Lane Avenue "to resupply the narcotics being sold and to pick up U.S. currency obtained from the sale of narcotics." Id. The CS and the SOI also "identified associates of [Defendant] who [were] utilized to transport [Defendant] to and from the . . . locations to limit his exposure to law enforcement." Id. According to the CS and the SOI, those associates were "also responsible for distributing narcotics on [Defendant's] behalf." Id.

According to Agent Yarborough's testimony, the two associates identified were David Sutherland and Alexis Daughtry. Tr. I at 33. Agent Yarborough testified that

---

[17]     As noted, the search warrant for 137 Lane Avenue is not at issue here. Agent Yarborough testified that before that search warrant was executed, as part of what apparently was a separate investigation, JSO searched 137 Lane Avenue for "stolen property, possible vehicles, and had reported that nothing was found in that location." Tr. I at 54. Agent Yarborough decided not to search 137 Lane Avenue because he did not "believe that any narcotics would have still been there after just being hit by [JSO]." Tr. I at 54-55.

according to the CS, Ms. Daughtry "operat[ed] [Defendant's] narcotics business in his absence" and "maintain[ed] the residence at 204 Lane Avenue and also, in the past, hotel rooms at the hotel next door." Tr. I at 33-34. The CS stated that Ms. Daughtry "acted on [Defendant's] behalf as far as the sale of narcotics." Tr. III at 108. Agent Yarborough testified that he "observed [Mr. Sutherland and Ms. Daughtry] physically at those locations as [the CS] described" and that he was "able to ID them as the persons [the CS] described." Tr. I at 34. None of this corroborating information is in the Affidavit.

The Affidavit does not set forth the basis of knowledge of the CS and the SOI. Agent Yarborough testified that it was his understanding that the CS and the SOI knew this information because they had been to the relevant locations. Tr. I at 122; see also Tr. I at 126. According to Agent Yarborough, the SOI "explained that he was involved deeply in [Defendant's] narcotics business" and that "[t]hat's how he had the knowledge about the things that he had knowledge of." Tr. I at 126. Agent Yarborough testified the SOI "went into great detail about how he would break down dope and some more of the details with [Defendant's] business in the past." Tr. I at 122. This information was not set out in the Affidavit.

The Affidavit does not specify the relationship between the CS and the SOI, the relationship between the SOI and Defendant, or the SOI's criminal history. Agent Yarborough testified that he "kn[e]w for a fact" the SOI had animosity towards Defendant. Tr. I at 39. According to Agent Yarborough, the SOI and Defendant had a "very hostile relationship . . . ." Tr. I at 93. Agent Yarborough testified the SOI "explained a situation between [him] and [Defendant] where a female who had a relationship with both of them became pregnant with [the SOI's] child and said that [Defendant] had paid for her to have

- 13 -

an abortion." Tr. I at 39-40. The SOI and Defendant "had been exchanging words or threats toward each other during that time." Tr. I at 40. Agent Yarborough chose not to have the SOI contact Defendant to further the investigation "[d]ue to his hatred for [Defendant] and the possibility of violence erupting between the two." Tr. I at 40. Agent Yarborough did not "want to be responsible or liable for anything that would occur," and he did not "feel that it would aid [the] investigation . . . ." Tr. I at 40. Agent Yarborough was not aware of any criminal history that the SOI may have had, and he did not investigate the SOI's criminal history. Tr. II at 20-21.

Agent Yarborough testified that, generally, if he "question[s] the reliability [of a source] or if the source ha[s] any reason to be untruthful, that person's information [will] never be provided in [an] affidavit . . . ." Tr. I at 69. Agent Yarborough indicated that it is his practice to inform an issuing judge of a particular bias a source of information may have against the target of an investigation if he "believe[s] that that person's bias causes them to give incorrect or fraudulent information . . . ." Tr. I at 70-71. Agent Yarborough stated that he does not include a source's "personal feelings in an affidavit for a search warrant" if the source's statements are "verified" and believed to be "truthful" by Agent Yarborough. Tr. I at 71.

As to this case specifically, Agent Yarborough testified the SOI was "very upfront on his feelings with [Defendant] and also provided information that was deemed accurate and also corroborated by what [law enforcement] found[ and] what [law enforcement] learned during [the] investigation." Tr. I at 71. Agent Yarborough stated, however, that aside from the information obtained from the SOI at the March 15, 2018 meeting, he "did not attempt to solicit any other information from [the SOI]." Tr. I at 40.

As noted above, the Affidavit attributes each piece of information obtained at the March 15, 2018 meeting to <u>both</u> the CS and the SOI. Agent Yarborough's testimony, however, created some confusion as to who provided what information. Agent Yarborough testified that it was the CS who advised that Defendant moved his business from the Knights Inn hotel to a new location. Tr. I at 41. When the Court indicated the Affidavit states it was both the CS and the SOI who provided this information, Agent Yarborough responded that the CS and the SOI were interviewed at the same time, that the SOI was "also very familiar with [Defendant's] operations," and that the SOI's information was "the exact same as that provided by the CS." Tr. I at 41-42; <u>see also</u> Tr. I at 45 (Agent Yarborough testifying that there are "bits and pieces of information that are being provided by the [SOI], but those aren't any different than what the CS himself is telling [law enforcement]"); Tr. I at 118-19 (Agent Yarborough testifying that the "information was equally provided" and that the CS and the SOI both "had knowledge of this information"). Agent Yarborough testified that when the CS provided the information about Defendant's new location, the SOI "did not offer any different details from that . . . ." Tr. I at 42. Based on that, Agent Yarborough believed the SOI "agreed" with the CS. Tr. I at 42.

Later in his testimony, Agent Yarborough stated the CS and the SOI advised him they both "had knowledge of everything listed in . . . [the A]ffidavit." Tr. I at 46. Agent Yarborough testified that "[n]ot one person ha[d] more information than the other . . . ." Tr. I at 119. As to the investigation as a whole, however, "the majority of the information obtained by [Agent Yarborough] came from the [CS]." Tr. I at 42-43.

### 4. Physical Surveillance

According to the Affidavit, on March 21, 2018, Agent Yarborough began reviewing information obtained from a court-ordered "cellular phone locator (e911 ping)" on Defendant's cellphone. Affidavit at 5. The cellular service for Defendant's phone was terminated on March 26, 2018. Id. From March 21, 2018 to March 26, 2018, Agent Yarborough noted that Defendant traveled to 204 Lane Avenue, 137 Lane Avenue, and Melissa Court, "further corroborating the information provided by the CS and the SOI." Id.[18]

After Defendant's phone service was terminated, Agent Yarborough conducted physical surveillance of 204 Lane Avenue, 137 Lane Avenue, and Melissa Court from March 26, 2018 through March 28, 2018. See id. at 5-6. The Affidavit's representations as to Agent Yarborough's observations during these surveillances are set out below.

On March 26, 2018, Agent Yarborough surveilled 204 Lane Avenue and 137 Lane Avenue. Id. at 5. At about 9:15 a.m., Agent Yarborough saw Defendant arrive at 204 Lane Avenue as a passenger in a vehicle. Id. Defendant got a key from his pocket and apparently entered the 204 Lane Avenue residence. Id. He remained there during a two-hour period of surveillance. Id. During this time, Agent Yarborough saw "[n]umerous persons" arrive at the location "on foot and by vehicle." Id. These individuals would knock on the front door "until the door was opened by an occupant." Id. Most of them remained at the location for less than ten minutes. Id. Agent Yarborough represented that based on

---

[18]   Agent Yarborough testified he used the recorded March 5, 2018 phone call between the CS and Defendant "to obtain a cell phone ping" on Defendant's phone. Tr. I at 20. Agent Yarborough stated that based on the ping information obtained, he learned Defendant was visiting Melissa Court and 204 Lane Avenue and the times at which "he was moving in between those two places." Tr. I at 21-22. The ping Agent Yarborough testified about is likely the same one that was court-ordered and is described in the Affidavit.

his "training and experience, [he believed] that the observed individuals were purchasing small user amounts of narcotics from an occupant of the residence." Id.[19]

On the following day, March 27, 2018, Agent Yarborough surveilled 137 Lane Avenue. Id. At about 9:37 a.m., he saw Defendant "exit the residence and enter the front passenger door of a vehicle." Id.[20] Defendant was carrying a "partially empty" black plastic bag. Id. The vehicle then traveled to 204 Lane Avenue, where Agent Yarborough and Officer Hickox saw Defendant exit the vehicle, unlock the door with a key he got from his pocket, and enter the residence carrying the black plastic bag. Id.

On the same day at about 11:26 a.m., Defendant "was observed" arriving at Melissa Court as a passenger in a vehicle. Id. Defendant was "carrying a large object in his right hand that appeared to be concealed from view under a cloth and packaging." Id. At about 12:02 p.m., Defendant exited the residence "carrying a small box." Id. Defendant then left as a passenger in the same vehicle he had arrived in. Id.

Later that day, at about 5:22 p.m., Defendant returned to Melissa Court as a passenger in a vehicle. Id. The driver was "carrying a small package that was taken inside of the residence." Id. At 5:50 p.m., Defendant and the driver exited the residence and left in the same vehicle they had arrived in. Id.

The next day, March 28, 2018, Agent Yarborough and Officer Hickox surveilled 204 Lane Avenue and 137 Lane Avenue. Id. At about 7:20 a.m., Agent Yarborough saw a white female exit 137 Lane Avenue, while carrying a white "package/envelope." Id. She entered

---

[19]     The Affidavit contains no information regarding any observations made at 137 Lane Avenue on March 26, 2018. See Affidavit at 5.

[20]     Agent Yarborough testified the "vehicle was occupied by [Mr.] Sutherland," who he believed was "the renter of that vehicle . . . ." Tr. I at 36. As noted above, the CS and the SOI identified Mr. Sutherland as one of Defendant's associates.

a "waiting vehicle" that then traveled to 204 Lane Avenue. Id. at 5-6. She and "a white male passenger then exited the vehicle while carrying the package/envelope." Id. at 6. Agent Yarborough saw the female "produce a key and unlock the residence before entering." Id. The female and male "had been previously identified by the CS and [the] SOI as associates of [Defendant,] who distribute narcotics on his behalf." Id.

Agent Yarborough provided the following testimony regarding the locations surveilled. Agent Yarborough testified in substance that he believed Defendant resided at Melissa Court based in part on Defendant's driver's license address and his probation address. Tr. I at 13-14.[21] Agent Yarborough's physical surveillance at Melissa Court was "very limited" because the residence is located in a "small . . . residential area." Tr. I at 15; see also Tr. I at 111. There is a cul-de-sac past the residence, so "[a]nytime that you drive past that location, you're required to turn around and drive back past that location." Tr. I at 15. Agent Yarborough attempted to conduct surveillance at Melissa Court twice, but on both occasions he was "approached by neighbors looking into [his] windows and walking around [his] truck, wondering . . . what [he] was doing in that area." Tr. I at 15; see also Tr. I at 111.

In contrast, the 204 Lane Avenue residence was located on a "very busy four-lane highway . . . ." Tr. I at 16. The traffic made it "very easy to blend in in that area." Tr. I at 16. Agent Yarborough sometimes parked at a business across the street from the 204 Lane

---

[21]     Defendant was actually on federal supervised release, not probation. Tr. I at 52; see United States v. Bronner, 3:17-cr-0063-J-34JRK. Defendant had been convicted on March 11, 2003 in the United States District Court for the Southern District of Georgia of conspiracy to distribute narcotics. See Judgment (Doc. No. 2 at 48-53), filed April 12, 2017 in United States v. Bronner, 3:17-cr-0063-J-34JRK. On April 5, 2017, the case was transferred to this district. See Transfer of Jurisdiction (Doc. No. 1), filed April 11, 2017 in United States v. Bronner, 3:17-cr-0063-J-34JRK.

Avenue residence "to get a good view of the house." Tr. I at 16. Agent Yarborough also "conduct[ed] numerous drive-bys to observe who was coming and going from that address . . . ." Tr. I at 14-15.

### 5. Pole Camera

Agent Yarborough testified that in mid-March 2018, he made a request to FDLE's Electronic Surveillance Support Team to install a pole camera at Melissa Court. Tr. I at 22.[22] Agent Yarborough wanted to use a pole camera to avoid detection. Tr. I at 22. He believed the camera began recording on March 16, 2018. Tr. I at 22. He did not know when the pole camera stopped recording, Tr. I at 50-51, but he believed the camera was taken down on May 1, 2018, Tr. I at 105.[23]

According to Agent Yarborough's testimony, the pole camera was installed on a light pole across the street from the Melissa Court residence. Tr. I at 23. The light pole was seven or eight feet tall. Tr. I at 23; see also Tr. I at 114. The camera captured a view of the front and side of the Melissa Court residence, the driveway, and any individuals and vehicles approaching or leaving the residence. Tr. I at 105-06. Agent Yarborough indicated that if he had been standing next to the light pole where the camera was, he would have been able to observe the same view the camera captured. Tr. I at 60. Agent Yarborough testified that "[t]here [were] no shrubs, fences, or brush or anything that would have obstructed [his] view that the pole camera would allow [him] to see better or to advance [his] capabilities." Tr. I at 60. Agent Yarborough "would have had much more visibility being

---

[22]     FDLE's Electronic Surveillance Support Team is "responsible for installing and maintaining" pole cameras. Tr. I at 22.

[23]     Agent Yarborough testified he sent an email to Special Agent Stephen Busey advising him that the investigation was over and, according to Agent Yarborough, "the pole camera would have been removed after that." Tr. I at 51.

there in person because the device [was] located in . . . a recess, so [the camera footage was] limited on how far left and right, up and down [it could] go." Tr. I at 61. If Agent Yarborough had been there, for example, he "would have been able to see the cars coming down the driveway . . . ." Tr. I at 61.[24]

Agent Yarborough testified the quality of the footage was "pretty poor most of the time." Tr. I at 26; see also Tr. II at 5. Agent Yarborough described it as follows:

> I would compare it to a low-budget horror movie where you see the subjects' arms not really moving in consistent motion with that person. At times they may appear to move eight f[ee]t at a time due to the camera not catching quick enough frames to make that the smooth high-definition videos we're all used to.
>
> And also during these times that you're watching the video, if the motion trigger isn't activated, you'll -- sometimes you could be staring at a house, and in the next frame there's four cars at the house and you have no idea how they got there, what time they got there, or who got out of those cars.

Tr. II at 5-6.

The pole camera had the options to zoom, pan, and tilt. Tr. I at 27. Agent Yarborough used the zoom and pan options to "look in and zoom on tags and also persons to identify them." Tr. I at 26. He "did not recall being able to" zoom in to see inside the residence. Tr. I at 26. Agent Yarborough testified that based on the footage he reviewed prior to the October 16, 2019 hearing, "there were no instances where the interior of the home [was] observed on camera." Tr. II at 5. The camera footage did not have any sound. Tr. I at 28. The footage was digitally searchable by date and time only. Tr. I at 110; see Tr. I at 29.

---

[24]  Based on the context of Agent Yarborough's testimony, it appears that he intended to refer to vehicles coming down the street.

The camera was motion-activated. Tr. I at 29, Tr. II at 17. Agent Yarborough testified that the motion-activation mechanism could be triggered by "cats, dogs, tree limbs blowing, things of that nature . . . ." Tr. II at 17. According to Agent Yarborough, the mechanism was a "hit or miss" and was not "overly accurate at triggering when it should have." Tr. II at 17; see also Tr. II at 22. For example, "[a] lot of times you'll see a car arrive, and you never s[ee] anyone exit. And then a short time later, that car has disappeared, and you never s[ee] who got in it." Tr. II at 17.

The camera also had infrared capability to allow the viewer to see at night. Tr. I at 28. Agent Yarborough tried to use the infrared capability, Tr. I at 29, but the visibility was "very poor," Tr. II at 6. The nighttime footage was "very blurry," and it was a "hit or miss." Tr. I at 28. Agent Yarborough indicated that using the zoom option at night did not allow him to see very well either. Tr. II at 7. Referring to the still image contained in Exhibit 9 (Doc. No. 24-2), Agent Yarborough testified the porch light was on when the camera captured that particular image, which "diminishe[d] the video quality quite substantially." Tr. II at 6-7.

Agent Yarborough estimated that he used the camera's infrared feature "30 plus" times. Tr. I at 65. He used it "just to see what time [Defendant] returned home, things of that nature." Tr. I at 65. Agent Yarborough could not see "a lot of detail" on vehicles using the infrared technology, so he would have to confirm the type of vehicle the following morning. Tr. I at 65.

The camera's footage was transmitted via a "cellular connection" to a server that was "housed and controlled by FDLE." Tr. I at 30. Agent Yarborough had a username and password that allowed him to log in to that server and view the footage. Tr. I at 30.

According to Agent Yarborough, pole cameras "routinely" stop transmitting due to "any kind of network issue, bad weather, things of that nature . . . ." Tr. I at 30; <u>see also</u> Tr. II at 22. In this case, however, he did not "recall a specific incident where there wasn't coverage." Tr. I at 32.

The pole camera allowed Agent Yarborough to view live footage of one location while being physically present at another location. Tr. I at 32. For example, if he was parked at 204 Lane Avenue, he was able to observe (through the camera footage) Defendant leave the Melissa Court residence. Tr. I at 32. Agent Yarborough could then wait until Defendant arrived at 204 Lane Avenue, where Agent Yarborough was parked. Tr. I at 32-33.

Agent Yarborough testified he viewed footage from almost every day the camera was recording. <u>See</u> Tr. I at 107-10. Some days, he looked at the live footage and other days he watched recorded footage (if, for example, he missed the live footage from one day). Tr. I at 107-08. Agent Yarborough estimated there were "maybe three days" of footage that he did not look through. Tr. I at 108-10. He testified he did not think he watched any footage after April 27, 2018, the day the search warrants were executed. Tr. I at 114.

Agent Yarborough did not seek a warrant to install the pole camera because based on his experience, he did not think he needed one. <u>See</u> Tr. I at 134-35. He did not consult with anyone about whether he needed a warrant to use the pole camera. Tr. I at 64. Agent Yarborough testified:

> I've never been asked for a search warrant or told that I was required to have one to place a camera in a setting that is visible, that doesn't give us any view other than what a person would have from that location in public on the street, in other words, if it doesn't invade their privacy, the interior of their home, anything of that nature, what I would -- what I would put that as an area that requires an expectation of privacy.

Tr. I at 64.

The Affidavit provides the following information about Agent Yarborough's observations from the pole camera's footage. Agent Yarborough observed through the "recorded video surveillance" that there continued to be "a large amount of traffic arriving at and departing from [Defendant's] residence" at Melissa Court. Affidavit at 6. The vehicles seen at Melissa Court had also been observed at 204 Lane Avenue and 137 Lane Avenue. Id. The "recordings" show Defendant "transporting items believed to be U.S. currency obtained from the sale of narcotics into the residence" at Melissa Court. Id. Agent Yarborough stated in the Affidavit that he also "observe[d Defendant] transporting packages" from Melissa Court to 204 Lane Avenue and 137 Lane Avenue, apparently referring to the combination of the camera footage and live surveillance. Id.

Evidently referring to his observations via physical and video surveillance, Agent Yarborough then represented that based on his "training and experience, it is common practice for subjects distributing large amounts of narcotics to utilize multiple storage locations, points of sale, modes of transportation, [and] associates and/or employees to limit their direct involvement with the sale of narcotics in an effort to avoid detection from law enforcement." Id.

### 6. Traffic Stops

According to the Affidavit, law enforcement conducted two traffic stops on individuals leaving 204 Lane Avenue: one on March 28, 2018 and one on March 29, 2018.

The Affidavit states that on March 28, 2018 at about 10:03 a.m., JSO Officer J. Ottinger tried to "perform a traffic stop on a white male," who Agent Yarborough saw leaving 204 Lane Avenue. Id. The male subject was seen approaching the 204 Lane

Avenue residence and conducting "what appeared to be a hand[-]to[-]hand transaction with two individuals who were in the driveway of the location." <u>Id.</u> The male subject then "relocated a short distance away where he was observed by [Officer] Hickox holding a syringe while placing a tourniquet on his arm." <u>Id.</u> Officer Ottinger initiated a traffic stop, but the "driver fled the area and was later arrested after a high[-]speed pursuit that resulted in a crash." <u>Id.</u> According to Officer Ottinger, "the driver tossed what he believed to be narcotics from the vehicle during the pursuit." <u>Id.</u> Agent Yarborough and Officer Hickox arrived at the scene and spoke to the driver,[25] who had been read his <u>Miranda</u> rights. <u>Id.</u> The "driver" told them that "he had traveled to the residence and purchased heroin from an associate of [Defendant]." <u>Id.</u> The "male",[26] said that he knew Defendant as "Jabo" and that Defendant used a "cartel source" to buy heroin and cocaine. <u>Id.</u>[27] The "statements from the driver confirmed [Agent] Yarborough's observations of a hand[-]to[-]hand narcotics transaction." <u>Id.</u>

Agent Yarborough testified as follows regarding the March 28, 2018 traffic stop. The individual stopped was Ernest Moore. Tr. III at 92. That day, prior to the stop, Agent Yarborough saw Mr. Moore conduct a hand-to-hand transaction with two men (Roland Lott and Hugh Howard) in the driveway of 204 Lane Avenue. Tr. III at 94. Defendant was not

---

[25]     The undersigned presumes the "driver" was the male subject who left 204 Lane Avenue and was spotted with the syringe.

[26]     The undersigned presumes the "male" was the driver.

[27]     Agent Yarborough represented in the Affidavit that based on his training and experience, the statement by the driver regarding a cartel source is often associated with foreign nationals or persons who supply narcotics from foreign sources. Affidavit at 6.

part of that transaction. Tr. III at 94. Apparently before meeting with Mr. Moore, Mr. Lott and Mr. Howard had been inside the 204 Lane Avenue residence. <u>See</u> Tr. III at 94.

Agent Yarborough testified that when he arrived at the scene of the traffic stop, Mr. Moore indicated he fled because he recognized Officer Hickox. Tr. III at 93. Mr. Moore stated, "Look, man, I know you both know Jabo and Raw Dog[28] . . . are selling heroin on Lane Avenue, but Jabo has that cartel connection and I'm scared for my family." Tr. III at 93. At the time, Agent Yarborough already knew from the CS that "Jabo" was the "most common name that [Defendant] was going by on the street." Tr. III at 94.

The Affidavit states that on March 29, 2018, Trooper Earrey was surveilling 204 Lane Avenue when he initiated a traffic stop of a vehicle departing from that location. Affidavit at 6. After Trooper Earrey "establish[ed] probable cause to search the vehicle's passenger compartment for narcotics, [he] found crack cocaine, cocaine hydrochloride and marijuana." <u>Id.</u> Trooper Earrey told Agent Yarborough he had seen the driver of the vehicle enter the residence and leave shortly after. <u>Id.</u> Trooper Earrey advised he believed the driver had bought the narcotics at 204 Lane Avenue. <u>Id.</u>

Agent Yarborough testified that the individual stopped on March 29, 2018 was Warren Lamar Coates, and Agent Yarborough did not believe he gave a statement. Tr. III at 91-92. According to Agent Yarborough, Mr. Coates did not implicate Defendant. Tr. III at 92.

---

28     Agent Yarborough testified that "Raw Dog" is Mr. Lott. Tr. III at 93.

**7. Termination of Agreement with CS**

Agent Yarborough testified the CS was terminated as a confidential source on July 5, 2018 (more than two months after the search warrants were executed). Tr. I at 59, 99; see also Exhibit 8 (Doc. No. 22-9) (Confidential Source Agreement).[29]  According to Agent Yarborough, the CS assisted law enforcement because he was going to get paid, Tr. I at 58, and Agent Yarborough believed this was the CS's sole motivation for working with law enforcement, Tr. I at 83. Agent Yarborough testified he did not tell the CS how much he would be paid; Agent Yarborough typically just tells confidential sources they will "receive payment once the investigation is complete." Tr. I at 80-81. Agent Yarborough stated that "at the conclusion of [Defendant's] investigation," the CS was paid around $800 to $1,200 for the assistance he provided. Tr. I at 58. The Affidavit does not include any information about the CS getting paid for his cooperation.

Agent Yarborough testified that when drafting search warrant affidavits, he "tr[ies] to be as vague as [he] can to protect the identity of [a] confidential source" and to "limit[ ] the exposure of the confidential source." Tr. I at 91. According to Agent Yarborough, in state court and in the "three places [he has] been employed," "it is not normal practice to list anything about [a confidential source], their manner of being recruited, payment, anything like that in an affidavit, for their protection." Tr. I at 74. Agent Yarborough testified, "The only time that that information has ever been revealed, I've been asked by a judge, as they've signed the affidavit, . . . at which time that's provided." Tr. I at 74. In this case, Judge Arias did not ask Agent Yarborough any questions. Tr. I at 74.

---

[29]    Apparently, the CS was later arrested in November 2018. See Tr. I at 49, 103.

**B. Second Motion**

**1. Agent Mayer**

Agent Mayer was the lead DEA agent at 204 Lane Avenue when the search warrant was executed on April 27, 2018. Tr. III at 9-10. The JSO SWAT team served the search warrant at about 6:45 a.m., and Agent Mayer arrived at 204 Lane Avenue at around 7:00 a.m. Tr. III at 15, 18. He testified DEA coordinated with JSO, so that once JSO served the search warrant and "secured the location," DEA "took over as evidence collection, evidence processing, [and] investigative detail." Tr. III at 10. Agent Mayer was part of a "four-man kind of DEA search team or evidence collection team" at the scene. Tr. III at 28-29; see also Tr. III at 15.

When Agent Mayer arrived, Defendant was outside the residence in handcuffs. Tr. III at 10, 13, 18-20. Also outside were about nine other individuals, who at the time JSO served the search warrant had been inside or near the 204 Lane Avenue residence. Tr. III at 10, 16, 28. One of these individuals was Ms. Daughtry. Tr. III at 16, 18.[30] As explained below, Ms. Daughtry was later transported to the DEA office, where she was interviewed by Agent Yarborough. Tr. III at 16, 29, 33.[31] According to Agent Mayer, these individuals were "not free to leave up and until [law enforcement] cleared the scene." Tr. III at 35.

---

[30]    As noted, Agent Yarborough testified Ms. Daughtry was one of Defendant's associates identified by the CS. See Tr. I at 33.

[31]    The other individuals were "checked by [JSO] for warrants or any other outstanding things and . . . their biographical information was written down . . . ." Tr. III at 16; see also Tr. III at 28. Agent Mayer thought that "photographs of each one was taken," and he believed that everyone (except evidently Ms. Daughtry), was "released from the scene when [they] cleared the scene with [JSO]." Tr. III at 16.

"Very shortly" after arriving at 204 Lane Avenue, Agent Mayer asked Defendant if he would like to call his "wife," Marketa Raysor,[32] (who was believed to be at the Melissa Court residence), and ask her to open the door because the police were outside with a warrant. Tr. III at 10-11.[33] Defendant used Agent Mayer's cellphone to call Ms. Raysor, and he "explained to her that she should open the door for the police and that everything was going to be okay." Tr. III at 11.

After DEA was "kind of briefed on the situation" at 204 Lane Avenue and Agent Mayer believed that the Melissa Court residence was "secured," he and the DEA team entered the residence, searched it, and processed the evidence found. Tr. III at 29. While DEA was processing the scene, JSO was monitoring Defendant and the other people who were outside. Tr. III at 29.

Agent Mayer testified the SWAT team had found an "unknown amount of U.S. currency in [Defendant's] pocket," which he believed "turned out to be a little over $1,000." Tr. III at 11. Agent Mayer later clarified that it was $4,000. Tr. III at 20-21.[34]

---

[32]    Agent Yarborough testified the woman who Agent Mayer referred to as Defendant's "wife" is Ms. Raysor, but Agent Yarborough did not think Defendant and Ms. Raysor were actually married. Tr. III at 59.

[33]    The Melissa Court search warrant and the 204 Lane Avenue search warrant were served at about the same time. Tr. III at 10.

[34]    On cross-examination, Agent Mayer was asked whether there was "any discussion with [Defendant] at the scene about the money coming from the dog track[.]" Tr. III at 21. Agent Mayer responded as follows:

There may have been. I don't remember specifically. I don't -- so I definitely did not question him about the money. He may have given a statement that was not -- I don't remember, but now that you say dog track, that sounds familiar to me, so there's a possibility that that was something he said to me.

Tr. III at 22.

Eventually, Agent Mayer decided to have Defendant transported to the DEA office to be interviewed by Agent Yarborough, Tr. III at 33, who would "explain to [Defendant] what was going on," Tr. III at 12. Agent Mayer thought that "bringing [Defendant] to the DEA office so that [Agent] Yarborough could conduct an interview at the very least may bear fruit and help provide additional information that would assist in [the] investigation." Tr. III at 32.

Agent Mayer did not think he told Defendant, word for word, that he was under arrest. Tr. III at 13. Agent Mayer explained to him that he (Defendant) would be transported to the DEA office, that there was "probable cause to believe that he was involved in drug trafficking," and that the "lead investigator" (Agent Yarborough) "would be down at the office and would explain to him everything that was going on [at that] point and where [they] stood." Tr. III at 13.

Agent Mayer testified that around 9:30 a.m., "[r]ight before" he left the scene and while Defendant was still in handcuffs, Agent Mayer asked Defendant if "he wanted any footwear or shoes or anything of that nature" because Defendant had socks on but no shoes. Tr. III at 12, 36; see also Tr. III at 13 (indicating that Defendant was in handcuffs each time Agent Yarborough spoke with him). Defendant told Agent Mayer there was a pair of "flip-flop or slides," Tr. III at 12, in the "middle of the living room," Tr. III at 26, 36-37.

Agent Mayer entered the residence and within thirty seconds found a pair of black slides "in very close proximity to the cigar box which contained drugs and drug

paraphernalia." Tr. III at 12, 26.[35] The cigar box was on a clear coffee table in the middle of the living room, Tr. III at 12, and the slides were "below and to the side" of the coffee table, Tr. III at 27. The slides were about one to two feet away from the coffee table, "underneath the lip of the coffee table." Tr. III at 40; see also Tr. III at 12-13. There was a "couch to the side" and "chairs . . . maybe even recliners . . . sort of around the coffee table area." Tr. III at 26-27. According to Agent Mayer, the slides were closest to the recliners. Tr. III at 27.

Agent Mayer thought the cigar box was Defendant's based on the proximity of the slides to the box, and based on information obtained during the investigation of Defendant prior to the execution of the search warrant. Tr. III at 30-32.[36] Agent Mayer did not have any other information from that morning that "link[ed]" the cigar box to Defendant. Tr. III at 31. Agent Mayer did not ask whether the cigar box belonged to anyone. Tr. III at 30. He believed "further investigating was warranted to determine if [Defendant] was in fact linked to the box . . . ." Tr. III at 32.

At some point that morning, JSO transported Defendant to the DEA office in the backseat of a JSO cruiser. Tr. III at 13-16; see also Tr. III at 16-17. Agent Mayer testified that when Defendant arrived at the DEA office, he escorted Defendant into a holding cell. Tr. III at 17. Defendant's handcuffs were removed at that time. Tr. III at 14. As Agent Mayer

---

[35]    The cigar box contained contained "[c]rack cocaine, heroin, a scale, [and other] drug paraphernalia." Tr. III at 31.

[36]    Agent Mayer did not know when Defendant took his slides off, when the cigar box was placed on the coffee table, or who placed the cigar box there. Tr. III at 32. Agent Mayer believed, however, that when JSO entered the residence, Defendant was standing and wearing the slides, "had set down the box[,] and had stepped right out of his slides . . . ." Tr. III at 27; see also Tr. III at 27-28 (Agent Mayer testifying his "sense" was that the slides "were in close proximity to somebody that was standing near the coffee table").

was escorting Defendant, he explained to Defendant that he would be placed in a holding cell pending Agent Yarborough's arrival. Tr. III at 14.

According to Agent Mayer, Agent Yarborough "would have . . . met with [Defendant] between 10:00 [a.m.] and 11:00 [a.m.], and there was a process of conversation that took place." Tr. III at 18. Agent Mayer believed "there was food provided" to Defendant. Tr. III at 18. He testified that "at some time after noon, after 1:00 [p.m.] . . . [Defendant] would have been transported to jail eventually that afternoon." Tr. III at 18. Agent Mayer estimated that Defendant was at the DEA office for "probably a total of maybe six hours." Tr. III at 17.

### 2. Agent Yarborough

Agent Yarborough was "probably two houses away" from Melissa Court "standing in the street" when the Melissa Court search warrant was served. Tr. III at 100; see also Tr. III at 42. He was "overseeing the scene there." Tr. III at 42. Agent Yarborough testified that the following individuals (besides Defendant) were present at the Melissa Court residence when the search warrant was executed: Ms. Raysor, Ronald Bronner, Jr. (Defendant's son), a Zyann Kirkland, a Kayla Mathis, and "possibly an infant." Tr. III at 100; see also Tr. III at 86-87. Agent Yarborough did not interview or question these individuals, and none of them were arrested. Tr. III at 101-02.

Agent Yarborough testified the following items were found at the Melissa Court residence when the search warrant was executed: four firearms (two in Defendant's son's room, Tr. III at 102-03); a box of ammunition; a digital scale; a respirator mask; a box of

rubber gloves; an empty bottle of "super mannitol";[37] an "ounce-size narcotics packaging press"; a hydraulic press with cocaine residue; and three glass vials with cocaine residue. Tr. III at 43. The box of ammunition, the mask, and the box of gloves were found in the master bedroom dresser. Tr. III at 103. Ms. Raysor indicated to law enforcement that she and Defendant shared the master bedroom. Tr. III at 118.

Agent Yarborough testified he associated the drug paraphernalia found at Melissa Court with Defendant based on the following: the information Agent Yarborough had obtained prior to the execution of the search warrants, Tr. III at 102; the fact that Defendant "was a person that [he] identified as being involved in the narcotics business"; the fact that Defendant resided at Melissa Court; and the fact that Defendant was "the primary person in control of that residence," Tr. III at 85-86.[38] Agent Yarborough, however, indicated that no one in the residence said anything that showed Defendant owned or possessed any of the contraband found. Tr. III at 101-02.

Agent Yarborough testified the following evidence was found at 204 Lane Avenue and factored into his belief that he had probable cause to arrest Defendant: the cigar box;[39]

---

[37]    Agent Yarborough stated that he believed mannitol is a laxative and that drug traffickers mix it with "crack cocaine" and "powder cocaine" to increase the weight of the product to be sold. Tr. III at 68.

[38]    Agent Yarborough testified he knew Defendant controlled the Melissa Court and 204 Lane Avenue residences "based on the information that was provided by the [CS] and the [SOI], the visual surveillance and pole cam[era] footage that showed [Defendant] going to and from these locations on a regular basis, staying overnight at these locations." Tr. III at 88-89. Agent Yarborough stated he had seen Defendant stay overnight at 204 Lane Avenue and Melissa Court, Tr. III at 86, but that "the majority of the time [at night] was spent at Melissa Court," Tr. III at 99. During the day, Defendant spent most of the time traveling between the two residences. Tr. III at 99.

[39]    At some point prior to Defendant being transported to the DEA office, Agent Mayer informed Agent Yarborough of the cigar box and the contents found in it. Tr. III at 104. Agent Mayer described the box to Agent Yarborough as a wooden cigar box. Tr. III at 104. Agent Yarborough testified he told Agent Mayer that the wooden cigar box was what they "were looking for, more than likely." Tr. III at 104. Agent Yarborough was "intrigued" by the wooden cigar box that was found because he had observed Defendant "holding that box going to and from" 204 Lane Avenue and Melissa Court. Tr. III at 104-05. Agent Yarborough believed the wooden cigar box that was found was the same one he had seen Defendant holding. Tr. III at 105.

"circles of crack cocaine"; heroin; a digital scale that was inside the cigar box; "[a] smaller bag in the dining room found that contained heroin"; glass beakers; and a kitchen whisk covered in residue. Tr. III at 105. Agent Yarborough testified they also found a firearm, but he suggested that the firearm did not contribute to his belief that there was probable cause to arrest Defendant. See Tr. III at 105-06. As to the slides Agent Mayer found, Agent Yarborough testified in substance that while he was surveilling Defendant during the investigation, he had seen Defendant wearing slides that were "dark in color." Tr. III at 106. Agent Yarborough could not "say for sure" whether the slides he had seen before were the ones Defendant was wearing the day the search warrants were executed. Tr. III at 107.

Evidence obtained prior to the execution of the search warrants also factored into Agent Yarborough's belief that there was probable cause to arrest Defendant. Specifically, Agent Yarborough pointed to the two traffic stops, see supra pp. 23-25, and an April 6, 2018 interview of a woman named Shelly Newman that Officer Oddinger conducted. Tr. III at 95. As to the latter, Agent Yarborough testified that Officer Oddinger "made contact with [Ms. Newman] in the vicinity of 204 Lane Avenue, . . . and [Officer] Oddinger informed [Officer] Hickox that a black male known to [Ms. Newman] as Jabo was a heroin dealer who deals large amounts of narcotics." Tr. III at 95. According to Agent Yarborough, Ms. Newman also indicated to Officer Oddinger that "Jabo" used a "silver in color vehicle and operated at 204 Lane Avenue . . . ." Tr. III at 95. Ms. Newman explained that "Jabo" "purposely gets females addicted to heroin and uses this as a way to force them into acts of prostitution from which he also benefits monetarily." Tr. III at 96. Agent Yarborough testified that "based on [his] communication with [Officer] Oddinger, [Ms. Newman] knew this information because she was a heroin addict in that area." Tr. III at 96. Agent

Yarborough indicated that he has never spoken with Ms. Newman and that he did not know whether she is reliable. Tr. III at 96. (The information provided by Ms. Newman was not included in the Affidavit.)

Agent Yarborough testified that the morning of April 27, 2018, his "plan was to detain [Defendant] if he was located at either residence." Tr. III at 98. Agent Yarborough believed there was probable cause to arrest Defendant "[a]s soon as the drugs were located at [Melissa Court] and also at the 204 Lane Avenue address." Tr. III at 84. He decided to arrest Defendant once the firearms, drug paraphernalia, and narcotics were found. Tr. III at 98.[40] He made this decision prior to leaving the scene at Melissa Court. Tr. III at 83. He believed that Defendant was under arrest when he was transported from 204 Lane Avenue to the DEA office. Tr. III at 84.[41]

Later the morning of April 27, 2018, Agent Yarborough returned to the DEA office to interview Ms. Daughtry and Defendant. Tr. III at 42. Defendant was already at the DEA office when Agent Yarborough arrived. Tr. III at 43. Agent Yarborough and Trooper Earrey interviewed Ms. Daughtry first. Tr. III at 43-44. Agent Yarborough testified he had seen Ms. Daughtry at 204 Lane Avenue when he surveilled that location during the investigation. Tr. III at 45-46. During her interview, Ms. Daughtry essentially confirmed the CS's information that she was involved in Defendant's narcotics business. See Tr. III at 44-45.

Thereafter, Defendant was brought to the "downstairs holding room." Tr. III at 46. Agent Yarborough did not recall whether Defendant was in handcuffs at the time, but he

---

[40]     Agent Yarborough did not request an arrest warrant when he sought the search warrants. Tr. III at 98.

[41]     It appears the parties do not agree on the timing of Defendant's arrest.

testified that it is "normal procedure to remove the[ handcuffs] once in the interview room." Tr. III at 46.[42] Agent Yarborough estimated that the interview room is about eight feet by ten feet with a "six-foot table surrounded by possibly five, six chairs at the most." Tr. III at 46-47. The room has a window on one side. Tr. III at 47.

Agent Yarborough and Trooper Earrey entered the interview room, sat "directly across" from Defendant, and introduced themselves. Tr. III at 50. Evidently, the only people in the interview room were Agent Yarborough, Trooper Earrey, and Defendant. Agent Yarborough asked Defendant whether he had "already been read Miranda[.]" Tr. III at 47. Defendant responded, "You mean my rights, where at?" Tr. III at 48. Agent Yarborough testified he was not sure whether Defendant had been read his Miranda rights earlier that day. Tr. III at 48-49, 74. A report authored by Agent Yarborough indicates that Defendant "stated he had been read [his] Miranda [r]ights but was unsure if he understood." Exhibit 14 (Doc. No. 30-2) at 3.[43]

"To be safe," Agent Yarborough read Defendant his Miranda rights from an FDLE card:

> Before you make any statement or answer any questions, you must fully understand your constitutional rights.
>
> You have the right to remain silent. Anything you say can be used against you in court.
>
> You have the right to call or obtain an attorney at any -- You have the right to call or obtain an attorney at this time and to have one present now or at any time during questioning. If you cannot afford an attorney and you want one before or at any time during questioning, one will be provided for you.

---

[42]     As noted above, Agent Mayer testified that Defendant's handcuffs were removed after Agent Mayer escorted Defendant into the holding cell. Tr. III at 14.

[43]     For ease of reference, citations to Agent Yarborough's report (Exhibit 14) follow the pagination assigned by the Court's electronic filing system (CM/ECF).

If you decide to answer questions now, you have the right to stop answering at any time during questioning.

Do you understand these rights?

Having these rights in mind, are you willing to talk with me now?

Tr. III at 48-50 (internal quotation marks omitted).

Defendant responded "Yes" to the first question ("Do you understand these rights?") and to the second question ("Having these rights in mind, are you willing to talk with me now?"). Tr. III at 51; see also Exhibit 14 (Doc. No. 30-2) at 3-4. Agent Yarborough testified that Defendant did not have any questions about his Miranda rights and that he did not ask Agent Yarborough to clarify them. Tr. III at 70. Defendant never invoked his right to an attorney or his right to remain silent or end the interview. Tr. III at 71. Agent Yarborough did not obtain a written waiver of Defendant's Miranda rights. Tr. III at 71.

Agent Yarborough testified that "immediately after" he read Defendant his Miranda rights, he told Defendant he would be charged with possession of heroin and cocaine. Tr. III at 111-12.[44] Agent Yarborough explained to Defendant that "he would not be released that day due to him being on probation." Tr. III at 54.[45] During his testimony, Agent Yarborough read the following from his report: "[I] confronted Defendant with knowledge of his narcotics activities and identified the items located during the execution of [the] search warrants at his home and at the 204 Lane Avenue . . . address." Tr. III at 56; see also Exhibit 14 (Doc. No. 30-2) at 4.

---

[44]    Earlier in his testimony, Agent Yarborough stated that he also advised Defendant he would be charged with "the items that were found in the 204 Lane Avenue house." Tr. III at 53.

[45]    As noted above, Defendant was on federal supervised release.

After Agent Yarborough informed Defendant that he would be arrested and after he confronted Defendant about his narcotics activities, Defendant told Agent Yarborough he wanted to cooperate. Tr. III at 51; see also Tr. III at 56; Exhibit 14 (Doc. No. 30-2) at 4. Agent Yarborough "informed [Defendant] that no promises or guarantees could be made, to which [Defendant] replied, 'I'm on federal paper. I need to help myself.'" Tr. III at 56; see also Tr. III at 69; Exhibit 14 (Doc. No. 30-2) at 4. Agent Yarborough then told Defendant that "if he chose to cooperate, he would [still] be arrested that day due to him being on probation" and that "[t]here would be no release if he cooperated or anything like that." Tr. III at 52. Agent Yarborough testified that although he did not make any promises to Defendant, he advised Defendant that "he could possibly receive judicial consideration." Tr. III at 69. He also explained to Defendant that "in [his] experience[, he had] seen people get drastically reduced sentences or other favorable outcomes when they go above and beyond to help law enforcement [on] further cases." Tr. III at 69.

Agent Yarborough's report states that he then asked Defendant "to explain in detail the manner in which he had conducted his narcotics business." Tr. III at 56; Exhibit 14 (Doc. No. 30-2) at 4. Defendant "identified sources of supply that he used to obtain narcotics." Tr. III at 57; see also Exhibit 14 (Doc. No. 30-2) at 4. He also identified a narcotics business partner named Robert Curtis Johnson. Tr. III at 57; see also Exhibit 14 (Doc. No. 30-2) at 4. Defendant advised he "regularly purchased 2- and 3-kilogram quantities of cocaine once a month, utilizing this relationship with Mr. Johnson." Tr. III at 57; see also Exhibit 14 (Doc. No. 30-2) at 4. Defendant used his cellphone to call Mr.

Johnson[46] and ask him to cooperate and help in "assist[ing Defendant's] situation." Tr. III at 57-58, 59. Mr. Johnson agreed to do so, but Agent Yarborough believed Mr. Johnson "changed [phone] numbers the following day." Tr. III at 58.[47] Agent Yarborough testified that the phone call to Mr. Johnson was not recorded because "Mr. Johnson was going to be a corroborator[,[48]] and [DEA] do[es] not record conversations with corroborators." Tr. III at 76.

Defendant also called Ms. Raysor "multiple times." Tr. III at 59. He told her that he had been arrested, and "she helped him obtain phone numbers for other individuals that [they] attempted to contact unsuccessfully." Tr. III at 59.

Defendant placed a recorded call to an individual by the name of Andre Haynes. See Tr. III at 60, 65; Exhibit 14 (Doc. No. 30-2) at 4. During this call, Defendant and Mr. Haynes negotiated the price of three kilograms of cocaine. Tr. III at 60; see also Tr. III at 76; Exhibit 14 (Doc. No. 30-2) at 4. Mr. Haynes told Defendant he could provide Defendant the narcotics the next morning. Tr. III at 61; Exhibit 14 (Doc. No. 30-2) at 4. DEA, however, did not have the "manpower to do that the following day, [so they] were not able to cover the delivery of narcotics." Tr. III at 61; see also Tr. III at 76-78.

After the above phone calls, Agent Yarborough asked Defendant "if he had any additional narcotics on hand," and Defendant responded that "he had just sold the last of 3 kilograms" he had. Tr. III at 62; see also Exhibit 14 (Doc. No. 30-2) at 4. Agent

---

[46]     According to Agent Yarborough, Defendant had to call "multiple people trying to get ahold of Mr. Johnson." Tr. III at 62.

[47]     Agent Yarborough tried calling Mr. Johnson either the following day or the following week, and the number was no longer in service. Tr. III at 76.

[48]     By "corroborator," Agent Yarborough apparently meant "cooperator."

Yarborough believed Defendant said he had gotten those three kilograms three weeks before the interview. Tr. III at 62; <u>see also</u> Exhibit 14 (Doc. No. 30-2) at 4-5.

Agent Yarborough told Defendant he had seen him "multiple times carrying a wooden box that [they] believed to be a cigar box prior to the search warrants." Tr. III at 63; <u>see also</u> Exhibit 14 (Doc. No. 30-2) at 4. Defendant advised he owned the cigar box and the narcotics found in the cigar box, except for the heroin. Tr. III at 63; <u>see also</u> Exhibit 14 (Doc. No. 30-2) at 4. Defendant stated he did not possess any currency other than the money found in his pocket, which Defendant believed was $4,200. Tr. III at 64; Exhibit 14 (Doc. No. 30-2) at 5.

When asked if Defendant claimed ownership of the other items found at 204 Lane Avenue and Melissa Court, Agent Yarborough testified that Defendant "denied possession of the firearms" found. Tr. III at 64; <u>see also</u> Exhibit 14 (Doc. No. 30-2) at 5. With regard to the firearms found at Melissa Court specifically, Agent Yarborough explained to Defendant that two firearms were found "underneath the dresser in his son's room." Tr. III at 81. Defendant stated he did not "know anything about them." Tr. III at 81. Agent Yarborough told Defendant that his son could be charged in relation to those firearms, but he did not say this "in a threatening manner [or] to coerce [Defendant] to claim ownership of the guns[.]" Tr. III at 82. Agent Yarborough also asked Defendant whether he would let his son get arrested for firearms that Defendant knew were his (Defendant's). Tr. III at 81-82. Defendant "continued to deny knowledge of that." Tr. III at 82. Agent Yarborough indicated he did not tell Defendant that if he cooperated, his son would not be charged in connection with the firearms found. Tr. III at 82.

Agent Yarborough testified Defendant's interview lasted from about 11:00 a.m. to 3:30 p.m. Tr. III at 64; see also Exhibit 14 (Doc. No. 30-2) at 5. According to Agent Yarborough, it was "a drawn-out process" because of Defendant's cooperation. Tr. III at 64. They had to wait for "persons to call [them] back." Tr. III at 65. Specifically, they waited for Mr. Johnson to call back Defendant because he was at work, and they waited for Mr. Haynes to call and "discuss[ ] the kilograms of cocaine." Tr. III at 65. Defendant did not give a written statement. Tr. III at 119.

According to Agent Yarborough, the interview was "personable," "non-hostile," and "non-threatening." Tr. III at 65-66. Agent Yarborough was wearing a green and tan battle dress uniform. Tr. III at 66. Trooper Earrey was wearing a black FHP battle dress uniform with a "tactical vest" that displayed "FHP" and possibly his name. Tr. III at 66. Agent Yarborough and Trooper Earrey both had weapons, but they did not draw them. Tr. III at 66. They never threatened Defendant. Tr. III at 68-69.

Agent Yarborough indicated that Defendant's answers were responsive to his questions and that he did not appear to be under the influence of drugs, alcohol, or any intoxicant. Tr. III at 69-70. Agent Yarborough was able to understand Defendant "very clearly." Tr. III at 70. Agent Yarborough did not remember whether Defendant asked them for anything to eat or drink, but he testified it is "very possible that [they] did provide food." Tr. III at 66. Agent Yarborough stated they "normally" provide food if the interview "goes past lunch." Tr. III at 66.[49]

---

[49]   The interview with Defendant was not recorded, Tr. III at 47, because the room where the interview was held "did not have any ability for recording of interviews," Tr. III at 74.

Defendant was transported to the Duval County Jail at about 5:00 p.m. See Exhibit 14 (Doc. No. 30-2) at 5; Tr. III at 114, 116.[50]  At some point, Agent Yarborough completed an arrest report charging Defendant with "[t]rafficking in heroin and in cocaine," and he sent it electronically to the jail. Tr. III at 115; see also Exhibit 14 (Doc. No. 30-2) at 5.

## IV. Discussion

For ease of discussion, the four matters Defendant challenges are addressed below in the following sequence: 1) the use of the pole camera; 2) the search warrants; 3) Defendant's statements to law enforcement; and 4) Defendant's warrantless arrest.

**A. First Motion – Pole Camera**

**1. Parties' Arguments**

Defendant contends that "[d]ecisional law has moved in the direction of requiring search warrants for technology that automates surveillance that, if performed directly by humans, would not require a warrant." First Motion at 3. Defendant cites United States v. Moore-Bush, 381 F. Supp. 3d 139 (D. Mass. 2019), as amended (June 4, 2019), appeal docketed, No. 19-1625 (1st Cir. June 21, 2019), and argues that "while law enforcement officers may surveil the outside of a suspect's home without a warrant, some decisional law requires a warrant for protracted, automated surveillance by a telephone pole camera." First Motion at 4. In his Reply, Defendant relies also on People v. Tafoya, — P.3d —, 2019 WL 6333762 (Colo. App. Nov. 27, 2019) and United States v. Vargas, No. CR-13-cr-6025-EFS, 2014 U.S. Dist. LEXIS 184672 (E.D. Wash. Dec. 15, 2014) (unpublished), motion for

---

[50]     Prior to being transported to the Duval County Jail, Agent Yarborough and Defendant "agreed to follow up." Tr. III at 67. It was Agent Yarborough's understanding that Defendant was going to continue to cooperate and that Agent Yarborough would meet with him and his attorney "at a later date." Tr. III at 67. Agent Yarborough also planned to sign up Defendant as a confidential source. Tr. III at 119. The meeting, however, did not take place, and Defendant was not signed up as a confidential source. Tr. III at 119.

reconsideration denied, No. CR-13-cr-6025-EFS, Doc. No. 117 (E.D. Wash. Jan. 5, 2015), appeal dismissed based on motion for voluntary dismissal, No. 15-30006 (9th Cir. May 12, 2015). See Reply at 13.

Responding, the Government asserts that the cases Defendant cites are not binding on this Court and that they are otherwise distinguishable from the instant case. See Govt.'s Resp. at 31-34; Sur-Reply at 1-3. In addition, the Government argues that Agent Yarborough "had a good faith belief that no warrant was needed for the use of a pole camera." Govt.'s Resp. at 36.

### 2. Applicable Law

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' and it provides that 'no Warrants shall issue, but upon probable cause.'" United States v. Joseph, 709 F.3d 1082, 1099 (11th Cir. 2013) (alteration in original) (quoting U.S. Const. amend. IV). To claim the protection of the Fourth Amendment, a defendant must "demonstrate a reasonable expectation of privacy against government intrusion." United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000) (citing Katz v. United States, 389 U.S. 347, 353 (1967)).

A number of courts have examined whether the use of a pole camera implicates the Fourth Amendment. As noted, Defendant points to three cases in which courts have found that the warrantless use of a pole camera violated the Fourth Amendment: Vargas, 2014 U.S. Dist. LEXIS 184672; Moore-Bush, 381 F. Supp. 3d 139; and Tafoya, 2019 WL 6333762.

In <u>Vargas</u>, the United States District Court for the Eastern District of Washington held that a pole camera installed without a warrant, which captured activities in a partially fenced, rural front yard for six weeks violated the defendant's reasonable expectation of privacy and thus suppression was warranted. 2014 U.S. Dist. LEXIS 184672.

In <u>Moore-Bush</u>, the United States District Court for the District of Massachusetts held that the use of a pole camera—only the particular one in that case—to track an individual's movements constituted a search under the Fourth Amendment. 381 F. Supp. 3d at 150. The pole camera in <u>Moore-Bush</u> had the following characteristics that the court found compelling: 1) it continuously recorded for eight months; 2) it focused on the driveway and the front of the house; 3) it could zoom "so close that it [could] read license plate numbers"; and 4) it had a "digitally searchable log" that allowed it not to have to be monitored in real time. <u>Id.</u> According to the <u>Moore-Bush</u> court, "[t]aken together, these features permit the Government to piece together intimate details of a suspect's life." <u>Id.</u> (citation omitted). The <u>Moore-Bush</u> court relied on the United States Supreme Court's recent decision in <u>Carpenter v. United States</u>, 138 S. Ct. 2206 (2018) and on the concurrences of Supreme Court Justices Sonia Sotomayor and Samuel A. Alito in <u>United States v. Jones</u>, 565 U.S. 400 (2012), which the court found were incorporated in <u>Carpenter</u>. <u>See</u> <u>Moore-Bush</u>, 381 F. Supp. 3d at 147-48. Both <u>Jones</u> and <u>Carpenter</u> addressed questions that did not involve pole cameras.

In <u>Jones</u>, the Supreme Court held that the placement of a GPS tracking device on an individual's vehicle and the use of that device to track the individual's movements constitutes a search under the Fourth Amendment. 565 U.S. at 404. In her concurrence, Justice Sotomayor noted that "[a]wareness that the Government may be watching chills

associational and expressive freedoms" and that "the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." Id. at 416. Justice Alito stated in his concurrence that "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," but that "the use of longer-term GPS monitoring in investigations of most offenses impinges on expectations of privacy." Id. at 430 (citation omitted). In Moore-Bush, the court used these observations as guiding "principles" in deciding whether the use of the pole camera in that case constituted a search under the Fourth Amendment. 381 F. Supp. 3d at 147-48.

In Carpenter, the Supreme Court considered the following question: "[W]hether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 138 S. Ct. at 2211. Holding that it was indeed a search when the Government obtained seven days of historical cell phone records from a wireless provider, id. at 2212, 2217, the Supreme Court announced "that the Government must generally obtain a warrant supported by probable cause before acquiring such records," id. at 2221. The court in Moore-Bush, applying Carpenter to the pole camera situation, relied on Carpenter's reasoning that "a person does have some objectively reasonable expectations of privacy when in spaces visible to the public." Moore-Bush, 381 F. Supp. 3d at 145 (citing Carpenter, 138 S. Ct. at 2217).

In Tafoya, the Colorado Court of Appeals held that the use of a pole camera in that particular case to surveil the defendant's home for three months constituted a search under the Fourth Amendment. 2019 WL 6333762, at *1. The pole camera in Tafoya captured an

area behind a six-foot-high privacy fence, and it provided continuous coverage in the form of both recorded and live footage. Id. Like the Moore-Bush court, the court in Tafoya relied on Carpenter and the Jones concurrences for the proposition that "not all governmental conduct escapes being a 'search' simply because a citizen's actions were otherwise observable by the public at large." Tafoya, 2019 WL 6333762, at *7.

The weight of authority (prior to Carpenter and the other cases cited above) holds that cameras capturing movements that can be seen by anyone do not implicate the Fourth Amendment. See, e.g., United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009) (concluding that eight-month warrantless video surveillance of driveway and garage door did not violate Fourth Amendment because activities were in unobstructed plain view); United States v. Vankesteren, 553 F.3d 286, 291 (4th Cir. 2009) (finding that video camera in open field "did little more than the agents themselves could have physically done, and its use was therefore not unconstitutional"); United States v. Gonzalez, 328 F.3d 543, 548 (9th Cir. 2003) (concluding that camera placed in public mailroom in community hospital did not offend Fourth Amendment).

In light of ever-evolving technology and recent Supreme Court Fourth Amendment jurisprudence (including Carpenter and Jones), some courts are re-examining whether pole cameras implicate the Fourth Amendment. As summarized above, some courts have found the Fourth Amendment is implicated; others, however, have found it is not. See, e.g., Report and Recommendation (Doc. No. 159), United States v. Ratliff, No. 3:18-cr-00206-J-25JRK (M.D. Fla. Oct. 16, 2019), adopted, Order (Doc. No 182), No. 3:18-cr-00206-J-25JRK (M.D. Fla. Jan. 15, 2020); United States v. Fanning, No. 1:18-CR-362-AT-CMS, 2019 WL 6462830, at *3-4 (N.D. Ga. May 28, 2019) (unpublished) (finding that the

defendant had no reasonable expectation of privacy in public area captured by pole camera installed outside a warehouse), report and recommendation adopted, No. 1:18-CR-0362-AT-1, 2019 WL 3812423 (N.D. Ga. Aug. 13, 2019) (unpublished); United States v. Gbenedio, No. 1:17-CR-430-TWT-JSA, 2019 WL 2177943, at *2 (N.D. Ga. Mar. 29, 2019) (unpublished) (finding no Fourth Amendment violation by "the use of a pole camera installed on public property, or property unaffiliated with [the d]efendant, to view the exterior of a commercial business in a publicly accessible strip mall"), report and recommendation adopted, No. 1:17-CR-430-TWT, 2019 WL 2173994 (N.D. Ga. May 17, 2019) (unpublished); United States v. Edmonds, No. 2:18-CR-00225-01, 2020 WL 573272, at *3 (S.D.W. Va. Feb. 5, 2020) (unpublished) (finding no Fourth Amendment violation by warrantless installation of pole camera that captured "footage of vehicles coming and going from the residences—something that can be observed by any neighbor, passer-by, or officer physically surveilling the area" (citation omitted)); United States v. Kelly, 385 F. Supp. 3d 721, 726-30 (E.D. Wis. 2019) (finding warrantless installation of camera outside a drug stash apartment did not implicate the Fourth Amendment); United States v. Kubasiak, No. 18-CR-120-PP, 2018 WL 4846761, at *3-8 (E.D. Wis. Oct. 5, 2018) (unpublished) (finding no implication of Fourth Amendment in fixed camera placed in a neighbor's house that recorded the exterior of the defendant's residence).

**3. Analysis**

Under the facts of this case, the undersigned finds that suppression of the evidence obtained from the pole camera is not appropriate. To the extent this conclusion differs from the one reached by the courts in Moore-Bush, Vargas, Tafoya, and other non-binding

opinions, the undersigned respectfully declines to follow them (based mainly on the circumstances presented here).

The pole camera in this case captured views visible to anyone standing on the sidewalk or driving on the street, and Defendant did not have a reasonable expectation of privacy in the public sidewalk or roadway. The pole camera's footage was of the exterior of the residence and the driveway only, and it did not show the inside of the residence or of any privacy fence. Tr. I at 26, 105-06; Tr. II at 5. The pole camera had the option to zoom, but Agent Yarborough did not remember being able to zoom to see inside the residence. Tr. I at 26. Even though pole cameras are at times used by law enforcement to enhance surveillance abilities beyond those that can be accomplished physically, Agent Yarborough testified he would have had the same view standing next to the light pole on which the camera was installed. Tr. I at 60-61. Indeed, it appears physical surveillance would have been more valuable because the pole camera footage was poor most of the time, Tr. I at 26, 28, 61; Tr. II at 5-7, and its motion-activation mechanism was not very accurate, Tr. II at 17, 22. As a result, the footage was at times sporadic, to the point that it would sometimes fail to capture key information, such as a vehicle arriving at the residence or an individual exiting a vehicle. Tr. II at 17.

For the foregoing reasons, notwithstanding the length of the surveillance (a little less than seven weeks) and the camera's capabilities, the use of the pole camera did not implicate the Fourth Amendment. See United States v. Houston, 813 F.3d 282, 287-88 (6th Cir. 2016) (finding no Fourth Amendment violation because the defendant "had no reasonable expectation of privacy in video footage recorded by a camera that was located

on top of a public utility pole and that captured the same views enjoyed by passersby on public roads").[51]

## B. First Motion – Probable Cause for the Search Warrants

### 1. Parties' Arguments

Defendant contends the search warrants were "flawed because they omitted facts vital to the issuing court's determination of probable cause, and they lacked sufficient detail and corroboration to overcome the impact of the omissions." Reply at 1. Specifically, Defendant argues the Affidavit omits the following facts and information: the SOI "had an overwhelming bias against Defendant"; the SOI and the CS are relatives; the SOI and the CS had "extensive criminal histories and appear to have been actively involved in the drug trade at or near the time they provided information to the investigating agents";[52] the CS was paid for his work as a confidential source; the basis for the CS's and the SOI's knowledge; and the basis for Agent Yarborough's knowledge. Id. at 1-2, 6. Defendant also contends that "it is not possible to determine from the [A]ffidavit[ ] which bits of information [from the March 15, 2018 meeting] came from [the SOI] and which came from the [CS]." Id. at 2; see also id. at 4-5. Defendant argues the warrants were also defective because they "were based partly on the pole-camera video, which itself was improperly obtained without a warrant . . . ." First Motion at 2.

Defendant asserts the above "omissions are not cured by detail" because the Affidavit contains "very little detail as to how the informants kn[e]w about Defendant's

---

[51]     In light of the findings regarding the pole camera, the undersigned need not address the Government's good faith argument regarding the warrantless installation of the pole camera.

[52]     Although Defendant claims that the SOI was involved in the drug trade at the time he provided information to law enforcement, there was no evidence or testimony indicating that the SOI was actively involved in the drug trade during that time.

alleged drug trafficking or what they kn[e]w about details such as when and precisely where they saw guns in Defendant's rented properties." Reply at 11-12. Likewise, Defendant argues the "omissions are not cured by corroboration of [the SOI's] and [the CS's] statements" because "there were no controlled purchases from Defendant" and the phone call the CS placed to Defendant was "ambiguous because of its use of nontraditional terminology such as 'Up on 28th Street' and 'Lebron James,'[ ] and law enforcement never followed through with an actual monitored transaction." Id. at 12 (citation omitted).

Responding, the Government contends Judge Arias "had a substantial basis for crediting the [CS]'s and [the SOI]'s statements in the search warrant [A]ffidavit, even if the [A]ffidavit did not detail why the information provided by the [CS] and the [SOI] was reliable, the criminal histories of the [CS] and [the SOI], or provide information about the nature of their relationship with [D]efendant." Govt.'s Resp. at 24. As to the omission of the CS's criminal history and the "[CS]'s and the [SOI]'s relationship with [D]efendant," the Government argues they were "neither intentional nor reckless, but merely negligent at worst." Id. at 25.

According to the Government, Agent Yarborough corroborated the CS's "information using a controlled phone call to [D]efendant, confirming [D]efendant's location through the GPS ping data, and physically observing [D]efendant going between the 204 Lane Avenue residence and Melissa Court residence with a cigar box, both in person and through the pole camera." Id. Relying on United States v. Haimowitz, 706 F.2d 1549, 1555 (11th Cir. 1983), the Government argues that "it was implicit that at least the [CS] was involved in the drug trade because he was able to call [D]efendant and request an ounce

of heroin, which is likely more than a personal use amount." Govt.'s Resp. at 26-27. The Government contends that "[v]iewed as a whole and with the deference given to the issuing judge, the [A]ffidavit discloses that (1) there was a high probability [D]efendant was selling controlled substances, specifically heroin and (2) [D]efendant was transporting these substances between the 204 Lane Avenue residence and the Melissa Court residence and was, therefore, in possession of at least heroin at both locations." Id. at 28.

### 2. Applicable Law

"Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.

When law enforcement seeks a warrant to search a person's residence, "the affidavit must supply the [issuing judge] with a reasonable basis for concluding that [the d]efendant might keep evidence of his crimes at home, i.e., a safe yet accessible place." Kapordelis, 569 F.3d at 1310 (citation and internal quotation marks omitted). In the absence of "an allegation that the illegal activity occurred at the location to be searched, for example the home, . . . 'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'" Id. (citing United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)).

An issuing judge's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted) (observing that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review"); see also Joseph, 709 F.3d at 1093 (stating that "[w]e afford great deference to the determination of a[n issuing] judge that a search warrant affidavit is supported by probable cause, and we uphold the determination of the [issuing] judge so long as he had a substantial basis for concluding that a search would uncover evidence of wrongdoing" (citation and internal quotation marks omitted)). Review of the sufficiency of the evidence supporting probable cause is generally limited to the information that was presented to the judicial officer who issued the warrant. United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982).

A search warrant is void if the affidavit supporting such warrant contains "deliberate falsity or . . . reckless disregard" for the truth and if "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 156, 171 (1978); see also Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997). "The reasoning in Franks also applies to information omitted from warrant affidavits." Madiwale, 117 F.3d at 1326. So, if an affidavit "contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit,'" a warrant may be invalidated. Id. at 1326-27 (quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)). "A party need not show by direct evidence that the affiant [made] an omission recklessly," because if "facts omitted from the affidavit are clearly critical to a finding of probable cause," then "recklessness may be inferred from proof of the omission itself." Id. at 1327 (quoting Martin, 615 F.2d at 329). On the other hand, "[o]missions that

are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." Id. (citations omitted). "Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. (citation omitted).

In examining the sufficiency of an affidavit based on information provided by an informant, "the informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." Gates, 462 U.S. at 230. These factors are to be "understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id. at 233 (citation omitted). Even if an affidavit omits felony convictions and "numerous bad acts" of an informant, if it contains other information that corroborates an informant's credibility, it is not so defective so as to be lacking in probable cause. Haimowitz, 706 F.2d at 1555. Indeed, if an "affidavit contains detailed, firsthand information that is specific in its allegations, and is therefore self-corroborating," the affidavit is "sufficient on its face to support [a] finding of probable cause by the [issuing judge]." Id. (quotation omitted).

### 3. Analysis

Defendant essentially challenges three aspects of the Affidavit: 1) the reliability of the information provided by the CS and the SOI; 2) the probative value of the information obtained from the recorded phone call; and 3) the legality of the footage obtained from the pole camera. Based on the previous finding regarding the legality of the pole camera, the inclusion of the pole camera evidence in the Affidavit does not render the search warrants

defective. The undersigned thus addresses the remaining challenges to the Affidavit below.

The Affidavit lacks impeachment information regarding the CS and the SOI. Specifically, the Affidavit does not contain any information regarding the SOI's relationship with Defendant, the relationship between the CS and the SOI, the payment to the CS, the CS's and the SOI's criminal histories, or the CS's alleged active involvement in the narcotics business during his time as a confidential source. All of this information, if known or reasonably attainable, goes directly to the credibility of the CS's and the SOI's respective statements, and as such, should have been included in the Affidavit.

As to the CS's alleged involvement in drug trafficking during his cooperation as a confidential source, Agent Yarborough testified he did not know whether the CS was selling narcotics. Tr. I at 12, 48. Given that the only evidence presented at the hearing regarding the CS's drug trafficking postdates the CS's cooperation, this is not information that would have been known to or reasonably attained by Agent Yarborough. It thus follows that the omission of the CS's alleged involvement in drug trafficking does not amount to an intentional omission of material information. In other words, Agent Yarborough could not have included information not known to him or about something that had not yet occurred.

The rest of the impeachment information, however, was known to Agent Yarborough and intentionally omitted and as such, requires further scrutiny. See Madiwale, 117 F.3d at 1326-27. Agent Yarborough essentially testified his practice is that if he thinks a source of information is credible, he does not include relevant impeachment information in his search warrant affidavits. See Tr. I at 71. He also indicated that it is not "normal

practice" to include information about a confidential source—such as whether he or she was paid—"for their protection." Tr. I at 74.[53]

The Affidavit also fails to set out the basis of knowledge of the CS and the SOI. This information goes directly to the reliability of the sources and should have been included. The Affidavit does not explain how the CS knew that Defendant was distributing multi-kilogram quantities of cocaine and heroin or that Defendant stored narcotics at Melissa Court. See Affidavit at 4. The Affidavit also fails to indicate how the CS and the SOI knew that Defendant moved his narcotics business to 204 Lane Avenue and 137 Lane Avenue, that the residences at 204 Lane Avenue and 137 Lane Avenue were used as points of sale for narcotics, that Defendant traveled to and from Melissa Court to 204 Lane Avenue and 137 Lane Avenue "to resupply the narcotics being sold and to pick up U.S. currency obtained from the sale of narcotics," and that Defendant used associates to drive him to and from these residences. See id. The Affidavit also makes no mention of how the CS and the SOI knew the identities of Defendant's associates who drove Defendant to and from the residences. See id.

Agent Yarborough's failure to set out in the Affidavit the basis of the CS's and the SOI's knowledge apparently was not inadvertent or by mistake because he was aware of how they knew about Defendant's illegal drug activity. See Madiwale, 117 F.3d at 1326-27. Agent Yarborough testified that the CS had seen multi-ounce quantities of narcotics at the Melissa Court residence and that the CS had purchased multi-ounce quantities of narcotics from Defendant. Tr. I at 87, 112. Agent Yarborough also stated that he believed

---

[53] The undersigned finds puzzling Agent Yarborough's reasoning that he omitted certain facts to protect the CS and the SOI. At the evidentiary hearing, Agent Yarborough identified the CS and the SOI by their respective names and referred to them by name throughout his testimony. See, e.g., Tr. I at 11-12, 18-20, 34, 39-42, 47, 49, 57, 71, 78, 83, 102-03, 120, 122-23.

the CS and the SOI had first-hand knowledge of the information they provided at the March 15, 2018 meeting. See Tr. I at 122-27. Specifically, Agent Yarborough testified that the CS and the SOI had both been to the relevant residences and that the SOI was deeply involved in Defendant's narcotics business. Tr. I at 122, 126. According to Agent Yarborough, the SOI explained in "great detail" Defendant's business and how the SOI would "break down dope." Tr. I at 122. Not including this information as to the basis of knowledge in the Affidavit suggests that Agent Yarborough has a fundamental misconception of the totality of information that should be included in a search warrant application. There is no evidence, however, that Agent Yarborough was trying to mislead Judge Arias by omitting the CS's and the SOI's basis of knowledge.[54]

As noted, Agent Yarborough's testimony regarding the March 15, 2018 meeting with the CS and the SOI created some confusion as to who provided what information. In the end, however, Agent Yarborough clarified that "[n]ot one person ha[d] more information than the other," Tr. I at 119, and that the CS and the SOI advised they both "had knowledge of everything listed in . . . [the A]ffidavit," Tr. I at 46.

Although the Affidavit does not include impeachment information about the SOI and the CS, and it does not set out the basis of knowledge of the CS and the SOI, the Affidavit nonetheless contains sufficient evidence that independently corroborates the sources' statements. See Haimowitz, 706 F.2d at 1555; Gates, 462 U.S. at 230, 233. Specifically, the Affidavit sets forth information obtained from the March 5, 2018 recorded phone call

---

[54] Although Defendant argues the Affidavit "lack[s] details regarding how and when . . . [Agent Yarborough] derived his knowledge," Reply at 6, he does not point to any specific "knowledge" that he alleges lacks detail. The Affidavit makes clear that Agent Yarborough acquired his knowledge from meetings with the CS and the SOI, the ping on Defendant's cellphone, his personal observations during physical and video surveillance, and observations made by and statements made to Trooper Earrey and Officer Oddinger.

between the CS and Defendant concerning illegal narcotics, a court-ordered ping on Defendant's cellphone, physical and video surveillance, and two traffic stops.

The recorded phone call corroborates the CS's statement that Defendant was selling narcotics and that the CS could purchase multi-ounce quantities of drugs from Defendant. Affidavit at 4. On its face, the Affidavit represents that the word "heroin" was used when the CS and Defendant were negotiating the drug deal. Agent Yarborough omitted from the Affidavit that during the phone call, Defendant and the CS used code words to refer to heroin, not the actual word "heroin." See Tr. I at 20-21. Although Agent Yarborough should have disclosed to Judge Arias that code words were used and that some of them were unusual, the omission of this information is immaterial. Had Agent Yarborough disclosed the use of code words and explained that based on his experience the code words referred to heroin, Judge Arias's conclusion that there was probable cause to issue the search warrants would not have changed. Accordingly, under the facts of this case, Agent Yarborough's failure to specify in the Affidavit that code words were used does not result in a lack of probable cause. In any event, even if all references to the phone conversation were excised from the Affidavit, the Affidavit contains sufficient evidence corroborating the CS's and the SOI's statements, as detailed below.

The Affidavit provides sufficient evidence corroborating that Defendant traveled to and from 204 Lane Avenue, 137 Lane Avenue, and Melissa Court, and that Defendant used drivers to do so. Affidavit at 4. The ping showed that Defendant traveled to all three locations. Id. at 5. Agent Yarborough also observed Defendant at these locations during the three days of physical surveillance (March 26 through March 28, 2018) after the service of Defendant's cellphone was terminated. Id. at 5-6. Each time Agent Yarborough

observed Defendant, Defendant was either arriving or departing in a vehicle driven by another individual. See id. at 5.

The Affidavit also contains evidence corroborating the CS's and the SOI's statement that Defendant used 204 Lane Avenue as a point of sale for narcotics. Id. at 4. While conducting physical surveillance on March 26, 2018, Agent Yarborough observed activity that, based on his training and experience, he believed showed narcotics were being sold at the 204 Lane Avenue residence. See id. at 5. Specifically, in the span of two hours, he saw "numerous" individuals arrive at 204 Lane Avenue, where they would be let in the residence by an occupant and where most of them remained for less than ten minutes. Id. On March 28, 2018, Agent Yarborough also observed a white male arrive at the 204 Lane Avenue residence and conduct a hand-to-hand transaction with two individuals. Id. at 6. Officer Hickox then saw the white male subject a short distance away from 204 Lane Avenue holding a syringe while placing a tourniquet on his arm. Id. After he was stopped by Officer Ottinger, the subject told Agent Yarborough and Officer Hickox that he had purchased heroin from an associate of Defendant. Id. Further, the next day, Trooper Earrey conducted a traffic stop of an individual leaving the 204 Lane Avenue residence and found narcotics in his vehicle. Id.

Agent Yarborough's various observations (via physical and video surveillance) of Defendant carrying packages and what, based on his training and experience, he believed to be U.S. currency to and from the three locations corroborate the CS's and the SOI's statements that Defendant traveled to the three residences to resupply and pick up money from narcotics sales. Id. at 4. While conducting physical surveillance on March 27, 2018, Agent Yarborough saw Defendant travel with a partially empty black plastic bag from 137

Lane Avenue to 204 Lane Avenue. Id. at 5. A little less than two hours later, Agent Yarborough saw Defendant arrive at Melissa Court with a "large object" that was concealed under a "cloth and packaging." Id. About a half hour later, Agent Yarborough observed Defendant leave the Melissa Court residence with a small box. Id. Later that day, Agent Yarborough saw Defendant return to Melissa Court as a passenger in a vehicle and observed the driver carrying a "small package" into the residence. Id. As to the video surveillance, the recordings showed Defendant transporting what Agent Yarborough believed to be money to Melissa Court and transporting other packages from Melissa Court to 204 Lane Avenue and 137 Lane Avenue. Id. at 6.

Lastly, the Affidavit contains information confirming the CS's and the SOI's statements identifying two of Defendant's associates in the drug business. Id. at 4. On March 28, 2018, Agent Yarborough saw the female associate leave 137 Lane Avenue with a white "package/envelope" and travel to 204 Lane Avenue with the male associate while carrying the "package/envelope." Id. at 5-6. Agent Yarborough observed that the female associate had a key that she used to enter the 204 Lane Avenue residence. Id. at 6. This information corroborated the CS's and the SOI's statements that these individuals were associates of Defendant.

In sum, although the Affidavit lacks information regarding the credibility and reliability of the CS and the SOI (including their basis of knowledge), the information obtained from the cellphone ping, the physical and video surveillance, and the traffic stops furnished independent corroboration of the sources' statements sufficient to establish probable cause to issue the search warrants. See Haimowitz, 706 F.2d at 1555; Gates, 462 U.S. at 233. The recorded phone call between Defendant and the CS provided further

corroboration of the CS's and the SOI's statements, but excising this evidence from the Affidavit would not render the search warrants unsupported by probable cause.[55]

## C. Second Motion – <u>Miranda</u>

### 1. Parties' Arguments

Defendant seeks to suppress the statements he made to law enforcement on April 27, 2018 before and after his arrest, including those made during the recorded call placed to Mr. Haynes at the DEA office. <u>See</u> Second Motion at 4, 6; Motion to Amend at 3. Specifically, Defendant argues that his pre-arrest statement regarding the location of his slides was made before he was read his <u>Miranda</u> rights and should be suppressed because it was part of a custodial interrogation. Motion to Amend at 3-4. As to his post-arrest statements, Defendant contends that although he was read his <u>Miranda</u> rights, he did not "knowingly, intelligently and voluntarily waive his [<u>Miranda</u>] rights . . . ." Second Motion at 6. According to Defendant, "he was not sure he understood his rights," and there is "no evidence that agents explained the rights or had Defendant sign a written waiver." <u>Id.</u>

Responding, the Government asserts that Defendant's statement regarding the slides was not part of a custodial interrogation and should thus not be suppressed under <u>Miranda</u>. Govt.'s Supp. Mem. at 1-2. As to Defendant's post-arrest statements, the Government contends that Defendant "did not say or do anything to suggest he did not

---

[55] The undersigned notes that although in this case Agent Yarborough's failure to include impeachment information and the CS's and the SOI's basis of knowledge does not render the search warrants defective, Agent Yarborough's practice in drafting affidavits is troublesome. It is an agent's duty to provide the issuing judge with all the information necessary to evaluate an application for a search warrant and determine the credibility and reliability of any informants or sources. This information should include the informant's or source's basis of knowledge and impeachment information, as well as the agent's opinion as to the reliability of the informant or source and facts to support the opinion.

understand his Miranda rights." Govt.'s Resp. at 42. The Government further asserts that the circumstances surrounding the questioning of Defendant were not coercive. See id. at 42-43.[56]

### 2. Applicable Law

The requirement that a confession be voluntary to be admitted into evidence is based on the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), the United States Supreme Court announced a "prophylactic" rule to protect against violations of the Self-Incrimination Clause. Withrow v. Williams, 507 U.S. 680, 690-91 (1993) (collecting cases); see also Dickerson, 530 U.S. at 437-38. Under Miranda, an individual taken into custody must be advised that "he has the right to remain silent, that any statement he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 478-79.

These Miranda warnings "must precede any 'custodial interrogation.'" Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (quoting Miranda, 384 U.S. at 444). "A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action." Id. (quoting Miranda, 384 U.S. at 444). Miranda warnings are not required, however, during "[g]eneral 'on-the-scene questioning,' . . . concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-

---

[56]     As noted, the Government does not address the validity of Defendant's Miranda waiver.

finding process . . . ." Id. (quoting Miranda, 384 U.S. at 477). Further, "[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . ." Miranda, 384 U.S. at 478.

Two distinct questions may arise in the context of a suspect's statements to the police: whether the suspect validly waived his or her Miranda rights; and whether the suspect's statements to the police were voluntary. See Dickerson, 530 U.S. at 444 (stating that the "requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" (dicta)).

A suspect may waive his or her Miranda rights, "provided that the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. Courts look to two areas of inquiry to determine whether a waiver of a suspect's constitutional rights was valid:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

Aside from the validity of a waiver of one's Miranda rights, due process requires that a confession be voluntary to be admitted at trial. See Colorado v. Connelly, 479 U.S. 157, 163 (1986). In assessing whether a confession is voluntary, courts look to the totality of the circumstances to determine "whether a defendant's will was overborne at the time he confessed," or whether the confession was the product of rational intellect and free will. Reck v. Pate, 367 U.S. 433, 440 (1961); see also Arizona v. Fulminante, 499 U.S. 279,

285-86 (1991); Connelly, 479 U.S. at 176-77. The inquiry typically focuses on police overreaching. Connelly, 479 U.S. at 163-64. Relevant factors include the defendant's age, the defendant's education, the defendant's intelligence, whether Miranda warnings were given, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The voluntariness inquiry with respect to confessions is highly similar, if not identical, to the inquiry into the voluntariness of a waiver of Miranda rights. Connelly, 479 U.S. at 169-70 (stating that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context"); United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (stating that courts "engage in the same inquiry when analyzing the voluntariness of a Miranda waiver as when analyzing the voluntariness of statements under the Due Process Clause" (citation omitted)).

### 3. Analysis

a. Statement Regarding Slides

Agent Mayer's question to Defendant about whether Defendant wanted any shoes was not a custodial interrogation within the meaning of Miranda. Although Defendant was arguably in custody, Agent Mayer's question was not designed to elicit an incriminating statement and was more akin to "on-the-scene questioning." Miranda, 384 U.S. at 477. Moreover, Defendant's statement identifying the location of the slides was a spontaneous volunteered statement as Agent Mayer asked Defendant only whether he wanted shoes; he did not ask him to specify the shoes that he wanted or their location. Id. at 478.

Accordingly, Defendant's statement that there was a pair of slides in the living room did not implicate <u>Miranda</u>.

### b. Statements at DEA Office

Before questioning Defendant at the DEA office, Agent Yarborough read Defendant his <u>Miranda</u> rights from a card issued by FDLE. Tr. III at 48-50. The advisement complied with the requirements of <u>Miranda</u>. After being read his <u>Miranda</u> rights, Defendant affirmatively indicated that he understood them and wished to cooperate. Tr. III at 51; Exhibit 14 (Doc. No. 30-2) at 3-4. Defendant did not have any questions about his <u>Miranda</u> rights, and he did not ask Agent Yarborough to clarify them. Tr. III at 70. Defendant never invoked his right to an attorney or his right to remain silent or end the interview. Tr. III at 71. Defendant was responsive to Agent Yarborough's questions, and he did not appear to be under the influence of drugs, alcohol, or any intoxicant. Tr. III at 69-70. Agent Yarborough was able to understand Defendant "very clearly." Tr. III at 70. Defendant's decision to waive his <u>Miranda</u> rights was not a result of coercion, intimidation, or deception.

After waiving his <u>Miranda</u> rights and agreeing to speak with Agent Yarborough and Trooper Earrey, Defendant admitted that he owned the cigar box and the narcotics found inside the cigar box, except for the heroin. Tr. III at 63; Exhibit 14 (Doc. No. 30-2) at 4. Defendant also made a recorded call during which he negotiated the price of three kilograms of cocaine. <u>See</u> Tr. III at 60-61. Although Defendant's interview as a whole lasted about four hours, some of that time was spent making phone calls and waiting for Mr. Johnson and Mr. Haynes to call back Defendant. Tr. III at 64-65.

Under the circumstances, the undersigned finds that Defendant knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights. Moreover, although Defendant does

not argue that overall his statements were involuntary and instead focuses on the validity of the waiver, the undersigned nonetheless finds that in light of the totality of the circumstances (including Defendant's age; prior involvement with law enforcement; and the absence of any threats, coercion, or physical punishment), Defendant's post-arrest statements were voluntary.

## D. Second Motion – Warrantless Arrest

### 1. Parties' Arguments

Defendant argues that because law enforcement did not have probable cause to arrest him, all statements made at the DEA office, including those made during the recorded phone call with Mr. Haynes, should be suppressed as fruit of the poisonous tree. Second Motion at 4-6. Defendant initially argues his arrest was unlawful because it "arose out of evidence" seized during the execution of search warrants that were not supported by probable cause. Id. at 4. Defendant alternatively contends that "[e]ven if the Court finds there was probable cause to issue the warrant for the [204] Lane Avenue premises, and the [204] Lane Avenue search was lawful, the agents still did not have probable cause to arrest Defendant." Id. Specifically, Defendant asserts that: 1) the information supplied by the CS and the SOI did not provide the requisite probable cause because the sources "were not reliable"; 2) the agents' observations "gave rise to nothing more than suspicions"; and 3) the items seized during the execution of the search warrants also failed to supply probable cause because "there were approximately 10 people present in the [204] Lane Avenue premises, and neither Defendant nor any of the others were in proximity to the cigar box when agents conducted the search." Id. at 4-5.

Responding, the Government argues that "[a]t the time of [D]efendant's arrest, whether it was before [D]efendant left the 204 Lane Avenue residence or once he got to the DEA office, there was evidence that he was engaged in drug trafficking." Govt.'s Resp. at 38. The Government asserts that prior to the execution of the search warrants, Agent Yarborough had probable cause through "the controlled phone call with [D]efendant about the sale of an ounce of heroin, surveillance of [D]efendant traveling with the cigar box in between the two residences, take-aways involving two people leaving the 204 Lane Avenue [residence] and being found with narcotics, and the interview of [Ms. Newman], a heroin user." Id. The Government further contends that "the items located during the search of the 204 Lane Avenue and Melissa Court residences provided additional bases for probable cause to arrest the defendant." Id. at 38-39.

### 2. Applicable Law

Probable cause to arrest exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Wilkerson v. Seymour, 736 F.3d 974, 978 (11th Cir. 2013) (citation omitted). "Probable cause determinations traditionally have been guided by reviewing the totality of the circumstances." United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992) (citing Gates, 462 U.S. at 233). The "arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citation omitted).

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974) (citation omitted). The exclusionary rule applies "not only [to] primary evidence obtained as a direct result of an illegal search or seizure, but also [to] evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (citations omitted).

### 3. Analysis

As an initial matter, the undersigned finds that Defendant was effectively under arrest once he was placed in the JSO cruiser at the 204 Lane Avenue residence to be transported to the DEA office.

Defendant's post-arrest statements are not due to be suppressed because Defendant's arrest was lawful. The information obtained prior to the execution of the search warrants (set out in detail above) provided law enforcement with the requisite probable cause to believe Defendant had committed or was committing a narcotics offense. In addition, the items found at the 204 Lane Avenue and Melissa Court residences further strengthened the probable cause determination.

At the Melissa Court residence, law enforcement found a digital scale, a respirator mask, a box of rubber gloves, an empty bottle of "super mannitol," a narcotics packaging press, a hydraulic press with cocaine residue, and three glass vials with cocaine residue. Tr. III at 43. The mask and rubber gloves were found in the master bedroom where Defendant slept. See Tr. III at 103, 118. At 204 Lane Avenue, law enforcement located a cigar box that contained crack cocaine, heroin, a digital scale, and other drug

paraphernalia; a bag with heroin; "circles of crack cocaine"; glass beakers; and a kitchen whisk with residue. Tr. III at 105. Further, when the search warrants were executed, Defendant had about $4,000 in his pocket. Tr. III at 20-21.

Although there were nine individuals besides Defendant present at 204 Lane Avenue and five individuals (including an infant) besides Defendant who resided at Melissa Court, the information obtained prior to the execution of the warrants provided probable cause to believe that Defendant was connected to the incriminating items found at the residences so as to reasonably believe Defendant was committing or had committed a narcotics offense. The CS and the SOI specifically indicated that Defendant was distributing narcotics, and during the recorded phone call, Defendant agreed to sell the CS heroin. Affidavit at 4. The CS's and the SOI's statements were corroborated by law enforcement. Agent Yarborough personally observed Defendant traveling to and from the different residences while carrying packages and what Agent Yarborough believed to be U.S. currency. Id. at 5-6. Indeed, Agent Yarborough had seen Defendant transporting a wooden cigar box to and from 204 Lane Avenue and Melissa Court. Tr. III at 104-05. Agent Yarborough believed the cigar box that was found at 204 Lane Avenue was the same one he had seen Defendant transporting. Tr. III at 105. Agent Yarborough also observed Defendant produce a key to unlock the door to the 204 Lane Avenue residence. Affidavit at 5. The two individuals who were stopped after leaving 204 Lane Avenue were both found in possession of narcotics. See id. at 6; Tr. III at 92-94. One of these individuals stated that Defendant sold heroin and had a cartel connection. Affidavit at 6; Tr. III at 93. Further, Ms. Newman indicated to Officer Oddinger that Defendant sold large amounts of

heroin and other narcotics, that he "operated" at 204 Lane Avenue, and that she knew this because she was a heroin addict. Tr. III at 95-96.

In sum, based on the totality of the circumstances, law enforcement had probable cause to arrest Defendant without a warrant. Given that the arrest was lawful, Defendant's subsequent statements were not tainted, and his fruit-of-the-poisonous tree argument fails.

## V. Conclusion

After due consideration, it is

**RECOMMENDED**:

That the Motion to Suppress (Doc. No. 19) and the Supplemental Motion to Suppress Evidence (Doc. No. 26), as amended by the Order (Doc. No. 45), be **DENIED**.

**RESPECTFULLY RECOMMENDED** in Jacksonville, Florida on May 18, 2020.

James R. Klindt
**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies to:

Honorable Marcia Morales Howard
United States District Judge

Assistant U.S. Attorney (Washington)
James Kerr Crain Glober, Esquire